Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

Northern District of California ☐ ▾

Federal Division

**FILED**

**JUN 07 2021**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

Christina Marie Goerss

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. **CV 21 - 4485**

*(to be filled in by the Clerk's Office)*

**RMI**

Jury Trial: *(check one)*  ☐ Yes  ☑ No

_____
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

Pacific Gas and Electric Company

_____
*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Christina Marie Goerss |
| Street Address | 1565 Anderson Ave |
| City and County | McKinleyville, Humboldt |
| State and Zip Code | California  95519 |
| Telephone Number | 707-264-1075 |
| E-mail Address | powergirl11@att.net |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

|  |  |
|---|---|
| Name | Daniel Campbell |
| Job or Title *(if known)* | Unknown |
| Street Address | Unknown |
| City and County | Hydesville, Humboldt |
| State and Zip Code | CA |
| Telephone Number | (707) 787-7802 |
| E-mail Address *(if known)* | Unknown |

Defendant No. 2

|  |  |
|---|---|
| Name | Ryan Harriman |
| Job or Title *(if known)* | Gas Service Representative |
| Street Address | Unknown |
| City and County | Santa Rosa, Sonoma |
| State and Zip Code | CA  Unknown |
| Telephone Number | (707) 494-6499 |
| E-mail Address *(if known)* | Unknown |

Defendant No. 3

|  |  |
|---|---|
| Name | Donnie Humphreys |
| Job or Title *(if known)* | Manager |
| Street Address | Unknown |
| City and County | Santa Rosa, Sonoma |
| State and Zip Code | CA  Unknown |
| Telephone Number |  |
| E-mail Address *(if known)* | Unknown |

Defendant No. 4

|  |  |
|---|---|
| Name | Paula Jean |
| Job or Title *(if known)* | Senior Professional in Human Resources |
| Street Address | Unknown |
| City and County | Unknown |
| State and Zip Code | CA Unknown |
| Telephone Number | (408) 493-3013 |
| E-mail Address *(if known)* | Unknown |

**C.    Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Pacific Gas and Electric Company |
| Street Address | 2475 Myrtle Ave |
| City and County | Eureka, Humboldt |
| State and Zip Code | CA  95501 |
| Telephone Number | (707) 444-1426 |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑    Other federal law *(specify the federal law)*:

USC02, Title 42, Chapter 126 §12111, 12132, 12203(a)

☑    Relevant state law *(specify, if known)*:

SB-1300

☐    Relevant city or county law *(specify, if known)*:

Unknown

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☐ Termination of my employment.
- ☐ Failure to promote me.
- ☑ Failure to accommodate my disability.
- ☑ Unequal terms and conditions of my employment.
- ☑ Retaliation.
- ☑ Other acts *(specify)*:   Hostile Work Environment/Harrassment/Intimidation/Retaliation

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.   It is my best recollection that the alleged discriminatory acts occurred on date(s)

October 29, 2018, November 29, 2018, December 11, 2018, January 7, 2018, February 26, 2019, etc.

C.   I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☑ is/are not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☐ race _____
- ☐ color _____
- ☐ gender/sex _____
- ☐ religion _____
- ☐ national origin _____
- ☐ age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*
- ☑ disability or perceived disability *(specify disability)*

Post Traumatic Stress Disorder (documented)

E.   The facts of my case are as follows.  Attach additional pages if needed.

(See Attached Statement of Facts)

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.   Exhaustion of Federal Administrative Remedies

A.      It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

Inquiry Case Number: 550-2019-01879 (filing date unknown) was dismissed by Malinda Tuazon on October 22, 2019 and review request denied by Bryan Hoss Intake Supervisor on January 24, 2020.

B.      The Equal Employment Opportunity Commission *(check one)*:

☐      has not issued a Notice of Right to Sue letter.

☑      issued a Notice of Right to Sue letter, which I received on *(date)*                              .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.      Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐      60 days or more have elapsed.

☐      less than 60 days have elapsed.

## V.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Restoration (or equivalent) to position enjoyed before discrimination took place.
Compensatory and Punitive Damages
Recovery of attorney fees, expert witness fees and court costs

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:     6/4/2021

Signature of Plaintiff

Printed Name of Plaintiff     CHRISTINA GOERSS

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency _____ GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

KEVIN KISH, DIRECTOR

January 8, 2020

Christina Goerss
1565 Anderson Ave
McKinleyville, California 95519

RE:   **Notice to Complainant**
DFEH Matter Number: 202001-08822408
Right to Sue: Goerss / Pacific Gas and Electric Company

Dear Christina Goerss:

Attached is a copy of your **amended** complaint of discrimination filed with the
Department of Fair Employment and Housing (DFEH) pursuant to the California Fair
Employment and Housing Act, Government Code section 12900 et seq.

Pursuant to Government Code section 12962, DFEH will not serve these documents on
the employer.  You or your attorney must serve the complaint.  If you do not have an
attorney, you must serve the complaint yourself.

The amended complaint is deemed to have the same filing date of the original
complaint.  This is not a new Right to Sue letter.  The original Notice of Case Closure
and Right to Sue issued in this case remains the only such notice provided by the
DFEH.  (Cal. Code Regs., tit. 2, § 10022.)

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Department of Fair Employment and Housing

1
2
3

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

4

**In the Matter of the Complaint of**

5    Christina Goerss                                    DFEH No. 202001-08822408

6                                        Complainant,

7    vs.

8    Pacific Gas and Electric Company
     2475 Myrtle Ave
9    Eureka, California 95501

10
     Ryan Harriman
11   Santa Rosa, California

12                                      Respondents

13   _____

14   1. Respondent **Pacific Gas and Electric Company**  is an **employer** subject to suit
     under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900
15   et seq.).

16   2. Complainant **Christina Goerss**, resides in the City of **McKinleyville** State of
     **California.**
17

18   3. Complainant alleges that on or about **March 27, 2019**, respondent took the
     following adverse actions:
19

20   **Complainant was harassed** because of complainant's sex/gender, disability
     (physical or mental), age (40 and over), other, sexual harassment- hostile
21   environment.

22   **Complainant was discriminated against** because of complainant's sex/gender,
     disability (physical or mental), age (40 and over), other, sexual harassment- hostile
23   environment and as a result of the discrimination was reprimanded, denied any
     employment benefit or privilege, denied reasonable accommodation for a disability,
24   other.

25

26

27                                          -1-
                          *Complaint – DFEH No. 202001-08822408*

28   Date Filed: January 8, 2020
     Date Amended: January 8, 2020

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, participated as a witness in a discrimination or harassment complaint, requested or used leave under the california family rights act or fmla (employers of 50 or more people) and as a result was reprimanded, denied any employment benefit or privilege, denied reasonable accommodation for a disability, other.

**Additional Complaint Details:** I requested reasonable accommodations multiple times when my disability inadvertently became known to management in October 2018 and the harassment began. I made four requests for reasonable accommodation total, two to each front-line supervisor. Both supervisors ignored my requests for accommodation and did not enter into a "good faith" conversation with me around my disability. Instead they did the complete opposite, I was relentlessly harassed by Ryan Harriman on and off the job for four months straight while I was trying to negotiate acute symptoms of PTSD and maintain work/life balance. I finally collapsed at the end of my workday on February 26, 2019. After being unfairly targeted for discipline at the beginning of my workday on February 26, 2019. I ultimately suffered a nervous breakdown as a result of years of trauma and abuse imposed on me by my employer. I have been suffering the consequences of speaking up against unwanted touching since 2014, that occurred when I worked in Human Resources. On March 27, 2019, Dan Campbell called me and threatened me with further aggressive action such as "issuing fit for duty" and suggested I "get another job". This triggered an additional month of aggravated symptoms and recessed my condition back to symptoms similar to the initial breakdown. I have been out on disability since February 2019. I have an expert medical witness willing to testify on my behalf and I have documentation to show motive for harassment and retaliation. As well as documentation showing I was engaging all available avenues of support available to me and was experiencing multiple system failures instead of results. My employer is one the largest employers in California, and I have evidence to show this is a culture issue and should be addressed as such. This is not a one-time incident being reported by a hysterical female. My employer is currently on federal probation for criminal negligence and may be persecuted for possible manslaughter. I have filed an inquiry with the EEOC (Case # 550-2019-01879). They refuse to move forward with an investigation and have instead referred me back to my abusers.

Date Filed: January 8, 2020
Date Amended: January 8, 2020

VERIFICATION

I, **Christina M Goerss**, am the **Complainant** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On January 8, 2020, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**McKinleyville, CA**

-3-
*Complaint – DFEH No. 202001-08822408*

Date Filed: January 8, 2020
Date Amended: January 8, 2020

| | | |
|---|---|---|
| 1 | Your Name: | Christina Marie Goerss |
| 2 | Address: | 1565 Anderson Avenue |
| 3 | Phone Number: | (707) 683-5143 |
| 4 | Fax Number: | Not Applicable |
| 5 | E-mail Address: | powergirl11@att.net |
| 6 | Pro Se Plaintiff | |

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christina Marie Goerss | Case Number   *[leave blank]* |
| | |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| Pacific Gas and Electric Company | |
| Daniel Campbell | DEMAND FOR JURY TRIAL |
| Ryan Harriman | Yes [ ]   No [✔] |
| Donnie Humphrey | |
| Defendant. | |

**PARTIES**

1. Plaintiff. [*Write your name, address, and phone number. Add a page for additional plaintiffs.*]

| | |
|---|---|
| Name: | Christina Marie Goerss |
| Address: | 1565 Anderson Avenue |
| Telephone: | (707) 683-5143 |

COMPLAINT
PAGE 1 OF 12 *[JDC TEMPLATE – Rev. 05/2017]*

1

2. Defendants. [*Write each defendant's full name, address, and phone number.*]

2

Defendant 1:

3

| Name: | Daniel Campbell |

4

| Address: | Hydesville, CA |

5

| Telephone: | (707) 787-7802 |

6

7

Defendant 2:

8

| Name: | Ryan Harriman |

9

| Address: | Santa Rosa, CA |

10

| Telephone: | (707) 494-6499 |

11

12

Defendant 3:

13

| Name: | Donnie Humphrey |

14

| Address: | Santa Rosa, CA |

15

| Telephone: | Unknown |

16

17

**JURISDICTION**

18

[*Usually only two types of cases can be filed in federal court, cases involving "federal questions" and cases involving "diversity of citizenship." Check at least one box.*]

19

3.  My case belongs in federal court

20

☑ under <u>federal question jurisdiction</u> because it is involves a federal law or right.

21

[*Which federal law or right is involved?*] Title VII of the Civil Rights Act of 1964, 42 U.S.C.

22

Section 2000e to 2000c-17, Americans with Disabilities Act, USC02, Title 42, Ch. 126 .

23

☐ under <u>diversity jurisdiction</u> because none of the plaintiffs live in the same state as any of the

24

defendants <u>and</u> the amount of damages is more than $75,000.

25

26

27

28

COMPLAINT

PAGE <u>2</u> OF <u>12</u> *[JDC TEMPLATE – Rev. 05/2017]*

## VENUE

[*The counties in this District are: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo, or Sonoma. If one of the venue options below applies to your case, this District Court is the correct place to file your lawsuit. Check the box for each venue option that applies.*]

    4.    Venue is appropriate in this Court because:

        [✔] a substantial part of the events I am suing about happened in this district.

        [ ] a substantial part of the property I am suing about is located in this district.

        [ ] I am suing the U.S. government, federal agency, or federal official in his or her

           official capacity <u>and</u> I live in this district.

        [✔] at least one defendant is located in this District and any other defendants are

           located in California.

## INTRADISTRICT ASSIGNMENT

[*This District has three divisions: (1) San Francisco/Oakland (2) San Jose; and (3) Eureka. First write in the county in which the events you are suing about happened, and then match it to the correct division. The San Francisco/Oakland division covers Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, and Sonoma counties. The San Jose division covers Monterey, San Benito, Santa Clara, Santa Cruz counties. The Eureka division covers Del Norte, Humboldt, Lake, Mendocino counties, only if all parties consent to a magistrate judge.*]

    5.    Because this lawsuit arose in <u>Humboldt</u> County, it should be assigned to the <u>Eureka</u> Division of this Court.

## STATEMENT OF FACTS

[*Write a short and simple description of the facts of your case. Include basic details such as <u>where</u> the events happened, <u>when</u> things happened and <u>who</u> was involved. Put each fact into a separate, numbered paragraph, starting with paragraph number 6. Use more pages as needed.*]

    1    I have been an employee of Pacific Gas and Electric Company since May 5, 2003. My last held position was Gas Service Representative (GSR). My immediate supervisors at the time of the events in the following complaint were Ryan Harriman and Daniel Campbell. Their immediate supervisor was Donnie Humphrey, Customer Field Service Manager.

- 4 -

2. Ryan Harriman was the front-line supervisor (upgrade) when I had a panic attack at work that ended my workday early on October 16, 2018. I shared some of my personal health information with Ryan Harriman relating to my disability in an attempt to humanize the situation. Ryan seemed sympathetic at the time, but his harrassment started almost immediately after he witnessed my panic attack.

3. I explained to Ryan Harriman several times that I was struggling with PTSD symptoms and that I was seeking help. I made the specific request for open and honest communication around my work performance when Mr. Harriman began the harrassment. I specified that the accomodation I was requesting was actually long standing company policy and therefore not a hardship at all.

4. Ryan Harriman denied me the opportunity of a good faith conversation. He instead exploited my disability by stressing a "hard trigger" of "financial insecurity" that I revealed to him when the harrassment began. I was requesting due process and constructive feedback rather than gossiping, sneaking around and micromanaging my work and second shift schedule.

5. There is nothing in my record that warranted the elevated level of attention Mr. Harriman insisted on paying me. It was quite the opposite. I enjoyed an elevated and celebrated career with my employer before the public onset of my PTSD symptoms. I had just come from the premeire gas academy where I was chosen to be the first female in the history of Gas Operations to qualify to be a Senior Technical Instructor.

6. I explained to Ryan Harriman that my disability made me hyper-vigilant. I told him I saw his constant interference and the rumors he stoked to be threats to my livelihood. I identified such a threat as a "hard trigger". I explained to him that I was working with EAP to find care and that I was having trouble finding a provider. But, that I was working hard to get the help I needed.

//

//

COMPLAINT
PAGE 4 OF 12 *[JDC TEMPLATE – Rev. 05/2017]*

- 5 -

## CLAIMS

### First Claim

(*Name the law or right violated*: Title I of the Americans with Disabilities Act of 1990 )

(*Name the defendants who violated it*: Daniel Campbell, Ryan Harriman, Donnie Humphrey )

[*Explain briefly here <u>what</u> the law is, <u>what each</u> defendant did to violate it, and <u>how</u> you were harmed. You do not need to make legal arguments. You can refer back to your statement of facts.*]

1. On October 29, 2018, 1:05 PM, I received a phone call from Ryan Harriman at the beginning of my shift. He explained to me that it was "time for my negative huddle call". This was the first time I attempted good faith with Mr. Harriman. I explained to him that my PTSD creates hypervigilance that requires me to manage my stress loads and safety.

2. On November 1, 2018, during a social phone call with a fellow employee it was made known to me that Mr. Harriman was having a side bar conversation with others about my work performance. I addressed it with Mr. Harriman by calling him and requesting again that he provide open and honest communication and keep my PHI private.

3. On January 10, 2019 at approximately 6:00 PM, Daniel Campbell met me on a job and we had a talk afterward about my disability. It was at this time that I revealed to Daniel Campbell that I had PTSD and that I need "open and honest communication" regarding my work performance. I also requested his intervention with Ryan Harriman.

4. February 26, 2019, 1:05 PM, I was pulled into the office by Daniel Campbell for a "Coaching and Counseling" session, the first step in the positive discipline process. Mr. Campbell did not follow the precedural steps outlined in IBEW Letter of Agreement No. 87-189 PGE. He was not prepared and did not document the event.

5. June 22, 2020 10:21 AM, I received a voicemail from Lisa Green, newly hired front-line supervisor from Santa Rosa stating I was "leaving the company" per "Donnie Humphrey". The next day I was confronted by Sandra Mendoza, Office Clerk, threatening a "Code of Conduct" by "Corporate Security" if I didn't "turn over my company assets".

//

COMPLAINT
PAGE 5 OF 12 *[JDC TEMPLATE - 05/17]*

1  <u>Second</u>                      **Claim**

2  (*Name the law or right violated*): Title VII of the Civil Rights Act, SEC. 2000e-2. [703], a-2

3  (*Name the defendants who violated it*): Daniel Campbell, Ryan Harriman, Donnie Humphrey

4  <u>1</u> . Daniel Campbell denied my requests for open and honest communication and

5  used my medical information against me to target and intimidate me. Mr. Campbell used

6  the threat of positive discipline without following proper procedure and triggered a

7  career-ending psychiatric injury in me. He threatened me post injury on March 27, 2019.

8  <u>2</u> . Ryan Harriman singled me out and relentlessly harrassed me, questioned my

9  performance, treated me as if I was untrustworthy and inferior even though I identified as

10  disabled mulitple times and requested accomodation multiple times. His actions were

11  paramount in my ultimate collapse and I have experienced very physical symptoms since.

12  <u>3</u> . Donnie Humphrey vicariously threatened me with a "Code of Conduct" from

13  "Corporate Security" while soundly ignoring his own due diligence in regard to my disability

14  and his direct reports. Instead of insisting on a proper investigation upon my injury (as is

15  company policy), he instead covered for and enabled my abusers.

16  <u>4</u> . Paula Jean, as a representative of Compliance and Ethics is under obligation

17  investigate and address allegations of discrimination, harrassment, hostile work evironment

18  and retaliation. Ms. Jean has not only ignored this responsibility, she has stonewalled the

19  process and refused to address my requests for a proper investigation.

20  <u>5</u> . Roberta Pena, as a representative of Integrated Disabilty Mangament Services

21  is under obligation to investigate and resolve my claim of injury. Ms. Pena ignored the two

22  inch ream of documentation I provided to prove the occupational injury I sustained. She

23  refused to perform a proper investigation or consult with my attending clinician.

24  <u>6</u> . PG&E has been tasked by the CPUC to address this exact behavior due to the

25  fact that they are under federal probation for the San Bruno incident for which I was a local

26  first responder and safety advocate. This systemic stigma and discrimination is directly

27  antithetic to the charge placed before them by the federal court system and its affiliates.

28

1

**Third** _____ **Claim**

(*Name the law or right violated*: USC02, Title 42, Chapter 126, §12112                                                )

(*Name the defendants who violated it*: Donnie Humphrey and Roberta Pena                                   )

1. Donnie Humphrey vicariously threatened me with a "Code of Conduct" from "Corporate Security" while soundly ignoring his own due diligence in regard to my disability and his direct reports. Instead of insisting on a proper investigation upon my injury (as is company policy), he instead covered for and enabled my abusers.

2. Donnie Humphrey knew that I had been injured and that I had filed for Worker's Compensation. He was interviewed regarding the events around my injury. Directly after that interview, Donnie Humphrey directed first Lisa Green, out of area front line supervisor and then Sandra Mendoza, Office Clerk to collect my company assets.

3. I never gave Donnie Humphrey permission to release my personal health information to anyone. Lisa Green is not my supervisor and Sandra Mendoza is not even in management. Mr. Humphrey told Ms. Green, whom with I have worked with in safety for years that I was "leaving the company". If I was not being discharged, this is slander.

4. Paula Jean, a representative of Compliance and Ethics provided written notice that "any issue involving an alleged occupational injury, must be resolved as part of [my] Worker's Compensation claim process and would not be included in any misconduct investigation."

5. Roberta Pena, as a representative of Integrated Disabilty Mangament Services ignored obligation to investigate and resolve my claim of injury. Ms. Pena ignored the two inch ream of documentation I provided to prove the occupational injury I sustained. She refused to perform a proper investigation or consult with my attending clinician.

6. PG&E has been tasked by the CPUC to address this exact behavior due to the fact that they are under federal probation for the San Bruno incident for which I was a local first responder and safety advocate. This systemic stigma and discrimination is directly antithetic to the charge placed before them by the federal court system and its affiliates.

COMPLAINT

PAGE 7 OF 12 *(JDC TEMPLATE -- 05/17)*

## Fourth                              Claim

(*Name the law or right violated*: USC02, Title 42, Chapter 126, §12132                                    )

(*Name the defendants who violated it*: Daniel Campbell, Ryan Harriman, Donnie Humphrey  )

1 . On February 26, 2021, during the "Coaching and Counseling" session, I revealed my disability to Daniel Campbell and told him that I was seeking help but having trouble finding a provider in the area. Daniel Campbell did not enlist or offer help from any of the known company resources such as EAP or the Reasonable Accomodations team.

2 . On March 27, 2019 at 2:44 PM, Daniel made a 22 minute phone call to me directly while I was on FMLA. During this call he threatened me with a "Fit for Duty". He also threatened to "pull my file" and suggested I "change my shift" or "just get another job". I experienced deep physical symptomology relapse after receiving this phone call.

3 . On November 1, 2018, I told Ryan Harriman that I was seeking help for my symptoms of PTSD. I told him I was working with EAP to access care for my acute symptomology and that I was having trouble finding care in the area. I asked him for accomodation in the meantime and instead he relentlessly pursued me until I collapsed.

4 . On April 24, 2020 at 11:27 AM, I received an email from Paula Jean, after alerting her upline, stating that "any new allegations will be sent to an external investigator for investigation" and that "any issue involving an alleged occupational injury must be resolved as part of [my] Worker's Compensation claim process and would not be investigate

5 . On October 29, 2020, a Notice of Compainant of Investigation Completion was sent to my residence. The written notification claimed that the investigation was unable to corroborate the allegations made. The notice also claimed that I was interviewed during the course of the investigation, but that is not true.

6 . On November 29, 2018, the CPUC ordered PG&E to implement the safety recommendations of CPUC staff as outlined in a report by an independent third-party that originated through the Safety Culture proceeding. The behavior outlined in my complaint demonstrates the exact "Culture of Entitlement" that legal exper Scott Hempling speaks to.

Fifth _____ **Claim**

(*Name the law or right violated*: USC02, Title 42, Chapter 126, §12203(a) )

(*Name the defendants who violated it*: Daniel Campbell, Donnie Humphrey )

1. On February 26, 2021, Daniel Campbell used the threat of a "Coaching and Counseling" session to intimidate me after my report of the sexual harrassment against me by Ryan Harriman. I had specifically asked for open and honest communication as an accomodation for my disability, but my request was ignored and intimidation tactics enlisted

2. On March 27, 2019 at 2:44 PM, Daniel Campbell made a 22 min phone call to me while I was on FMLA. During this call he threatened me with a "Fit for Duty". He also threatened to "pull my file" and suggested I "change my shift" or "just get another job". I experienced deep physical symptomology relapse after receiving this phone call.

3. On November 1, 2018, I told Ryan Harriman that I was seeking help for my symptoms of PTSD. I told him I was working with EAP to access care for my acute symptomology and that I was having trouble finding care in the area. I asked him for accomodation in the meantime and instead he relentlessly pursued me until I collapsed.

4. On March 22, 2020, Donnie Humprey was interviewed regarding my claim of occupational injury. Mr. Humphrey did not request or perform an investigation into the claims I was making. Mr. Humphrey failed to comply to company safety obligations that require a safety investigation be performed to determine "root cause" of injury.

5. On June 22, 2020, Donnie Humphrey used his power and influence to vicariously threaten me with a "Code of Conduct" from "Corporate Security" if I did not release my company assets. This is a direliction of duty and an attempt to cover up the crimes committed under his watch. I have the voicemail recording available upon request.

6. On November 29, 2018, the CPUC ordered PG&E to implement the safety recommendations of CPUC staff as outlined in a report by an independent third-party that originated through the Safety Culture proceeding. The behavior outlined in my complaint demonstrates the exact "Culture of Entitlement" that legal exper Scott Hempling speaks to.

**DEMAND FOR RELIEF**

*[State what you want the Court to do. Depending on your claims, you may ask the Court to award you money or order the defendant to do something or stop doing something. If you are asking for money, you can say how much you are asking for and why you should get that amount, or describe the different kinds of harm caused by the defendant.]*

1. Before my injury, I enjoyed a very high status in Customer Field Services and the company at large. I was popular because I led by example. My annual reviews reflected my strong work ethic and high standard of service to the company. My pristine safety record reflected my commitment to safety, reliability and affordiblity. I did everything I could to alert those around me of the medical crisis I was experiencing but my pleas not only fell on deaf ears, they fell on the ears of predators. My livelihood has been "raped" from me (according to my expert witness, Dr. Robin Nolan) and my abusers have freed their budgets from my pension burden and my second shift differential. My life has been completely dismantled to to appease my abusers narcissism and hunger for postion. I have suffered greatly physically, emotionallly and spiritually. I am seeking full restoration.

**DEMAND FOR JURY TRIAL**

*[Check this box if you want your case to be decided by a jury, instead of a judge, if allowed.]*

☐ Plaintiff demands a jury trial on all issues.

Respectfully submitted,

Date: 6/4/2021

Sign Name: _Goerss_

Print Name: CHRISTINA M. GOERSS

COMPLAINT
PAGE 10 OF 12 *[JDC TEMPLATE – 05/17]*

*[Copy this page and insert it where you need additional space.]*

1. Regarding Statutes of Limitations: I am aware that I am outside of the statutes that require a response within 90 days of a Notice of Right to Sue from the EEOC. If it pleases the court: before I contacted the EEOC to inquire on a right to sue letter, I had already received a right to sue letter from the Department of Fair Employment and Housing.That letter is dated January 8, 2020 (see attached). This letter has been my target as it was my first filed; making the EEOC right to sue redundant (see attached email).

2. As I read, "Civil Practice and Procedure: Tolling of Statutes of Limitations in Response to COVID-19 Pandemic", it appears that the statutes have been tolled for six months to protect parties who have a civil cause of action that accrued before or during the COVID-19 pandemic". I am hoping that means that the new date for limitation would be June 8, 2021; which I am trying to honor in this circumstance with a mailing date of June 4, 2021.

3. I can provide a written assessment from my attending clinician, Dr. Robin Nolan (upon request) to attest to my state of mental competency during the time frame in question. I have worked very hard over the course of my lifetime disability to achieve wholeness and good health in mind, body and spirit. Dr. Nolan has been an integral part of my recovery from psychiatric injury. Had I received her care when I was pleading for in March of 2017, the vital resources of the court would not have been necessary.

4. I am filing with the federal court division not just because of jurisdiction but because I am deeply concerned with the direction the company is unapologetically taking. As a long standing safety steward, who was well respected in her trade, I am attempting to raise alarm to a systemic issue that, for the sake of California and its residence, MUST be addressed. I have attached a document I produced for my Worker's Compensation claim that sums up my concerns in the proper context (see attached).

5. Pacific Gas and Electric Company places far too much responsibility on the shoulders of its first responders, to not support them when they stumble. On behalf of my brothers and sisters in the field, I implore the court to move forward with this complaint.

- 8 -

*[Copy this page and insert it where you need additional space.]*

1. Additional Defendant for Second Claim - Title VII of the Civil Rights Act, SEC. 2000e-2. [703], a-2. Defendant 4: Paula Jean at 111 Almaden Blvd, P.O. Box 15005, San Jose, CA  95115-0005, (408) 493-3013.

2. Additional Defendant for Second Claim - Title VII of the Civil Rights Act, SEC. 2000e-2. [703], a-2. Defendant 5: Roberta Pena at P.O. Box 7779, San Francisco, CA 94120-7779.

3. Additional Defendant for Third Claim - USC02; Title 42, Chapter 126, §12112 Defendant 5: Roberta Pena at P.O. Box 7779, San Francisco, CA  94120-7779.

COMPLAINT

PAGE 12 OF 12 *[JDC TEMPLATE – 05/17]*

## Evidence Table of Content:

General Claim
- Grievance document from Value Options of California and response, dated June 7, 2019

First Claim
- IBEW Letter of Agreement No. 87-189 PGE
- Corporate Security Threat Voicemail recording screenshot, June 22, 2020

Second Claim
- Corporate Responsibility and Sustainability Report 2020
- Correspondence with Compliance and Ethics Dept, dated November 5, 2020
- Page 33 of QME Report from Dr. Andrea R. Bates, MD, received August 25, 2020
- Witness Testimony from Roberta Pena, dated June 18, 2020 (red-lined and annotated)
- Correspondence with Roberta Pena, dated May 27, 2020
- Press Release from November 29, 2018
- Probation Summons January 30, 2019

Third Claim
- Correspondence with Compliance and Ethics Dept dated April 24, 2020 (revisit)
- Page 33 of QME Report from Dr. Andrea R. Bates, MD (revisit)
- Denial of Worker's Compensation benefits, received August 25, 2020
- Press Release from November 29, 2018 (revisit)

Fourth Claim
- Correspondence with Compliance and Ethics Dept dated April 24, 2020 (revisit)
- Correspondence with Compliance and Ethics Dept dated October 29, 2020
- Order to Implement dated November 29, 2018 (revisit)
- Executive Summary of Safety Culture Assessment performed by North Star Consulting
- "To Improve Utility Performance Fix the Culture of Entitlement" by Scott Hempling
- Injury Relevancy Document

Fifth Claim
- Witness Testimony from Roberta Pena, dated June 18, 2020; red-lined and annotated (revisit)
- Corporate Security Threat Voicemail recording screenshot, June 22, 2020 (revisit)
- "To Improve Utility Performance Fix the Culture of Entitlement" by Scott Hempling (revisit)

# ValueOptions®
### O F   C A L I F O R N I A

**VOC Non-Urgent Grievance Acknowledgement**

June 7, 2019

**Christina Goerss**
**1565 Anderson Ave.**
**McKinleyville, Ca. 95519**

**Member: Christina Goerss**
Inquiry #: 06032019-2617544-020000

**Dear Ms. Goerss:**

This letter is to inform you that on **June 4, 2019** we received your request for a review of your grievance.

Substance of the Grievance:
- You stated that you are not getting the help you need from VOC.
- You stated that VOC referred you to a MD "who can only write prescriptions" which is not what you need. You stated that you have PTSD and need to get off work.
- You feel like you are getting the runaround by VOC and need to be seen by a provider.

If you have written comments, documents, records, and other information relating to the case that you would like us to consider and were not submitted with your request, please contact me at the telephone number below so we can make arrangements to obtain this material for consideration during our review process. You will be notified in writing of our determination within 30 days from our receipt of your request.

The California Department of Managed Health Care is responsible for regulating health care service plans. If you have a grievance against your health plan, you should first telephone your health plan at **888-445-4436 (TTY 800-735-2929)]** and use your health plan's grievance process before contacting the department. Utilizing this grievance procedure does not prohibit any potential legal rights or remedies that may be available to you. If you need help with a grievance involving an emergency, a grievance that has not been satisfactorily resolved by your health plan, or a grievance that has remained unresolved for more than 30 days, you may call the department for assistance. You may also be eligible for an Independent Medical Review (IMR). If you are eligible for IMR, the IMR process will provide an impartial review of medical decisions made by a health plan related to the medical necessity of a proposed service or treatment, coverage decisions for treatments that are experimental or investigational in nature and payment disputes for emergency or urgent medical services. The department also has a toll-free telephone number **1-888-HMO-2219** and a **TDD** line **1-877-688-9891** for the hearing and speech impaired. The department's Internet Web site **http://www.hmohelp.ca.gov** has complaint forms, IMR application forms and instructions online.

If you have any questions concerning this letter, please call **(800) 228-1286** extension: **262422**; **(TTY 800-735-2929)**.  You may also contact me in writing by submitting a letter to my attention at the address below.

**Language Assistance**
SPANISH (Español):  Para obtener asistencia en Español, llame al, **(800) 228-1286**.
TAGALOG (Tagalog):  Kung kailangan niyo ang tulong sa Tagalog tumawag sa **(800) 228-1286**.
CHINESE (中文):  如果需要中文的帮助，请拨打这个号码 **(800) 228-1286**.
NAVAJO (Dine):  Dinek'ehgo  shika  at'ohwol  ninisingo, kwiijigo  holne' **(800) 228-1286**.

Sincerely,

Shawna Gibson
Quality Management
ValueOptions of California, Inc.
P.O. Box 6065 Cypress, California 90630-0065

June 13, 2019

Shawna Gibson
Quality Management
ValueOptions of California, Inc.
P.O. Box 6065
Cypress, CA  90630-0065

Member: Christina Goerss
Inquiry #: 06032019-2617544-020000

Dear Ms. Gibson,

Thank you so much for your prompt response to the complaints made on June 3, 2019. After reviewing the Substance of the Grievance, I have a few clarifications.

According to your records:

- *I stated that I was not getting the help I need from VOC.*

Clarification: I have been seeking care for symptoms of PTSD since January 2017. After an exhaustive search in early 2017, I was referred to a therapist that was uninterested in filling out the necessary paperwork to go beyond my "six free sessions" available through EAP. I was also unaware of the difference between my EAP benefits and my "mental health benefits". I had always dealt with in-network providers and had no difficulty transitioning between my EAP benefits and continuing care based off of medical need. In addition to this therapist, I had also been paying out of pocket to see an EMDR specialist, Francis Muela LMFT. In April 2017, Francis diagnosed me with PTSD and treated me for the same. Unfortunately, it was also discovered in April 2017 that I had a large abdominal tumor and that I was going to need surgery. I then reinstated my access search when I suffered a panic attack at work that rendered me unable to respond to an emergency call in October 2018. I was told by VOC at this time that I could look for my own therapist as they had been unable to find an in-network provider in my area. Due to the severity of the panic attack I assumed the best fit would be a psychiatrist, as I was primarily looking for someone qualified to address the complexity of my trauma. I landed on Ange Lebou in McKinleyville. I was told by his staff that he was out of the country and would return "around the first of the year". When I called back at the beginning of the year, his staff told me he would return in February 2019. I relayed this information to VOC and was later told that when VOC contacted Mr. Lebou in February, his staff said he was not accepting new patients. Due to the increasing demands at work and the harassment that followed my panic attack in October, I was unable to follow up beyond that. My stress levels finally escalated beyond a manageable level on February 26, 2019 and I experienced a breakdown. I called VOC immediately after speaking with the 24-Hour Nurse's Hotline to reinitiate my access search on February 27, 2019. I explained in February that I was now out of work for an issue I had been trying to receive care on since January 2017. After speaking with several people and receiving little guidance, I decided to return to Francis Muela for EMDR in order to expedite my return to work. Unfortunately, when I told Ms. Muela about the harassment I was experiencing at work, she told me she was unable to help me. She explained that my needs exceeded her training. She told me I should be evaluated by someone more qualified, I assumed she meant a psychiatrist. I decided to consult with a medical doctor due to the physical nature of the symptoms. The doctor I saw recommended that I see a psychiatrist. I contacted VOC again and explained this. I further explained that I needed to be evaluated,

treated and monitored to ensure a safe return to work due to the nature of work I do and the complexity of my case. I was told at this time that psychiatrists do "medication management" but I was not told that psychiatrists do not do talk therapy. I was under the impression that the psychiatrist would manage my medication after a thorough evaluation of the complex trauma I experienced and that the medication would be paired with a comprehensive treatment plan. That was not the case. The psychiatrist I was referred to did not even give me twenty minutes to explain what was happening to me, even though I had paid for the hour. I could have never imagined that a psychiatric doctor would not offer talk therapy. I had never had to access this level of care before. I had no way of knowing there had been a change in culture. Furthermore, it surprises me to see doctors so comfortable prescribing something without a thorough evaluation and a corresponding treatment plan. This is an important piece of information that would be good to clarify to the layman in crisis next time. In fact, navigating the many moving pieces to this situation has been excruciating in this condition. I would expect that any number of therapists I spoke to would've been able to pick up on that. As a matter of fact, it wasn't until I spoke with Karen in Southern California on June 4, 2019 that I felt I was actually being heard. Overall, regarding the help I received from VOC, I am mostly surprised that it took these many conversations, a declaration of self-harm, and a grievance to get the appropriate level of urgency from VOC. I have been explaining to each person I spoke with since February 27, 2019 that I am currently out of work due to a breakdown. I explained that the trauma I had experienced was severe and the symptoms are very physical. I also explained that I am a gas first responder for PG&E which means that my job is safety critical. I would not be so adamant for proper care otherwise. I have never experienced anything this physical before in my life and to face it without treatment is something I would wish on no one. Moving forward it is paramount that I receive the appropriate amount of treatment before I can confidently return to work. My story is very violent and difficult to tell. Telling it these many times has taken a great toll on my body. It's unfortunate that VOC has missed these many opportunities to make that connection. I was under the impression that the person on the other end of the phone was a licensed therapist.

- *I stated that VOC referred me to an MD "who can only write prescriptions" which is not what I need. I stated that I have PTSD and need to get off work*

Clarification: At the time I called to initiate an access search for a psychiatrist I expressed that I needed a psychiatric evaluation. This was what was suggested by Francis Muela and by the medical doctor I consulted with. I explained that my trauma is severe and extensive. I do not have confidence in a medication program that only took minutes to evaluate. I have never had this level of physical symptoms before, nor have I needed to access this level of care. What I have observed is that each time I speak to someone, I am starting from scratch. Either there are no notes on my account or the representative answering the phone does not want to take the time to read them. The disconnect here is vital, as I simply cannot express the complexity of the case within a few minutes. I have said each time that I am "currently off work" and have been since February 27, 2019 and that I am trying to be evaluated for PTSD as I am experiencing physical symptoms that are hindering my ability to face the many enhanced stressors of my job. Primarily, due to the hazardous nature of my job, I feel it is my duty to ensure that I am properly evaluated, treated and then released to work to ensure my safety and the safety of others.

- *I feel I am getting the runaround by VOC and need to be seen by a provider.*

Clarification: I have been told by several VOC representatives that an "access search" is to be performed by the VOC staff. I was told numerous times that providers would be screened for me, using the criteria

given and that a VOC representative would contact me once a qualified provider who is accepting new patients has been found. This is an important service VOC provides, especially to PG&E employees; as we are traditionally a thinly stretched workforce that is vital to the functionality of Northern California. The full-service access search is an excellent way to support PG&E's employees in a tangible way. There is a great number of us that do not sit at a desk all day, therefore performing the nuts and bolts of the access search rather than just handing someone a list and saying "good luck" is a much more effective way to ensure folks are actually getting the care they need in a timely manner. Unfortunately for me, it wasn't until I submitted my grievance and threatened self-harm that I was able to receive this level of attention to my case. I'm sure you share my passion for process improvement and see the opportunities inherent here.

In closing, I'd like to thank you for your attention to this matter. I hope you are able to receive this information in the spirit of which it is given. I am neither laying blame nor pointing fingers. I am trying to provide valuable feedback that can hopefully prevent someone with less resolve from coming to the place I came to on June 3, 2019. As I have stated before, my primary purpose is a safe and sustaining return to work. I am committed to this end and am grateful to your service to help make that possible.

Warm regards,
Christina Goerss
1565 Anderson Ave
McKinleyville, CA  95519

# DISCIPLINE

1. **Letter Agreement No. 87-189** (Positive Discipline Guidelines)

2. **Letter Agreement No. 13-05** (Safety Principles and Use of Behavior Based Approach)

# LETTER AGREEMENT
# NO. 87-189 PGE

September 21, 1987

Local Union No. 1245
International Brotherhood of
 Electrical Workers, AFL-CIO
P. 0. Box 4790
Walnut Creek, CA 94596

      Attention:  Mr. Jack McNally, Business Manager

Gentlemen:

      This cancels and supersedes previous agreements on this matter.

      Confirming the discussions between the Union and Company and based upon the favorable results of the trial period in North Bay Division and at the Geysers Power Plant, Positive Discipline will be extended to the remainder of the PGandE system represented by Union.

      Positive Discipline will be implemented in accordance with the following schedule:

| | |
|---|---|
| November 1, 1987: | Redwood Region<br>Humboldt Bay Power Plant |
| December 1, 1987: | Pipeline Operations |
| January 1, 1988: | East Bay Region<br>Steam Generation<br>Nuclear, Power Operations |
| February 1, 1988: | Sacramento Valley Region<br>San Joaquin Valley Region |
| March 1, 1988: | Golden Gate Region<br>Mission Trail Region |
| April 1, 1988: | General Construction<br>General Office |

      Company will schedule orientation meetings with all affected employees.  Company will advise Union's Business Representatives of all such meeting dates, times, and places.  Union's Business Representatives, upon request of the Representative, will be allowed to make a presentation at such meetings.  Additionally, Union will make a video presentation at each meeting.

Company will complete the following prior to the implementation of Positive Discipline:

1).    Company will prepare a list of employees to whom any step of Constructive Discipline have been applied within twelve months prior to the appropriate implementation date.

2).    Company will determine and list each such employee's equivalent status under Positive Discipline, normally not to exceed a written reminder in two categories. As a general guideline, a disciplinary letter received within the prior six months will be converted to an oral reminder. Disciplinary time-off within the prior twelve months will be converted to a written reminder. These guidelines are for conversion only and are not to be construed as applicable to future disciplinary actions. In those limited circumstances where it is clear that the last step prior to termination has been applied, Company may place such employee at the decision-making leave step. However, termination may not occur if another disciplinary problem takes place in a category other than the category that gave rise to the decision-making leave status. All converted disciplinary action will be subject to the deactivation schedule of positive discipline utilizing the original date of the constructive discipline action.

3).    Company will review and obtain concurrence of the list with Union. If concurrence cannot be reached locally, any disputed conversions will be referred for resolution to a Committee consisting of one member designated by Company's Manager of Industrial Relations and one member designated by Union's Business Manager.

4).    Company will explain to each affected employee in the presence of a Shop Steward, if the employee desires the presence of a Shop Steward, his status under Positive Discipline as it related to his previous status under Constructive Discipline in meetings between employees and their supervisors.

5).    Company will deactivate and remove all recorded disciplinary action from employee's 701 files or supervisor's operating files that occurred "more than twelve months prior to the start date of Positive Discipline. All such documents will not be used or referred to in any matter affecting the status of an employee including any step of the grievance procedure.

For the purposes of Contract Sections 205.11 and 18.11, the definition of "active counseling" under the Positive Discipline System, unless changed by the parties through negotiations, will be defined as during the previous twelve-month period (1) two or more instances in which the employee has received written reminders, (2) a decision-making leave or (3) a demotion with cause.

The Attendance Category referred to in the Positive Discipline Guidelines shall not be used to circumvent Section 112.8 of the Physical Agreement and Section 7.8 of the Clerical Agreement.

Employees will be entitled to Union representation at any phase of Positive Discipline including coaching and counseling.

All steps of positive discipline are subject to the grievance procedures of the Physical and Clerical Agreements. Coaching and counseling is subject to the grievance procedures only to determine accuracy.

The attached Positive Discipline Guidelines, which are incorporated herein, will be administered as the Positive Discipline System. This agreement may be amended at any time by agreement between Company and Union.

If you are in accord with the foregoing and the attachment and agree thereto, please so indicate in the space provided below and return one executed copy of this letter to the Company.

Local Union 1245, IBEW                           3                           September 21, 1987
                                                                             87-189-PGE

Yours very truly,

PACIFIC GAS AND ELECTRIC COMPANY

By: ___s/l Wayland Bonbright_____
        Manager of Industrial Relations

The Union is in accord with the foregoing and the attachment and it agrees thereto as of the date hereof.

LOCAL UNION NO. 1245, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO

___September 23, 1987_____        By: ___s/Jack McNally_____
                                            Business Manager

69

PACIFIC GAS AND ELECTRIC COMPANY
<u>POSITIVE DISCIPLINE GUIDELINES</u>

<u>INTRODUCTION</u>

It has been the policy of Pacific Gas and Electric Company to enhance and to improve work performance in all areas by means of clear communication and understanding of performance requirements by all employees.  To this end, Company will utilize Positive Discipline to:

1.      Improve communications between supervisors and employees.

2.      Improve knowledge and understanding by individuals of performance expectations.

3.      Communicate the expectation of change and improvement through coaching and counseling.

In order to ensure that customers are served effectively and Company business is conducted properly and efficiently, employees must meet certain standards of performance and perform their jobs in a safe and effective manner.   Supervision is responsible for establishing employee awareness of their job requirements, and employees, in turn, are responsible for meeting these standards and expectations.  Positive Discipline is a system that emphasizes an individual's responsibility for managing their performance and behavior.   It focuses on communicating an expectation of change and improvement in a personal, adult, non-threatening way; while at the same time, maintaining concern for the seriousness of the situation.   Key aspects of this system-include recognizing and encouraging good performance, correcting performance problems through coaching and counseling, and building commitment to effective -work standards and safe work practices.

If an employee has a conduct, attendance or work performance problem, disciplinary action may be necessary to correct the situation.  Positive Discipline is designed to provide the opportunity to correct deficient performance and build commitment (not merely compliance) to expected performance in a manner that, is fair and equitable to all employees.   Each step is a reminder of expected performance, stressing decision making and individual responsibility, not punishment.

The Positive Discipline Program applies to all regular employees.  It does not apply to probationary employees.  The performance of probationary employees shall continue to be monitored utilizing performance reviews and counseling.  The Employee Assistance Program will continue to play a very important role and should be utilized when appropriate.

<u>THE POSITIVE DISCIPLINE SYSTEM</u>

A.      <u>Coaching and Counseling</u>

        Coaching/counseling is the expected method for the supervisor to inform an employee about a problem in the areas of work performance, conduct, or attendance.  The objective of performance coaching/counseling is to help the employee recognize that a problem exists and to develop effective solutions to it.  Since it is the supervisor's approach to a performance problem that often brings about the employee's decision to change behavior, it is critical that the supervisor be prepared.  Coaching/counseling is intended to be a deliberation and discussion between the supervisor and employee.  Normally, performance problems can be resolved at this step.  Coaching/counseling memos or notes kept in the supervisor's operating file should be deactivated in the same manner as oral reminders (Section VI.A) If a bargaining-unit employee requests a shop steward prior to or during coaching/counseling, such request shall be granted.

B.      <u>Positive Discipline Steps</u>

        When an employee fails to respond to counseling or a single incident occurs which is serious enough to warrant a formal step of discipline, the supervisor will have several options, depending on the seriousness of the performance problem.  These options or steps of the Positive Discipline system are:

        NOTE:  ALL BARGAINING UNIT EMPLOYERS ARE ENTITLED TO APPROPRIATE UNION

REPRESENTATION DURING ANY STEP OF POSITIVE DISCIPLINE.

<u>STEP ONE - ORAL REMINDER</u>

1.    <u>Application</u>

The supervisor discusses the conduct, attendance, or work performance problem with the employee in a private meeting.  The supervisor reminds the employee of the importance of commitment to follow work rules and Company standards.  In this problem-solving discussion, the supervisor informs the employee that this is the first step of the discipline process and restates the employee's need to live up to his/her commitment.  The meeting closes with the supervisor expressing confidence in the employee's ability to change.

2.    <u>Documentation</u>

(a)    The supervisor will prepare a hand-written memo documenting the basic conversation date it, and keep it in his/her operating file.  The employee; is entitled to and will be given a copy of this memo.

(b)    The supervisor will also make a notation of this discussion on the Employee Performance Record sheet (Attachment 1).

(c)    An oral reminder is active for six (6) months.

<u>STEP TWO - WRITTEN REMINDER</u>

A written reminder is a formal conversation between a supervisor and employee about a continued or serious performance problem.  The conversation is followed by the supervisor's written letter to the employee summarizing the conversation and the employee's commitment to change their behavior.  It. is the second step of the Positive Discipline System.

1.    <u>Application</u>

This step is applied when:

- An employee's commitment to improve is not met within the six (6) month active time period for an oral reminder; or

- An employee commits a serious offense whether or not any previous disciplinary action has been taken.

2.     <u>Documentation</u>

(a)    After the conversation with the employee, the supervisor will then write a letter to the employee summarizing the discussion.  It should contain the exact performance problem, the date of casual, and/or oral reminders, what offense caused the reminder, the employee's commitment and need to change in the future, and whether further steps of Positive Discipline could follow.

(b)    The original copy of the letter is given to the employee.  The immediate supervisor retains a copy of the letter and a copy is placed in the employee's Personnel (701) file.

(c)    The supervisor will make a notation of this discussion on the Employee Performance Record sheet (Attachment 1).

(d)    The written reminder is active for twelve (.12) months.

STEP THREE - DECISION MAKING LEAVE (DML)

The DML is the third and final step of the Positive Discipline System. It consists of a discussion between the supervisor and the employee about a very serious performance problem. The discussion is followed by the employee being placed on DML the following work day <u>with pay</u> to decide whether the employee wants and is able to continue to work for PGandE, this means following all the rules and performing in a fully satisfactory. manner.

The employee's decision is reported to their supervisor the workday After the DML. It is an extremely serious step since, in all probability, the employee will be discharged if the employee does not live up to the commitment to meet all Company work rules and standards during the next twelve months (12) the active period of the DML; except as provided in Section III.B.

Because the DML is a total performance decision by the employee, there is only one <u>active</u> DML allowed.

1.    Application

      This step is applied when:

      •   An employee's commitment to improve is not met during the twelve (12) month active time period for a written reminder; or

      •   An employee commits a very serious offense whether or not previous discipline has taken place.

2.    Documentation

      (a)    Notes are to be written covering the key points of the conversation. The exact date and offenses should be included. Employee excuses, protests, and reasons should be included.

      (b)    When the employee returns from the Decision Making Leave, the employee will be given a letter summarizing the Decision Making Leave incident and the employee's decision. This letter should be written by the supervisor using the notes mentioned in (a) above. The letter will advise the employee that termination could follow should they fail to live up to their commitment to maintain total performance and abide by all Company rules.

      (c)    The original copy of the letter is given to the employee. The immediate supervisor retains a copy of the letter and a copy is placed in the employee's Personnel (701) File. The supervisor will also make a notation of this discussion on the Employee's Performance Record sheet (Attachment 1).

      (d)    A DML is active for twelve (12) months.

      In the event an employee at a discipline step is placed on an approved leave of absence or is on the Compensation Payroll in excess of, ten consecutive workdays, the active periods referred to above will be suspended until the employee returns to the active payroll. However, if an employee is off the active payroll in excess of twelve consecutive months, any discipline will be deactivated upon their return to the active payroll.

C.    Reviewing Performance Record Sheet

      Upon advance notice given to the supervisor allowing a mutually agreeable time to be determined, an employee will be allowed to review their performance record sheet kept in the supervisor's operating file.

III.   TERMINATION -

      A.    Termination occurs when Positive Discipline has failed to bring about a positive change in an employee's behavior, such as another disciplinary problem occurring within the twelve (12) month active duration of a DML. Termination may also occur in those few instances when a single offense of such major consequence is committed that the employee forfeits his/her right to the Positive Discipline process, such as:

Theft (See Review Committee Decisions 1451 and 1452)
Striking a member of the public
Energy Diversion
Curb reading of meters

B.  Notwithstanding the foregoing, if a performance problem which normally would result in formal discipline occurs during an active DML, the Company shall consider mitigating factors (such as Company service, employment record, nature and seriousness of violation, etc.) before making a decision to discharge, all of which is subject to the provisions of the appropriate grievance procedure for bargaining unit employees.  In addition, a summary of the decision not to terminate should be documented and placed in the employee's Personnel (701) File, and the employee should be given a copy of the summary.

IV.  <u>ADMINISTRATIVE GUIDELINES</u>

A.  Rule infractions are generally divided into three categories.  These are (1) work performance, (2) conduct, and (3) attendance.  The maximum number of oral reminders that may be active at one time is three (3), and these must be in different categories.  Should another performance problem occur in a category where there is already an active oral reminder, the discipline step must escalate to a higher level of seriousness; usually a written reminder.  The maximum number of written reminders that may be active at one time is two (2), and these must be in different categories.  Should another performance problem occur in a category where there is already an active written reminder, the discipline step must escalate to a DML.

The above language refers to escalation to the appropriate disciplinary step once a decision to formally discipline has been made.  In lieu of taking formal disciplinary action, the supervisor may opt to coach/counsel an employee, taking into consideration mitigating factors.

In addition where appropriate, such as an employee who exhibits an inability to work in a classification that is not directly supervised, consideration for demotion should be made.

Placement of a bargaining unit employee at a Positive Discipline step or termination of a bargaining unit employee may be grieved by that employee's Union on the grounds that such action was without "just cause."  The degree of discipline was too severe, or there was disparity of treatment, pursuant to the provisions of the appropriate grievance procedure.

Because the Decision Making Leave is a total performance decision on the employee's part, there is only one DML.  Additionally, while the DML is active, no other formal steps of Positive Discipline may be administered; except as provided for in Section III.B.

B.  The following list, which is not intended to be all inclusive, gives examples of rule violations and general categories they fall into:

<u>Attendance:</u>

Absenteeism
Tardiness
Sick Leave Abuse (Positive Discipline will not circumvent or
  supersede sick leave abuse sections of any Labor Agreement)
Unavailability
Extended Lunches/Break Periods
No Call/No Show

<u>Conduct:</u>

Violation of the Employee Conduct Standard Practice
Carrying Firearms on Company Property or in Company Vehicles

73

Leaving Assigned Work Area/Location Without Permission
Insubordination: Refusal to Follow Supervisor's Instruction
Refusal to Work Overtime in an Emergency Situation
Fighting or Provoking a Fight on Company Property
Falsification of any Company Document or Record
Conducting Personal Business on Company Time Without Permission
Reporting a False Reason for an Absence
Congregating
Verbal and/or Sexual Harassment
Initiating, Encouraging, or Participating in a Walk-Out or Work Slowdown
Allowing Guests on Restricted Company Property Without Permission

### Work Performance:

Failure to Adhere to Safe Work Practices and Accident Prevention Rules
Unsatisfactory Work Performance (Quality/Quantity, Effort, and/or Negligence)
Backing Accidents
Sleeping on the Job
Poor Housekeeping
Excessive Time Away from Work Station

Note:   For some types of performance problems, caused by an ability deficiency, demotion to a lower classification may be the appropriate action rather than implementing any step of Positive Discipline.

C.   Offenses in each of the three categories are normally assigned a level of severity.  Their level of severity can be minor, serious, or major in nature.  As a general rule, the seriousness of the offense dictates which step of the Positive Discipline process would apply.

D.   The above list is not totally inclusive.  In addition, Company Standard Practices, Safety, and Procedural Rules, along with sound judgment and common sense should govern individual conduct and actions. Individual departments and locations also have rules and standards which must be adhered to or met.

## V.   CRISIS SUSPENSION

As has been past practice, a crisis suspension should be used when an employee's inappropriate behavior is so serious immediate removal from the workplace is necessary because the employee's actions indicate that remaining on or returning to the job may be detrimental to the employee, fellow employee, customers, or the Company.  The employee shall be required to leave Company property pending investigation.  Some examples would be theft, insubordination, threat of violent action, destruction of Company property, or reporting to work under the influence of alcohol or drugs.  These situations will be handled in the following manner:

1.   If, upon completion of its investigation, Company finds that there is insufficient evidence to support the alleged misconduct, the employee will be placed back to work and will be paid for the investigating time off.

2.   If, upon completion of its investigation, Company finds that there is sufficient evidence to support termination, the employee's employment will be terminated and the investigatory time off will be without pay.

3.   If, upon completion of its investigation, Company finds that there is sufficient evidence to support disciplinary action but not termination, the appropriate step of Positive Discipline will be administered and the employee will be reimbursed for the investigatory time off without pay. However, should an employee be unfit for work or otherwise unavailable, the employee shall not be reimbursed for such time.

VI.    DEACTIVATION

A very important step of the Positive Discipline system which recognizes improved performance is the deactivation process.  If an employee has maintained fully satisfactory performance during the active period of a disciplinary action and the employee's attendance, conduct, and/or performance improves, it is imperative that the supervisor acknowledge the improvement.  The administrative process of deactivation is summarized below:

A.    Oral Reminder

At the end of the six month active time period, the Immediate Supervisor meets with the employee and Informs the employee of the inactive status of the oral reminder, and commends the employee for improved performance.  The supervisor notes the inactive status on the Employee's Performance Record sheet.  The original memo should be removed from the supervisor's operating file and be returned to the employee.  A copy shall also be forwarded to the Regional/Department Human Resources Office.

B.    Written Reminder/DML

At the end of the 12-month active time period for the written reminder and the 12 month active time period for the DML, the supervisor initiates a typed memo advising the employee of the inactive status of the step, commends the employee's improved performance, and removes all reference from the 701 File.  Copies are distributed to all who were previously copied on the written reminder or DML letters with the exception of the 701 file.  The supervisor also notes the inactive status on the Employee's Performance Record sheet.  A copy of the original written reminder and letter confirming the DML shall be forwarded to the Regional/Department Human Resources Office.

VII.    RECOGNIZING GOOD PERFORMANCE

The supervisor is a very important member of the work group.  Since the supervisor's job is to get work down through others, it is essential that energies be concentrated on helping employees be as successful as possible.  What a supervisor expects of an employee and the way the employee is treated to a large extent determines that employee's performance.  Good performance is a shared responsibility.

The supervisor has an opportunity to foster a working environment that is based on mutual respect and trust, a collaborative team effort that is mutually beneficial to the supervisor, the employee, and the organization.  Positive Discipline is intended not only to resolve performance problems, but also to focus on improvement in performance and recognize exceptional performance.  Reinforcement of this type of behavior will help to ensure its continuation and should be used under the following-circumstances:

A.    When an employee's attendance, conduct, and/or performance improves, it is imperative that the supervisor acknowledges the improvement in a way that encourages the employee to maintain the improvement.  Such change in behavior that are ignored often disappear.

B.    When an employee deserves recognition and commendation for performance, above and beyond the call of duty, such as:

- Taking immediate action in a crisis or emergency situation.

- Developing a cost saving or work saving idea.

- Providing special training or assistance to other employees.

C.    When an employee deserves recognition and commendation for performing competently

and diligently over a period of time.  Examples would include:

- Maintaining a good attendance record over a significant period of time.

- Maintaining a record of working safely.

- Maintaining a spirit of teamwork that is demonstrated through specific actions.

In a discussion of this nature, the supervisor must refer to the specific improvement or incident with which the supervisor is pleased.  The supervisor must be specific and sincere.  These positive contacts should be noted on the employee's performance record.  If the employee's performance is exceptional, or the supervisor is deactivating a step of Positive Discipline, a memo to the employee should be prepared by the supervisor recognizing this exceptional or improved performance.  A copy should also be placed in the employee's Personnel File (701) unless it is a deactivation memo/letter.  This type of recognition can be highly successful in establishing and maintaining a motivating, productive work environment.



# LETTER AGREEMENT
# NO. 13-05-PGE



**IBEW**

PACIFIC GAS AND ELECTRIC COMPANY
LABOR RELATIONS AND HUMAN RESOURCES DEPARTMENT
MAIL CODE N2Z
P.O. BOX 770000
SAN FRANCISCO, CALIFORNIA  94177
(415) 973-4310
STEPHEN RAYBURN
DIRECTOR AND CHIEF NEGOTIATOR

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO
LOCAL UNION 1245, I.B.E.W.
P.O. BOX 2547
VACAVILLE, CALIFORNIA  95696
(707) 452-2700
TOM DALZELL
BUSINESS MANAGER

January 28, 2013

Mr. Tom Dalzell, Business Manager
Local Union No. 1245
International Brotherhood of
  Electrical Workers, AFL-CIO
P.O. Box 2547
Vacaville, CA  95696

Dear Mr. Dalzell:

In support of making safety the most fundamental and critical element of how we conduct our business, the Company has developed new safety principles.  These principles emphasize building a trust based culture, encouraging open and honest communication, understanding underlying causes in order to prevent recurrence, treating safety incidents as learning opportunities, increasing recognition and rewarding of safe behavior, and adopting a behavior-based approach to discipline which decreases the emphasis on discipline.

Under these new principles, discipline for safety-related incidents will only be considered when an employee acts in a reckless manner, demonstrates a pattern of carelessness or non-compliance, puts themselves, their co-workers or the public at risk by intentionally violating a Key to Life, or violates the Code of Conduct.

The parties met recently to discuss the new safety principles, and in particular, the limited role of discipline and the use of a behavior based approach.  In the implementation of this new approach, the parties agree to the following as it relates to safety-related incidents.

Non-disciplinary safety discussions are the preferred approach to learn from an incident and develop positive approaches for eliminating similar incidents.  These one-on-one discussions are opportunities for open and honest discussion of safety incidents with a focus on understanding and learning.  Safety discussions are not considered as discipline or coaching and counselings under the Positive Discipline Agreement.
The parties agree that discipline for safety-related incidents will only be considered when an employee acts in a reckless manner, demonstrates a pattern of carelessness or non-compliance, puts themselves, their co-workers or the public at risk by intentionally violating a Key to Life, or violates the Code of Conduct.

Although there will be significantly less disciplinary action issued with this approach, the Union recognizes the Company's right to issue discipline and discharge for safety related incidents on the basis set forth above.  The Union reserves the right to grieve any discipline or demotion.

The parties agree to review open grievances involving safety related discipline issued to current employees prior

to the implementation of the safety principles.  Where it is determined that the discipline is inconsistent with the new safety principles, the discipline will be adjusted and the grievance will be closed on a non-precedential basis without prejudice.

During the 2011-2012 General Negotiations, the parties agreed to explore modification of the application of Positive Discipline to safety incidents.  The new approach implemented by the Company, along with the understandings reached in this letter agreement fulfills the parties' intent to reduce the use of discipline while holding accountable employees with poor safety records.  With this modified approach, the parties also agree to cancel Letter Agreement 10-36.

Either party may cancel this agreement by providing the other party 30 days written notice.

If you are in accord with the foregoing and agree thereto, please so indicate in the space provided below and return one executed copy of this letter to the Company.

Very truly yours,

PACIFIC GAS & ELECTRIC COMPANY


By:   ___s/Stephen A. Rayburn_____
         Stephen A. Rayburn
         Director and Chief Negotiator

The Union is in accord with the foregoing and agrees thereto as of the date hereof.

LOCAL UNION NO. 1245, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO


___February 14_____, 2013      By:   ___s/Tom Dalzell_____
                                                      Tom Dalzell
                                                      Business Manager

| Name | Date modified | Type | Size |
|---|---|---|---|
| Lisa Green 6-22-90 | 6/22/2020 5:14 PM | MPEG-4 Audio | 78 KB |
| Sandra Mendoza 6-23-2020 (PGE Assets) | 6/26/2020 4:23 PM | MPEG-4 Audio | 184 KB |



Executive Summary

# Corporate Responsibility and Sustainability Report

## 2020

Explore the report at: **www.pgecorp.com/sustainability**



# Message from Our Leadership

To Our Stakeholders:

Today, after more than a century of service to Northern and Central California, PG&E humbly stands at a turning point unlike any other in our history.

We have taken responsibility for the devastating wildfires caused by our electric equipment in recent years, including the 2018 Camp Fire. We pleaded guilty to involuntary manslaughter in the deaths of the 84 people who lost their lives in that tragedy. We settled billions of dollars in damage claims by fire victims, as well as cities, counties, and other public entities.

We have concluded an 18-month Chapter 11 proceeding while fending off hostile takeover attempts. And we have emerged with a plan of reorganization that includes strong commitments regarding our corporate governance, operations, and financial structure that are designed to further prioritize safety and were forged with guidance from both the California Governor's Office and our state regulator.

Now, we are beginning a new era for PG&E, charting a new path toward a different future as a different company—one that will provide better outcomes and more sustainable results for all those who depend on us.

We will not do business as we did in the past. Rather, we will use the hard lessons we have learned as a driving force for continuous improvement, accountability, and sustained performance in the work we do every day.

Amid a global pandemic, we are intensifying our focus on the health and safety of our customers, workforce, and communities. And we are responding to calls for racial equity by deepening PG&E's long-standing dedication to diversity, inclusion, and equal opportunity in the workplace.

Earning back the trust we have lost will require us to meet each one of our obligations, without faltering.

Overall, we believe that the agreements that underlie our plan of reorganization position PG&E as a sustainable, financially sound utility with the appropriate governance and oversight to safely serve our customers for the long term, while also making the investments required to help the state achieve its climate and clean energy goals.

Accordingly, we are recommitting our support for California's climate leadership, including electrification of the energy grid, sufficient charging infrastructure to power millions of electric vehicles, and a carbon-neutral economy by 2045. We are adapting our systems to climate risks, particularly the rising threat of wildfires and extreme weather. And we are doing so with the recognition that both the costs and benefits of these innovations must be shared equitably across the economic spectrum.

As we pursue that vision, we understand that our success will be measured in the results we deliver, not the sincerity of our words. We invite you to judge us by that standard, and we welcome your feedback on our progress in the days ahead.

Sincerely,
William L. Smith
Interim CEO and President
PG&E Corporation

# Plan of Reorganization Commitments

As part of our Plan of Reorganization for emergence from Chapter 11, PG&E made a series of commitments, all designed to further prioritize safety. PG&E made these commitments working with the Governor's Office and incorporating guidance from the President of the California Public Utilities Commission (CPUC).

The commitments include:

- Supporting the CPUC's enactment of measures to strengthen PG&E's governance and operations, including enhanced regulatory oversight and enforcement that provides course-correction tools as well as stronger enforcement if it becomes necessary;

- Hosting a state-appointed observer to provide the state with insight into PG&E's progress on safety goals;

- Appointing an independent safety monitor when the term of the court-appointed Federal Monitor expires;

- Establishing newly expanded roles of Chief Risk Officer and Chief Safety Officer, with both reporting directly to the PG&E Corporation CEO and President;

- Forming an Independent Safety Oversight Committee to provide independent review of operations, including compliance, safety leadership, and operational performance;

- Assuming all collective bargaining agreements with labor unions, pension obligations, and other employee obligations, Community Choice Aggregation servicing agreements, and all power purchase agreements as part of a broader commitment to California's clean energy future;

- Reforming executive compensation to further tie it to safety performance and customer experience;

- A commitment that PG&E Corporation will not reinstate a common stock dividend until it has recognized $6.2 billion in non-GAAP core earnings;

- Filing a proposal with the CPUC requesting a rate-neutral $7.5 billion securitization transaction after PG&E emerges from Chapter 11 in order to finance costs in an efficient manner that benefits customers and accelerates payment to wildfire victims; and

- Committing not to seek recovery in customer rates of any portion of the amounts that will be paid to victims of the 2015, 2017, and 2018 wildfires under the Plan when PG&E emerges from Chapter 11 (except through the rate-neutral securitization transaction).



# Integrating Sustainability

PG&E defines sustainability as meeting the needs of today in a way that creates a better tomorrow—for our customers, communities, employees and the planet.

As an energy provider rooted in California, PG&E confronts choices and challenges with environmental, social and economic factors that affect the customers and communities we serve. Finding the right balance between these factors in the decisions PG&E makes is essential to achieving our goals of providing safe, reliable, affordable, and clean energy—today and into the future.

Corporate sustainability as business strategy has never been more important—taking an approach that considers PG&E's operations through the lens of preparing for the future and providing long-term value to our many stakeholders. In fact, doing so is what customers, investors, policymakers, regulators, environmental and social justice advocates and many others have come to expect from PG&E.

To help guide our decisions, we rely on our Mission, Vision and Culture framework, developed through extensive outreach and interactions with our employees, customers and other stakeholders. Importantly, it places a sustainable energy future at the center as our North Star.

## Our Mission

To safely and reliably deliver affordable and clean energy to our customers and communities every single day, while building the energy network of tomorrow.

## Our Vision

With a sustainable energy future as our North Star, we will meet the challenge of climate change while providing affordable energy for all customers.

## Our Culture

We put safety first.

We are accountable. We act with integrity, transparency and humility.

We are here to serve our customers.

We embrace change, innovation and continuous improvement.

We value diversity and inclusion. We speak up, listen up and follow up.

We succeed through collaboration and partnership. We are one team.



3



Business

## Key Sustainability Indicators

### 114.9 miles
Miles of strength-tested gas transmission pipeline

### 426
Weather stations installed to monitor wildfire threat

At PG&E, we are moving forward with a number of structural, management and governance changes to improve operations, remove risk from our system, and ensure long-term accountability for sustained performance. We continue to work together with customers, regulators and community leaders to address the threat of wildfires and expand our wildfire safety programs. We are also recommitting to California's clean energy future by implementing and advocating for clean energy policy and investing in electrification.

# Highlights

**Invested $7 billion** to enhance and upgrade our infrastructure for safety, reliability and wildfire mitigation.

**Met or exceeded goals** for core elements of our 2019 Wildfire Mitigation Plan, including system hardening, vegetation management, enhanced inspections and situational awareness, such as fire detection and fire spread modeling capabilities based on an industry-leading satellite system.

**Learned important lessons to improve our execution of Public Safety Power Shutoffs (PSPS)** and began listening sessions with stakeholders to improve the program going forward with a goal of PSPS events that are smaller in size, shorter in length and smarter for our customers.

**Completed substantial work to strengthen our natural gas system**, achieving industry-leading gains in process safety, asset management and technology innovation.

**Delivered some of the nation's cleanest electricity** to customers, with nearly 30 percent coming from renewable sources and we remain on track to meet the state's 60 percent by 2030 renewable energy mandate.

**Generated approximately 10.7 billion kWh** of zero-carbon hydroelectric energy for the benefit of our customers.



# PG&E Overview

PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company, an investor-owned energy company that operates in Northern and Central California and delivers some of the nation's cleanest energy. Throughout this report, when we refer to "PG&E," we are discussing all of PG&E Corporation and its subsidiaries, including Pacific Gas and Electric Company. When we refer to the "Utility," we are discussing Pacific Gas and Electric Company.

| **Headquarters Location** | **Service Area** | **Service Area Population** |
|---|---|---|
| San Francisco, California | 70,000 square miles in Northern and Central California | Nearly 16 million people |

### Customer Accounts
(as of December 31, 2019)

#### 5.5 million electric distribution accounts:
- 4.8 million residential
- 0.7 million commercial, industrial and other

#### 4.5 million natural gas distribution accounts:
- 4.2 million residential
- 0.3 million commercial and industrial

### Employees (as of December 31, 2019)

#### Approximately 23,000 regular employees

Approximately 15,000 employees are covered by collective bargaining agreements with three labor unions:

- International Brotherhood of Electrical Workers (IBEW), Local 1245, AFL-CIO
- Engineers and Scientists of California/ International Federation of Professional and Technical Engineers (ESC/IFPTE), Local 20, AFL-CIO and CLC
- Service Employees International Union (SEIU), Local 24/7

### System

- 7,686 MW of PG&E-owned hydroelectric, nuclear, natural gas, solar and fuel cell generation
- Approximately 107,000 circuit miles of electric distribution lines (about 25 percent underground and 75 percent overhead) and approximately 18,000 circuit miles of electric transmission lines
- Approximately 43,000 miles of gas distribution pipelines, 6,600 miles of backbone and local gas transmission pipelines and three gas storage facilities

### PG&E's 2019 Electric Power Mix Delivered to Retail Customers[1]

|  | Percent of Bundled Retail Sales (actual procurement) | Percent of Bundled Retail Sales (Power Content Label) |
|---|---|---|
| Eligible Renewable | 29.7% | 27.4% |
| Fossil fuel-fired | 36.6% | 0.0% |
| Nuclear | 45.0% | 41.7% |
| Large Hydroelectric | 33.3% | 30.9% |
| Others, Net[2, 3] | (44.6)% | 0.0% |

1. Numbers may not add up to 100 due to rounding.

2. The allocation of bundled retail sale amounts and "Others, Net" in the "Power Content Label" column is consistent with current California Energy Commission guidelines, applied to specified electric generation and procurement volumes (i.e., fossil fuel-fired, nuclear, large hydroelectric, and renewable). Total reported generation and procurement volumes equate to actual electric retail sales.

3. Amount is mainly comprised of net California Independent System Operator open market (sales)/purchases.

### Composition of PG&E's 2019 Total Eligible Renewable Resource[1]

| Solar | 12.7% |
|---|---|
| Wind | 9.5% |
| Geothermal | 1.5% |
| Biomass and Waste | 3.7% |
| Eligible Hydroelectric | 2.3% |
| **Total** | **29.7%** |

1. As defined in Senate Bill 1078, which created California's Renewables Portfolio Standard; and Senate Bill 1038, which modified the definition of "in-state renewable electricity generation technology": an eligible renewable resource includes geothermal facilities, hydroelectric facilities with a capacity rating of 30 MW or less, biomass and biogas, selected municipal solid waste facilities, photovoltaic, solar thermal, and wind facilities, ocean thermal, tidal current, and wave energy generation technologies. These figures are preliminary and will not be finalized until verified by the California Energy Commission.



## Key Sustainability Indicators

## 20.8 minutes

Average response time to gas odor reports

## 171 line miles

System hardening completed in high fire threat districts

At PG&E, safety is our most important responsibility. Fulfilling our goal of becoming the utility that our customers expect and deserve requires that they, as well as the public and all our stakeholders, are able to trust that we will deliver electricity and natural gas safely, reliably and with unquestioned integrity.

Our focus is to continually reduce risk. Today, we are building an organization in which we have designed every work activity to facilitate safe performance, every member of our workforce knows and practices safe behaviors, and every individual is encouraged to speak up if they see unsafe or risky behavior and has confidence that their concerns and ideas will be heard and followed up on.

This focus is fundamental to all of our operations and consistent with PG&E's Mission, Vision, and Culture.

# Highlights

**Continued to build a safety culture** in which every member of our workforce is not only encouraged to speak up, but has confidence that their concerns and ideas will be heard and followed up on.

**Appointed an Independent Chief Safety Advisor** to the PG&E Corporation CEO and President and launched an Independent Safety Oversight Committee.

**Delivered more than 42,000 days of training** on courses specifically focused on safety and compliance.

**Executed our Community Wildfire Safety Program** to further reduce wildfire risks and keep our customers and the communities we serve safe.

**Awarded $2 million in wildfire prevention grants** to local Fire Safe Councils.

**Expanded our partnership with the California Fire Foundation** by funding a $1 million wildfire safety and preparedness grant focused on providing funding for firefighters and Community/Neighborhood Emergency Response Teams.

**Continued to make safety performance** the single largest driver for annual at-risk performance-based pay.

**Hosted 375 training workshops** to better prepare firefighters, police, public works officials and other authorities to respond to emergencies involving electricity and natural gas.

**Worked with other gas and electric providers, other essential industries and government officials** to develop and implement state-of-the-art security strategies and best practices.



# Customers & Communities

## Key Sustainability Indicators

### 1,253 GWh

Electricity saved through customer energy efficiency, exceeding our target

### 41.2%

Percentage of PG&E's overall procurement with diverse certified suppliers

PG&E's focus on investing in our infrastructure and improving our operations is designed to reduce risk and support our mission of providing customers with safe, reliable, affordable and clean energy. Every day, we are also working to better understand the energy needs of our customers, support cleaner energy options and increase customer choice. Our commitment also includes working locally to support the vitality of the communities where our employees live and work.

# Highlights

**Helped customers save more than $300 million** on their energy bills and avoid the emission of nearly 640,000 metric tons of carbon dioxide through our energy efficiency programs.

**Brought the total number of interconnected private solar customers** to nearly 465,000.

**Supported over 8,000 customers** who have installed battery storage at their homes or businesses, often paired with a solar system.

**Expanded our energy efficiency financing program**, which provides commercial customers and government agencies with loans for energy efficiency upgrades with no out-of-pocket costs and zero interest, funding 668 loans worth a total of $59 million.

**Installed approximately 2,300 Level 2 charging ports** at workplaces and multi-family dwellings and launched programs to support medium- and heavy-duty fleets and public fast charging.

**Contributed $17.5 million to charitable organizations** through our Better Together Giving Program and the PG&E Foundation, designed to help address critical social, educational and environmental challenges in the communities we serve.

**Continued to offer our community renewables programs**, which give customers the option to purchase 100 percent of their electricity from a universal solar program, without the need to install private rooftop solar panels.

**Achieved industry-leading supplier diversity results**, spending $3.41 billion—or 41.15 percent of our total expenditures—with businesses owned by women, minorities, service-disabled veterans and LGBTQ individuals.



**Employees**

## Key Sustainability Indicators

# 93%
Percentage of PowerPathway graduates hired into industry jobs

# 71,000 hours
Number of employee volunteer hours

Every day, approximately 23,000 PG&E employees are hard at work: putting our plans into action, finding new ways to meet the needs of our customers, and strengthening our energy systems to deliver safe, reliable, affordable and clean energy. We remain focused on building and retaining an engaged, well-trained and diverse workforce ready to meet the challenges of our business today and into the future.

# Highlights

**Established a new Wildfire Safety organization**, comprised of former firefighters, experts in vegetation management, meteorologists and other personnel.

**Demonstrated our commitment to communities** with employees contributing nearly 71,000 employee volunteer hours to schools and nonprofit service organizations.

**Achieved more than $7 million in pledges from employees** in our annual Campaign for the Community.

**Delivered more than 670,000 hours** of technical, leadership and employee training.

**Continued to provide career opportunities** for veterans and women through our Power Pathway™ workforce development program.

**Engaged employees** through our 11 Employee Resource Groups and three Engineering Networks across 27 chapters to promote diversity and inclusion, employee development and community service.

**Continued to earn recognition** for our commitment to diversity and inclusion, including rankings from the Human Rights Campaign, Disability Equality Index, *Black Enterprise* magazine, and *Latina Style* magazine.



## Environment

### Key Sustainability Indicators

## 30%

Percentage of power from eligible renewable resources

## 110,000

Metric tons of carbon dioxide avoided in our operations

PG&E's environmental commitment begins with our aim to fully meet all environmental requirements, but it extends much further. We continue to support and help advance the state's climate and clean energy goals. We also remain committed to supporting climate resilience efforts at the state and local levels to better prepare for, withstand and recover from extreme events and other risks related to climate change.

# Highlights

**Continued our operational partnership agreements** with the U.S. Forest Service and Bureau of Land Management to expedite and streamline critical wildfire safety and infrastructure work while protecting species and public lands.

**Continued to make significant progress in securing Habitat Conservation Plans,** which enable PG&E to most efficiently conduct operations and maintenance activities while protecting listed endangered species.

**Remained on track to meet the Million Ton Challenge,** a voluntary Pacific Gas and Electric Company goal to avoid one million tons of greenhouse gas (GHG) emissions from our operations over five years.

**Permanently protected 7,241 acres of land as part of the Land Conservation Commitment,** which ultimately will protect 140,000 acres of PG&E-owned watershed lands.

**Helped our customers save about 166 million gallons of water** through energy-efficiency measures that deliver water savings.

**Further integrated climate change adaptation planning** into our risk management processes.

**Awarded the third series of grants for the Better Together Resilient Communities grant program,** a shareholder-funded initiative to support local climate resilience planning efforts.

**Offered technical assistance workshops for suppliers focused on sustainability,** including best practices for measuring greenhouse gas emissions.

**Implemented sustainable practices at our facilities,** reducing aggregated energy use intensity by 8 percent.

# Key Sustainability Indicators

## Business

**2019 Result Legend:**   ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Gas Operations** | | | |
| **Strength-Tested Transmission Pipeline** (miles) | 102.6 | 114.9 | 33.1 |
| **Transmission Pipeline Replacement** (miles) | 14.4 | 21.3 | 34.0 |
| **Valves Automated** (number of valves) | 23 | 23 | 20 |
| **Retrofitted Transmission Pipeline** (projects) | 12 | 10 | 14 |
| **Gas Dig-Ins**[1]<br>(dig-ins per 1,000 Underground Service Alert tickets) | 1.70 | 1.04 | 1.44 |
| **Electric Operations** | | | |
| **System Average Interruption Frequency Index (SAIFI)**<br>average number of outages per customer | 1.089 | 1.129 | 1.136 |
| **System Average Interruption Duration Index (SAIDI)**<br>average duration of outages per customer in minutes | 129.2 | 148.8 | 147.6 |
| **Customers experiencing five or more sustained outages (CEMI-5)** | 2.61% | 3.20% | 3.12% |
| **Nuclear Operations** | | | |
| **Diablo Canyon Power Plant Reliability and Safety** | 93.7 | 97.5 | 95.0 |
| **Ethics and Compliance** | | | |
| **Employees Completing Annual Compliance and Ethics Training** | 99.8% | 99.9% | 99.8% |
| **Employees Completing Annual Code of Conduct Training** | 99.8% | 99.9% | 99.8% |

1. In 2019, Gas Dig-Ins measured the total number of third-party dig-ins (i.e., damage from a third party resulting in repair or replacement of an underground PG&E facility). In 2020, the measure was expanded to also include dig-ins from first and second parties.

2. Refers to the sum of 11 performance indicators developed by the nuclear power industry for nuclear power generation.

# Safety

2019 Result Legend: ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Wildfire Safety** | | | |
| **System Hardening** (line miles): Stronger poles, covered lines and/or targeted undergrounding | 150 | 171 | 241 |
| **Enhanced Vegetation Management** (line miles): Inspecting, pruning and removing vegetation | 2,450 | 2,498 | 1,800 |
| **Visual and Aerial Inspections on:** ≈50,000 transmission, ≈700,000 distribution and ≈200 substation assets in High Fire Threat Districts (HFTD) | 100% | 100% | See footnote 1 |
| **High-Definition Cameras** (cameras): Improving real-time monitoring of high-risk areas and conditions | 96 | 133 | 200 |
| **Weather Stations** (stations): Enhancing weather forecasting and modeling | 400 | 426 | 400 |
| **Sectionalizing Devices** (devices): Separating the grid into small sections for operational flexibility | N/A | 287 | 592 |
| **Transmission Line Switches** (devices): Enabling targeted transmission outages to lessen downstream customer impacts | N/A | N/A | 23 |
| **Public Safety** | | | |
| **Gas First-Time In-Line Inspections**[2] | 183.0 | 266.4 | 164.7 |
| **Gas Emergency Response**[3] (minutes) | 21.0 | 20.8 | 20.8 |
| **Electric Emergency Response**[4] (percentage within 60 minutes) | 97.5% | 95.3% | 96.5% |
| **Asset Records Duration Index**[5] | 1.0 | 1.2 | N/A |
| **Employee Safety** | | | |
| **Days Away, Restricted or Transferred (DART) Rate**[6] | 1.34 | 2.05 | 0.90 |
| **Preventable Motor Vehicle Incidents Rate**[7] | 2.45 | 2.91 | 2.41 |

1. Target is annual inspections for Tier 3 HFTD facilities and three-year cycles for Tier 2 HFTD facilities.

2. Measures the successful completion of first-time in-line inspections of newly-constructed natural gas transmission lines.

3. Average response time in minutes to an immediate response gas emergency order.

4. Percentage of time that PG&E personnel are on site within 60 minutes after receiving a 911 call of a potential PG&E electric hazard.

5. Weighted index that tracks the average number of days to complete the as-built process in the system of record for electric and gas capital and expense jobs from the time construction is completed in the field or released to operations. The Gas Operations Index consists of three weighted sub-metrics: Transmission (60%), Station (10%), Distribution (30%). The Electric Operations Index consists of three weighted sub-metrics: Transmission Line (25%), Substation (25%), Distribution (50%). In 2020, PG&E began tracking submetrics separately, rather than one consolidated metric.

6. Measures how frequently DART cases occur for every 200,000 hours worked, or for approximately every 100 employees.

7. Measures the number of preventable motor vehicle incidents occurring that the driver could have reasonably avoided, per 1 million miles driven.

# Customers and Communities

2019 Result Legend:  ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Customer Satisfaction** | | | |
| Escalated Customer Complaints[1] | 12.2 | 10.1 | 10.1 |
| Customer Connection Cycle Time[2] (business days) | 10 | 10 | 10 |
| Gas And Electric Meter Billing Accuracy[3] (percentage of bills) | 99.71% | 99.65% | 99.59% |
| **Energy Affordability** | | | |
| Energy Savings Assistance Program (number of homes weatherized) | 99,175 | 106,064 | 104,222 |
| California Alternative Rates For Energy (number of eligible customers enrolled) | 1,302,000 | 1,382,663 | 1,350,000 |
| **Customer Energy Efficiency[4]** | | | |
| Electricity Saved (GWh) | 1,079 | 1,253 | 955 |
| Natural Gas Saved (Million Therms) | 33.0 | 27.6 | 25 |
| Generation Capacity Avoided (MW) | 222 | 253 | 195 |
| **Clean Transportation** | | | |
| Electric Vehicle Charge Network (EVCN) (number of charge ports) | N/A[5] | 1,703 | 4,500[6] |
| **Supplier Diversity** | | | |
| Spending on Certified Diverse Suppliers (percentage of overall purchasing expenditures) | 38.0% | 41.2% | 38.0% |

1. Measures the number of customer complaints escalated to the CPUC per 100,000 adjusted customers.

2. Tracks the 12-month average design and construction cycle time for electric residential disconnect/reconnect work requested by customers and performed through Express Connections (our customer gateway).

3. Refers to the percentage of bills that are not adjusted after being mailed to the customer. Each year, a very small percentage of bills must be estimated, largely due to intermittent connectivity (similar to a cell phone temporarily losing its connection).

4. Data refers to annual energy savings or the first-year impacts associated with installed customer energy efficiency projects, or, appropriate. Targets are based on mandated energy efficiency savings as agreed upon with the CPUC. All data is as filed with the CPUC in Pacific Gas and Electric Company's Energy Efficiency Program Portfolio Reports. Annual energy savings include savings from codes and standards programs and, per CPUC policy governing energy efficiency goals, include savings from Regional Energy Network or Community Choice Aggregator programs in PG&E's service area, which represented approximately 1% or less of total annual savings.

5. PG&E's transportation electrification programs are multi-year efforts with end-of-program targets rather than annual targets. PG&E's EVCN program target is to install 4,500 Level 2 charging ports by the end of 2020, subject to modification based on conditions outside PG&E's control, such as customer needs, electric vehicle market conditions, weather, economic conditions, the COVID-19 crisis, and other factors.

6. For the safety of PG&E personnel, contractors, customers and site-hosts, the COVID-19 crisis has required an unanticipated, necessary curtailment of EVCN in-person site-host and customer coordination and field construction work. As a result, PG&E anticipates EVCN work will continue into 2021, shifting the overall program target of 4,500 ports to 2021 or a later date.

13

# Employees

**2019 Result Legend:** ■ = Target met or exceeded    ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|--------|-------------|-------------|-------------|
| **Employee Engagement** | | | |
| Employee Giving Campaign Pledges/Donations (participation rate) | 49% | 35% | 35% |
| Employee Engagement Index[1] | 68 | 64 | 68 |
| **Career Pathways** | | | |
| Training Effectiveness[2] | 4.28 | 4.57 | 4.5 |
| PowerPathway Graduates Hired Into Industry Jobs (percentage) | 80% | 93% | 80% |
| **Health and Wellness** | | | |
| Workforce Unavailable Due To Health[3] | 7.7% | 7.8% | 7.7% |

1. This figure represents the percentage of favorable responses to questions on an employee survey that measure employee engagement. In 2019, PG&E conducted a quarterly survey of employee engagement, sampling a portion of the employee population each time. The 2019 fourth quarter score was 64 percent with 33 percent of employees participating in the survey and a margin of error of plus or minus 2 points. PG&E conducts a full employee survey every two years, to allow more time to execute on action plans to address issues identified in the prior survey. the next full employee survey will be in 2020.

2. This figure measures the effectiveness of PG&E's internal training program on a five-point scale through employee surveys on predictive data from employees on their ability to use training on the job.

3. This figure represents the percentage of full-time employees unavailable for work either due to long-term or short-term health reasons, as measured by total workdays lost for the entire year.

# Environment

|  | | 2019 Result Legend: | ■ = Target met or exceeded | ■ = Target not met |
| --- | --- | --- | --- |

| Metric | 2019 Target | 2019 Result | 2020 Target |
| --- | --- | --- | --- |
| **Compliance** | | | |
| Agency Inspections Without A Written Enforcement Action | 90% | 91% | 90% |
| **Natural Resource Stewardship** | | | |
| Land Conservation Commitment:<br>(number of transactions closed)[1] | 13 | 11 | 12 |
| **Clean Energy** | | | |
| Renewables Portfolio Standard (RPS) | 31%[2] | 30%[3]<br>On track for multi-year<br>compliance period requirement | 33% |
| **Supply Chain Sustainability** | | | |
| Supplier Environmental Performance Standards[4] | 75% | 62% | 75% |
| **Reducing Our Footprint** | | | |
| Avoided Greenhouse-Gas Emissions (metric tons $CO_2$) | 220,000[5] | 109,899[5] | 260,000 |

1. Measures the number of transactions completed as part of our Land Conservation Commitment, through which PG&E is permanently protecting more than 140,000 acres through the donations of fee title and conservation easements on watershed lands to public agencies and qualified conservation organizations. In 2019, we completed 11 transactions, which was slightly below our target primarily due to PG&E's bankruptcy and weather-related conditions.

2. As defined in Senate Bill 1078, which created California's Renewables Portfolio Standard, and Senate Bill 1038, which modified the definition of "in-state renewable electricity generation technology," an eligible renewable resource includes geothermal facilities, hydroelectric facilities with a capacity rating of 30 MW or less, biomass and biogas, selected municipal solid waste facilities, photovoltaic, solar thermal, and wind facilities, ocean thermal, tidal current, and wave energy generation technologies. These figures are preliminary and will not be finalized until verified by the California Energy Commission.

3. California measures its RPS compliance using multi-year compliance periods. The 2017-2020 RPS Compliance Period is based upon eligible renewable deliveries over four years to achieve an average of 30 percent in the compliance period. Although PG&E is below the interim RPS target for 2019, there is no compliance requirement for specific deliveries in any individual year in a multi-year compliance period. The only compliance requirement is for the compliance period itself, and the company is well-positioned to meet its requirements for the 2017-2020 RPS Compliance Period.

4. Represents the percentage of top-tier suppliers that achieve a score of three or higher on a five-point scale relative to key elements of PG&E's Supplier Environmental Performance Standards. Scoring is based on suppliers' responses to an annual survey conducted by the Electric Utility Industry Sustainable Supply Chain Alliance. The target was not met due to increased requirements for suppliers to provide greater specificity on their environmental reduction targets. In response, PG&E is increasing efforts to educate suppliers on setting and reporting environmental reduction targets.

5. Represents the second year of Pacific Gas and Electric Company's voluntary goal to avoid one million tons of cumulative greenhouse emissions from 2018 through 2022, compared to a 2016 baseline. The goal, referred to as the "Million Ton Challenge," aims to reduce emissions from operations through energy-efficient and more sustainable facilities, continuing to deploy clean fleet vehicles, reducing methane emissions from natural gas operations, and adopting environmentally responsible products and services, with an initial focus on reducing the procurement of sulfur hexafluoride-containing electrical equipment. While we fell short of the 2019 target, we remain on track to meet the five-year goal.

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. ©2020 Pacific Gas and Electric Company. All rights reserved.



Executive Summary

# Corporate Responsibility and Sustainability Report

2020

Explore the report at: **www.pgecorp.com/sustainability**



# Message from Our Leadership

To Our Stakeholders:

Today, after more than a century of service to Northern and Central California, PG&E humbly stands at a turning point unlike any other in our history.

We have taken responsibility for the devastating wildfires caused by our electric equipment in recent years, including the 2018 Camp Fire. We pleaded guilty to involuntary manslaughter in the deaths of the 84 people who lost their lives in that tragedy. We settled billions of dollars in damage claims by fire victims, as well as cities, counties, and other public entities.

We have concluded an 18-month Chapter 11 proceeding while fending off hostile takeover attempts. And we have emerged with a plan of reorganization that includes strong commitments regarding our corporate governance, operations, and financial structure that are designed to further prioritize safety and were forged with guidance from both the California Governor's Office and our state regulator.

Now, we are beginning a new era for PG&E, charting a new path toward a different future as a different company—one that will provide better outcomes and more sustainable results for all those who depend on us.

We will not do business as we did in the past. Rather, we will use the hard lessons we have learned as a driving force for continuous improvement, accountability, and sustained performance in the work we do every day.

Amid a global pandemic, we are intensifying our focus on the health and safety of our customers, workforce, and communities. And we are responding to calls for racial equity by deepening PG&E's long-standing dedication to diversity, inclusion, and equal opportunity in the workplace.

Earning back the trust we have lost will require us to meet each one of our obligations, without faltering.

Overall, we believe that the agreements that underlie our plan of reorganization position PG&E as a sustainable, financially sound utility with the appropriate governance and oversight to safely serve our customers for the long term, while also making the investments required to help the state achieve its climate and clean energy goals.

Accordingly, we are recommitting our support for California's climate leadership, including electrification of the energy grid, sufficient charging infrastructure to power millions of electric vehicles, and a carbon-neutral economy by 2045. We are adapting our systems to climate risks, particularly the rising threat of wildfires and extreme weather. And we are doing so with the recognition that both the costs and benefits of these innovations must be shared equitably across the economic spectrum.

As we pursue that vision, we understand that our success will be measured in the results we deliver, not the sincerity of our words. We invite you to judge us by that standard, and we welcome your feedback on our progress in the days ahead.

Sincerely,
William L. Smith
Interim CEO and President
PG&E Corporation

# Plan of Reorganization Commitments

As part of our Plan of Reorganization for emergence from Chapter 11, PG&E made a series of commitments, all designed to further prioritize safety. PG&E made these commitments working with the Governor's Office and incorporating guidance from the President of the California Public Utilities Commission (CPUC).

The commitments include:

- Supporting the CPUC's enactment of measures to strengthen PG&E's governance and operations, including enhanced regulatory oversight and enforcement that provides course-correction tools as well as stronger enforcement if it becomes necessary;

- Hosting a state-appointed observer to provide the state with insight into PG&E's progress on safety goals;

- Appointing an independent safety monitor when the term of the court-appointed Federal Monitor expires;

- Establishing newly expanded roles of Chief Risk Officer and Chief Safety Officer, with both reporting directly to the PG&E Corporation CEO and President;

- Forming an Independent Safety Oversight Committee to provide independent review of operations, including compliance, safety leadership, and operational performance;

- Assuming all collective bargaining agreements with labor unions, pension obligations, and other employee obligations, Community Choice Aggregation servicing agreements, and all power purchase agreements as part of a broader commitment to California's clean energy future;

- Reforming executive compensation to further tie it to safety performance and customer experience;

- A commitment that PG&E Corporation will not reinstate a common stock dividend until it has recognized $6.2 billion in non-GAAP core earnings;

- Filing a proposal with the CPUC requesting a rate-neutral $7.5 billion securitization transaction after PG&E emerges from Chapter 11 in order to finance costs in an efficient manner that benefits customers and accelerates payment to wildfire victims; and

- Committing not to seek recovery in customer rates of any portion of the amounts that will be paid to victims of the 2015, 2017, and 2018 wildfires under the Plan when PG&E emerges from Chapter 11 (except through the rate-neutral securitization transaction).



# Integrating Sustainability

PG&E defines sustainability as meeting the needs of today in a way that creates a better tomorrow—for our customers, communities, employees and the planet.

As an energy provider rooted in California, PG&E confronts choices and challenges with environmental, social and economic factors that affect the customers and communities we serve. Finding the right balance between these factors in the decisions PG&E makes is essential to achieving our goals of providing safe, reliable, affordable, and clean energy—today and into the future.

Corporate sustainability as business strategy has never been more important—taking an approach that considers PG&E's operations through the lens of preparing for the future and providing long-term value to our many stakeholders. In fact, doing so is what customers, investors, policymakers, regulators, environmental and social justice advocates and many others have come to expect from PG&E.

To help guide our decisions, we rely on our Mission, Vision and Culture framework, developed through extensive outreach and interactions with our employees, customers and other stakeholders. Importantly, it places a sustainable energy future at the center as our North Star.

## Our Mission

To safely and reliably deliver affordable and clean energy to our customers and communities every single day, while building the energy network of tomorrow.

## Our Vision

With a sustainable energy future as our North Star, we will meet the challenge of climate change while providing affordable energy for all customers.

## Our Culture

We put safety first.

We are accountable. We act with integrity, transparency and humility.

We are here to serve our customers.

We embrace change, innovation and continuous improvement.

We value diversity and inclusion. We speak up, listen up and follow up.

We succeed through collaboration and partnership. We are one team.



3



Business

## Key Sustainability Indicators

### 114.9 miles
Miles of strength-tested gas transmission pipeline

### 426
Weather stations installed to monitor wildfire threat

At PG&E, we are moving forward with a number of structural, management and governance changes to improve operations, remove risk from our system, and ensure long-term accountability for sustained performance. We continue to work together with customers, regulators and community leaders to address the threat of wildfires and expand our wildfire safety programs. We are also recommitting to California's clean energy future by implementing and advocating for clean energy policy and investing in electrification.

# Highlights

**Invested $7 billion** to enhance and upgrade our infrastructure for safety, reliability and wildfire mitigation.

**Met or exceeded goals** for core elements of our 2019 Wildfire Mitigation Plan, including system hardening, vegetation management, enhanced inspections and situational awareness, such as fire detection and fire spread modeling capabilities based on an industry-leading satellite system.

**Learned important lessons to improve our execution of Public Safety Power Shutoffs (PSPS)** and began listening sessions with stakeholders to improve the program going forward with a goal of PSPS events that are smaller in size, shorter in length and smarter for our customers.

**Completed substantial work to strengthen our natural gas system**, achieving industry-leading gains in process safety, asset management and technology innovation.

**Delivered some of the nation's cleanest electricity** to customers, with nearly 30 percent coming from renewable sources and we remain on track to meet the state's 60 percent by 2030 renewable energy mandate.

**Generated approximately 10.7 billion kWh** of zero-carbon hydroelectric energy for the benefit of our customers.



# PG&E Overview

PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company, an investor-owned energy company that operates in Northern and Central California and delivers some of the nation's cleanest energy. Throughout this report, when we refer to "PG&E," we are discussing all of PG&E Corporation and its subsidiaries, including Pacific Gas and Electric Company. When we refer to the "Utility," we are discussing Pacific Gas and Electric Company.

## Headquarters Location

San Francisco, California

## Service Area

70,000 square miles in Northern and Central California

## Service Area Population

Nearly 16 million people

## Customer Accounts
(as of December 31, 2019)

### 5.5 million electric distribution accounts:
- 4.8 million residential
- 0.7 million commercial, industrial and other

### 4.5 million natural gas distribution accounts:
- 4.2 million residential
- 0.3 million commercial and industrial

## Employees (as of December 31, 2019)

**Approximately 23,000 regular employees**

Approximately 15,000 employees are covered by collective bargaining agreements with three labor unions:

- International Brotherhood of Electrical Workers (IBEW), Local 1245, AFL-CIO
- Engineers and Scientists of California/International Federation of Professional and Technical Engineers (ESC/IFPTE), Local 20, AFL-CIO and CLC
- Service Employees International Union (SEIU), Local 24/7

## System

- 7,686 MW of PG&E-owned hydroelectric, nuclear, natural gas, solar and fuel cell generation
- Approximately 107,000 circuit miles of electric distribution lines (about 25 percent underground and 75 percent overhead) and approximately 18,000 circuit miles of electric transmission lines
- Approximately 43,000 miles of gas distribution pipelines, 6,600 miles of backbone and local gas transmission pipelines and three gas storage facilities

## PG&E's 2019 Electric Power Mix Delivered to Retail Customers[1]

| | Percent of Bundled Retail Sales (actual procurement) | Percent of Bundled Retail Sales (Power Content Label) |
|---|---|---|
| Eligible Renewable | 29.7% | 27.4% |
| Fossil fuel-fired | 36.6% | 0.0% |
| Nuclear | 45.0% | 41.7% |
| Large Hydroelectric | 33.3% | 30.9% |
| Others, Net[2, 3] | (44.6)% | 0.0% |

1. Numbers may not add up to 100 due to rounding.

2. The allocation of bundled retail sale amounts and "Others, Net" in the "Power Content Label" column is consistent with current California Energy Commission guidelines, applied to specified electric generation and procurement volumes (i.e., fossil fuel-fired, nuclear, large hydroelectric, and renewable). Total reported generation and procurement volumes equate to actual electric retail sales.

3. Amount is mainly comprised of net California Independent System Operator open market (sales)/purchases.

## Composition of PG&E's 2019 Total Eligible Renewable Resource[1]

| | |
|---|---|
| Solar | 12.7% |
| Wind | 9.5% |
| Geothermal | 1.5% |
| Biomass and Waste | 3.7% |
| Eligible Hydroelectric | 2.3% |
| **Total** | **29.7%** |

1. As defined in Senate Bill 1078, which created California's Renewables Portfolio Standard, and Senate Bill 1036, which modified the definition of "in-state renewable electricity generation technology," an eligible renewable resource includes geothermal facilities, hydroelectric facilities with a capacity rating of 30 MW or less, biomass and biogas, selected municipal solid waste facilities, photovoltaic, solar thermal, and wind facilities, ocean thermal, tidal current, and wave energy generation technologies. These figures are preliminary and will not be finalized until verified by the California Energy Commission.

5



Safety

**Key Sustainability Indicators**

**20.8** minutes
Average response time to gas odor reports

**171** line miles
System hardening completed in high fire threat districts

At PG&E, safety is our most important responsibility. Fulfilling our goal of becoming the utility that our customers expect and deserve requires that they, as well as the public and all our stakeholders, are able to trust that we will deliver electricity and natural gas safely, reliably and with unquestioned integrity.

Our focus is to continually reduce risk. Today, we are building an organization in which we have designed every work activity to facilitate safe performance, every member of our workforce knows and practices safe behaviors, and every individual is encouraged to speak up if they see unsafe or risky behavior and has confidence that their concerns and ideas will be heard and followed up on.

This focus is fundamental to all of our operations and consistent with PG&E's Mission, Vision, and Culture.

# Highlights

**Continued to build a safety culture** in which every member of our workforce is not only encouraged to speak up, but has confidence that their concerns and ideas will be heard and followed up on.

**Appointed an Independent Chief Safety Advisor** to the PG&E Corporation CEO and President and launched an Independent Safety Oversight Committee.

**Delivered more than 42,000 days of training** on courses specifically focused on safety and compliance.

**Executed our Community Wildfire Safety Program** to further reduce wildfire risks and keep our customers and the communities we serve safe.

**Awarded $2 million in wildfire prevention grants** to local Fire Safe Councils.

**Expanded our partnership with the California Fire Foundation** by funding a $1 million wildfire safety and preparedness grant focused on providing funding for firefighters and Community/ Neighborhood Emergency Response Teams.

**Continued to make safety performance** the single largest driver for annual at-risk performance-based pay.

**Hosted 375 training workshops** to better prepare firefighters, police, public works officials and other authorities to respond to emergencies involving electricity and natural gas.

**Worked with other gas and electric providers, other essential industries and government officials** to develop and implement state-of-the-art security strategies and best practices.



## Customers & Communities

### Key Sustainability Indicators

**1,253** GWh

Electricity saved through customer energy efficiency, exceeding our target

**41.2%**

Percentage of PG&E's overall procurement with diverse certified suppliers

PG&E's focus on investing in our infrastructure and improving our operations is designed to reduce risk and support our mission of providing customers with safe, reliable, affordable and clean energy. Every day, we are also working to better understand the energy needs of our customers, support cleaner energy options and increase customer choice. Our commitment also includes working locally to support the vitality of the communities where our employees live and work.

# Highlights

**Helped customers save more than $300 million** on their energy bills and avoid the emission of nearly 640,000 metric tons of carbon dioxide through our energy efficiency programs.

**Brought the total number of interconnected private solar customers** to nearly 465,000.

**Supported over 8,000 customers** who have installed battery storage at their homes or businesses, often paired with a solar system.

**Expanded our energy efficiency financing program**, which provides commercial customers and government agencies with loans for energy efficiency upgrades with no out-of-pocket costs and zero interest, funding 668 loans worth a total of $59 million.

**Installed approximately 2,300 Level 2 charging ports** at workplaces and multi-family dwellings and launched programs to support medium- and heavy-duty fleets and public fast charging.

**Contributed $17.5 million to charitable organizations** through our Better Together Giving Program and the PG&E Foundation, designed to help address critical social, educational and environmental challenges in the communities we serve.

**Continued to offer our community renewables programs**, which give customers the option to purchase 100 percent of their electricity from a universal solar program, without the need to install private rooftop solar panels.

**Achieved industry-leading supplier diversity results**, spending $3.41 billion—or 41.15 percent of our total expenditures—with businesses owned by women, minorities, service-disabled veterans and LGBTQ individuals.



## Employees

### Key Sustainability Indicators

# 93%

Percentage of PowerPathway graduates hired into industry jobs

# 71,000 hours

Number of employee volunteer hours

Every day, approximately 23,000 PG&E employees are hard at work: putting our plans into action, finding new ways to meet the needs of our customers, and strengthening our energy systems to deliver safe, reliable, affordable and clean energy. We remain focused on building and retaining an engaged, well-trained and diverse workforce ready to meet the challenges of our business today and into the future.

# Highlights

**Established a new Wildfire Safety organization**, comprised of former firefighters, experts in vegetation management, meteorologists and other personnel.

**Demonstrated our commitment to communities** with employees contributing nearly 71,000 employee volunteer hours to schools and nonprofit service organizations.

**Achieved more than $7 million in pledges from employees** in our annual Campaign for the Community.

**Delivered more than 670,000 hours** of technical, leadership and employee training.

**Continued to provide career opportunities** for veterans and women through our Power Pathway™ workforce development program.

**Engaged employees** through our 11 Employee Resource Groups and three Engineering Networks across 27 chapters to promote diversity and inclusion, employee development and community service.

**Continued to earn recognition** for our commitment to diversity and inclusion, including rankings from the Human Rights Campaign, Disability Equality Index, *Black Enterprise* magazine, and *Latina Style* magazine.



Environment

## Key Sustainability Indicators

### 30%
Percentage of power from eligible renewable resources

### 110,000
Metric tons of carbon dioxide avoided in our operations

PG&E's environmental commitment begins with our aim to fully meet all environmental requirements, but it extends much further. We continue to support and help advance the state's climate and clean energy goals. We also remain committed to supporting climate resilience efforts at the state and local levels to better prepare for, withstand and recover from extreme events and other risks related to climate change.

# Highlights

**Continued our operational partnership agreements** with the U.S. Forest Service and Bureau of Land Management to expedite and streamline critical wildfire safety and infrastructure work while protecting species and public lands.

**Continued to make significant progress in securing Habitat Conservation Plans**, which enable PG&E to most efficiently conduct operations and maintenance activities while protecting listed endangered species.

**Remained on track to meet the Million Ton Challenge,** a voluntary Pacific Gas and Electric Company goal to avoid one million tons of greenhouse gas (GHG) emissions from our operations over five years.

**Permanently protected 7,241 acres of land as part of the Land Conservation Commitment**, which ultimately will protect 140,000 acres of PG&E-owned watershed lands.

**Helped our customers save about 166 million gallons of water** through energy-efficiency measures that deliver water savings.

**Further integrated climate change adaptation planning** into our risk management processes.

**Awarded the third series of grants for the Better Together Resilient Communities grant program**, a shareholder-funded initiative to support local climate resilience planning efforts.

**Offered technical assistance workshops for suppliers focused on sustainability**, including best practices for measuring greenhouse gas emissions.

**Implemented sustainable practices at our facilities**, reducing aggregated energy use intensity by 8 percent.

# Key Sustainability Indicators

## Business

**2019 Result Legend:** ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Gas Operations** | | | |
| **Strength-Tested Transmission Pipeline** (miles) | 102.6 | 114.9 | 33.1 |
| **Transmission Pipeline Replacement** (miles) | 14.4 | 21.3 | 34.0 |
| **Valves Automated** (number of valves) | 23 | 23 | 20 |
| **Retrofitted Transmission Pipeline** (projects) | 12 | 10 | 14 |
| **Gas Dig-Ins**[1] (dig-ins per 1,000 Underground Service Alert tickets) | 1.70 | 1.04 | 1.44 |
| **Electric Operations** | | | |
| **System Average Interruption Frequency Index (SAIFI)** average number of outages per customer | 1.089 | 1.129 | 1.136 |
| **System Average Interruption Duration Index (SAIDI)** average duration of outages per customer in minutes | 129.2 | 148.8 | 147.6 |
| **Customers experiencing five or more sustained outages (CEMI-5)** | 2.61% | 3.20% | 3.12% |
| **Nuclear Operations** | | | |
| **Diablo Canyon Power Plant Reliability and Safety** | 93.7 | 97.5 | 95.0 |
| **Ethics and Compliance** | | | |
| **Employees Completing Annual Compliance and Ethics Training** | 99.8% | 99.9% | 99.8% |
| **Employees Completing Annual Code of Conduct Training** | 99.8% | 99.9% | 99.8% |

1. In 2019, Gas Dig-Ins measured the total number of third-party dig-ins (i.e., damage from a third party resulting in repair or replacement of an underground PG&E facility). In 2020, the measure was expanded to also include dig-ins from first and second parties.

2. Refers to the sum of 11 performance indicators developed by the nuclear power industry for nuclear power generation.

# Safety

**2019 Result Legend:** ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Wildfire Safety** | | | |
| **System Hardening** (line miles): Stronger poles, covered lines and/or targeted undergrounding | 150 | 171 | 241 |
| **Enhanced Vegetation Management** (line miles): Inspecting, pruning and removing vegetation | 2,450 | 2,498 | 1,800 |
| **Visual and Aerial Inspections on:** ≈50,000 transmission, ≈700,000 distribution and ≈200 substation assets in High Fire Threat Districts (HFTD) | 100% | 100% | See footnote 1 |
| **High-Definition Cameras** (cameras): Improving real-time monitoring of high-risk areas and conditions | 96 | 133 | 200 |
| **Weather Stations** (stations): Enhancing weather forecasting and modeling | 400 | 426 | 400 |
| **Sectionalizing Devices** (devices): Separating the grid into small sections for operational flexibility | N/A | 287 | 592 |
| **Transmission Line Switches** (devices): Enabling targeted transmission outages to lessen downstream customer impacts | N/A | N/A | 23 |
| **Public Safety** | | | |
| **Gas First-Time In-Line Inspections[2]** | 183.0 | 266.4 | 164.7 |
| **Gas Emergency Response[3]** (minutes) | 21.0 | 20.8 | 20.8 |
| **Electric Emergency Response[4]** (percentage within 60 minutes) | 97.5% | 95.3% | 96.5% |
| **Asset Records Duration Index[5]** | 1.0 | 1.2 | N/A |
| **Employee Safety** | | | |
| **Days Away, Restricted or Transferred (DART) Rate[6]** | 1.34 | 2.05 | 0.90 |
| **Preventable Motor Vehicle Incidents Rate[7]** | 2.45 | 2.91 | 2.41 |

1. Target is annual inspections for Tier 3 HFTD facilities and three-year cycles for Tier 2 HFTD facilities.

2. Measures the successful completion of first-time in-line inspections of newly-constructed natural gas transmission lines.

3. Average response time in minutes to an immediate response gas emergency order.

4. Percentage of time that PG&E personnel are on site within 60 minutes after receiving a 911 call of a potential PG&E electric hazard.

5. Weighted index that tracks the average number of days to complete the as-built process in the system of record for electric and gas capital and expense jobs from the time construction is completed in the field or released to operations. The Gas Operations Index consists of three weighted sub-metrics: Transmission (60%), Station (10%), Distribution (30%). The Electric Operations Index consists of three weighted sub-metrics: Transmission Line (25%), Substation (25%), Distribution (50%). In 2020, PG&E began tracking submetrics separately, rather than one consolidated metric.

6. Measures how frequently DART cases occur for every 200,000 hours worked, or for approximately every 100 employees.

7. Measures the number of preventable motor vehicle incidents occurring that the driver could have reasonably avoided, per 1 million miles driven.

# Customers and Communities

**2019 Result Legend:** ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Customer Satisfaction** | | | |
| Escalated Customer Complaints[1] | 12.2 | 10.1 | 10.1 |
| Customer Connection Cycle Time[2] (business days) | 10 | 10 | 10 |
| Gas And Electric Meter Billing Accuracy[3] (percentage of bills) | 99.71% | 99.65% | 99.59% |
| **Energy Affordability** | | | |
| Energy Savings Assistance Program (number of homes weatherized) | 99,175 | 106,064 | 104,222 |
| California Alternative Rates For Energy (number of eligible customers enrolled) | 1,302,000 | 1,382,663 | 1,350,000 |
| **Customer Energy Efficiency[4]** | | | |
| Electricity Saved (GWh) | 1,079 | 1,253 | 955 |
| Natural Gas Saved (Million Therms) | 33.0 | 27.6 | 25 |
| Generation Capacity Avoided (MW) | 222 | 253 | 195 |
| **Clean Transportation** | | | |
| Electric Vehicle Charge Network (EVCN) (number of charge ports) | N/A[5] | 1,703 | 4,500[6] |
| **Supplier Diversity** | | | |
| Spending on Certified Diverse Suppliers (percentage of overall purchasing expenditures) | 38.0% | 41.2% | 38.0% |

1. Measures the number of customer complaints escalated to the CPUC per 100,000 adjusted customers.

2. Tracks the 12-month average design and construction cycle time for electric residential disconnect/reconnect work requested by customers and performed through Express Connections (our customer gateway).

3. Refers to the percentage of bills that are not adjusted after being mailed to the customer. Each year, a very small percentage of bills must be estimated, largely due to intermittent connectivity (similar to a cell phone temporarily losing its connection).

4. Data refers to annual energy savings or the first-year impacts associated with installed customer energy efficiency projects, as appropriate. Targets are based on mandated energy efficiency savings as agreed upon with the CPUC. All data is as filed with the CPUC in Pacific Gas and Electric Company's Energy Efficiency Program Portfolio Reports. Annual energy savings include savings from codes and standards programs and, per CPUC policy governing energy efficiency goals, include savings from Regional Energy Network or Community Choice Aggregator programs in PG&E's service area, which represented approximately 1% or less of total annual savings.

5. PG&E's transportation electrification programs are multi-year efforts with end-of-program targets rather than annual targets. PG&E's EVCN program target is to install 4,500 Level 2 charging ports by the end of 2020, subject to modification based on conditions outside PG&E's control, such as customer needs, electric vehicle market conditions, weather, economic conditions, the COVID-19 crisis, and other factors.

6. For the safety of PG&E personnel, contractors, customers and site-hosts, the COVID-19 crisis has required an unanticipated, necessary curtailment of EVCN in-person site-host and customer coordination and field construction work. As a result, PG&E anticipates EVCN work will continue into 2021, shifting the overall program target of 4,500 ports to 2021 or a later date.

# Employees

**2019 Result Legend:**   ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Employee Engagement** | | | |
| **Employee Giving Campaign Pledges/Donations** (participation rate) | 49% | 35% | 35% |
| **Employee Engagement Index**[1] | 68 | 64 | 68 |
| **Career Pathways** | | | |
| **Training Effectiveness**[2] | 4.28 | 4.57 | 4.5 |
| **PowerPathway Graduates Hired Into Industry Jobs** (percentage) | 80% | 93% | 80% |
| **Health and Wellness** | | | |
| **Workforce Unavailable Due To Health**[3] | 7.7% | 7.8% | 7.7% |

1. This figure represents the percentage of favorable responses to questions on an employee survey that measure employee engagement. In 2019, PG&E conducted a quarterly survey of employee engagement, sampling a portion of the employee population each time. The 2019 fourth quarter score was 64 percent with 33 percent of employees participating in the survey and a margin of error of plus or minus 2 points. PG&E conducts a full employee survey every two years, to allow more time to execute on action plans to address issues identified in the prior survey; the next full employee survey will be in 2020.

2. This figure measures the effectiveness of PG&E's internal training program on a five-point scale through employee surveys or predictive data from employees on their ability to use training on the job.

3. This figure represents the percentage of full-time employees unavailable for work either due to long-term or short-term health reasons, as measured by total workdays lost for the entire year.

# Environment

**2019 Result Legend:** ■ = Target met or exceeded   ■ = Target not met

| Metric | 2019 Target | 2019 Result | 2020 Target |
|---|---|---|---|
| **Compliance** | | | |
| **Agency Inspections Without A Written Enforcement Action** | 90% | 91% | 90% |
| **Natural Resource Stewardship** | | | |
| **Land Conservation Commitment:** (number of transactions closed)[1] | 13 | 11 | 12 |
| **Clean Energy** | | | |
| **Renewables Portfolio Standard** (RPS) | 31%[2] | 30%[3] On track for multi-year compliance period requirement | 33% |
| **Supply Chain Sustainability** | | | |
| **Supplier Environmental Performance Standards**[4] | 75% | 62% | 75% |
| **Reducing Our Footprint** | | | |
| **Avoided Greenhouse-Gas Emissions** (metric tons $CO_2$) | 220,000[5] | 109,899[5] | 260,000 |

1. Measures the number of transactions completed as part of our Land Conservation Commitment, through which PG&E is permanently protecting more than 140,000 acres through the donations of fee title and conservation easements on watershed lands to public agencies and qualified conservation organizations. In 2019, we completed 11 transactions, which was slightly below our target primarily due to PG&E's bankruptcy and weather-related conditions.

2. As defined in Senate Bill 1078, which created California's Renewables Portfolio Standard, and Senate Bill 1038, which modified the definition of "in-state renewable electricity generation technology," an eligible renewable resource includes geothermal facilities, hydroelectric facilities with a capacity rating of 30 MW or less, biomass and biogas, selected municipal solid waste facilities, photovoltaic, solar thermal, and wind facilities, ocean thermal, tidal current, and wave energy generation technologies. These figures are preliminary and will not be finalized until verified by the California Energy Commission.

3. California measures its RPS compliance using multi-year compliance periods. The 2017-2020 RPS Compliance Period is based upon eligible renewable deliveries over four years to achieve an average of 30 percent in the compliance period. Although PG&E is below the interim RPS target for 2019, there is no compliance requirement for specific deliveries in any individual year in a multi-year compliance period. The only compliance requirement is for the compliance period itself, and the company is well-positioned to meet its requirements for the 2017-2020 RPS Compliance Period.

4. Represents the percentage of top-tier suppliers that achieve a score of three or higher on a five-point scale relative to key elements of PG&E's Supplier Environmental Performance Standards. Scoring is based on suppliers' responses to an annual survey conducted by the Electric Utility Industry Sustainable Supply Chain Alliance. The target was not met due to increased requirements for suppliers to provide greater specificity on their environmental reduction targets. In response, PG&E is increasing efforts to educate suppliers on setting and reporting environmental reduction targets.

5. Represents the second year of Pacific Gas and Electric Company's voluntary goal to avoid one million tons of cumulative greenhouse emissions from 2018 through 2022, compared to a 2016 baseline. The goal, referred to as the "Million Ton Challenge," aims to reduce emissions from operations through energy-efficient and more sustainable facilities, continuing to deploy clean fleet vehicles, reducing methane emissions from natural gas operations, and adopting environmentally responsible products and services, with an initial focus on reducing the procurement of sulfur hexafluoride-containing electrical equipment. While we fell short of the 2019 target, we remain on track to meet the five-year goal.

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. ©2020 Pacific Gas and Electric Company. All rights reserved.

**Christina M Goerss**
**1565 Anderson Ave**
**McKinleyville, CA  95519**
**Email: powergirl11@att.net**
**Phone: (707) 834-0570**

November 5, 2020

Paula M. Jean
HR Investigations Business Operations Specialist, Expert
**Compliance and Ethics** Department for Pacific Gas and Electric Company
111 Almaden Boulevard
P.O. Box 15005
San Jose, CA  95115-0005

CC: Kimberly Thomas, HR Investigations Manager

**RE: Intake Notes for Interview with Christina Goerss/Investigation Outline for CMS # 20-0860**

Dear Ms. Jean,

This letter is to confirm receipt of the communication sent from your office on October 31, 2020 and dated October 29, 2020. It is worth noting that this is the first correspondence I have received from your office since April 23, 2020, at which point I was making a **second attempt** to receive confirmation of receipt of my two Statements of Claim; one against Learning Services senior management and one against Eureka Field Services front line supervision. These were very serious allegations made by a tenured member of Customer Field Services. I would've thought it would have warranted more attention than that.

For the record, my statements were originally sent on March 30, 2020, I did not receive confirmation of receipt of my claim until I requested it <u>again </u>on April 23, 2020 and copied your uplink. I also did not receive your NOTICE TO COMPLAINANT OF INVESTIGATION COMPLETION CMS #20-0860 until two weeks after I made a **formal complaint** to Susan Jue and Susan Meser about the abhorrent way I have been treated throughout, by nearly everyone involved in my dismantling. If you were **unable to substantiate my claims**, maybe it was because you didn't, in fact, investigate it properly.

I assure you that my take down was very real and very public and it had a rather detrimental effect on the workgroup up here in Eureka and Customer Field Services as a whole. I have been their biggest fan and mascot for many years. If the goal here is to foster a **"Speak Up" culture**, we have failed. If the goal is to silence dissent, management's message was sent loud and clear. Your organization is tasked to be the worker's last vestige in the face of bullying and abuse. That has <u>not</u> been my experience while working with you over the years. Gas Service Representatives are one of our most skilled and safety critical workforces in the company, especially in relation to the customer's safety. Their expertise is earned with sweat and dirt. The company owes them a huge debt of gratitude for continuing to excel in the face of unbelievable odds. Having been one, I can appreciate their sacrifices and I expect better from those that support them.

Furthermore, I am in a state of confusion around your claim that I was interviewed during the course of the above-mentioned investigation. I'm not sure how the investigations team can interview me without speaking to me. Maybe I've missed something. In the interest of clarity, could you please provide my copy of the **Intake Notes** taken during my interview for the aforementioned investigation? I was provided this information the first time around. I'm sure it's no trouble to produce them this time. I'm not sure if you have been informed that this has been a career ending injury for me. I have been stripped of all assets and told that "I am leaving the company" by management under threat of Corporate Security.

This was all done before my Worker's Compensation claim was settled. Management's preemptive habits betray their true intent. If that isn't retaliation for reporting an injury, our standards have laxed concernedly. There needs to be an accounting for the sake of future incidents. At least, that's how we do it in the field.

I am still a member of the PG&E family and a sterling one at that. This has been a very grave and painstaking experience for me. Being a long-standing safety steward and leader, I am deeply concerned with how opaque this all has been. In the field we refer to our standards and procedures when tasks are unclear. I'm curious what standards and procedures your team follow when conducting an investigation.

Standards and procedures are public information, I know it is with the EEOC. Could you please provide a link to the Compliance and Ethics standards and procedures pertaining to investigations? That might help clear up the confusion I am experiencing.

I don't think it is out of line under these curious circumstances to request that you show your work. Therefore, please provide an **outline of the individuals questioned and the evidence examined**. That information would go a long way toward demonstrating "good faith". I know I certainly have a cache of evidence that no one has questioned me about or asked to look at in any way. I provided it all to Roberta Pena, IDM expert and heard nothing more about it. These are all very curious behaviors and in the field we are required to show our work. I would like to see exactly what was done on my behalf.

Also for the record, I have a **Reasonable Accommodation** in effect with all representatives of the company. I only correspond in writing. I can only speak while in session with either of my attending doctors; as witness. The symptoms I have developed are quite violent. It is safest to be under their care when addressing my abusers. I rightfully put Compliance and Ethics at the tippy top of that list.

I do hope this correspondence finds you well during these unprecedented times. May God bless and keep you.

Warm regards,

Christina M. Goerss
Employee # 00113690

QME Psychiatric Report by Andrea R. Bates, MD, MBA
Re: Christina Goerss

mishandled and by EAP agitated my disability to the point of injury and delayed my recovery."

- Enclosures:
  - • Independent Physician File Review Response
  - • Examples of Operator Qualification Change Forms
  - • OSHA Code of Safe Practices
  - • Overtime Log Deep Dive
  - • Hours Worked (PG&E)
  - • SB-1300
  - • The PG&E Code of Conduct for Employees
  - • PG&E Director Code of Conduct
  - • Compliance and Ethics Statement
  - • Case# 20-0860 Compliance and Ethics Response Email
  - • 2015 Performance Appraisal
  - • 2014 Performance Appraisal
  - • List of PG&E Accomplishments fo r Customer Field Services and Gas Academy
  - • CTT + Certification
  - • 15 Year Service Award
  - • Ambassador Awards (4)
  - • Bronze Awards (2)
  - • FICO Score as of 6/23/2020
  - • List of Relevant Periodicals
  - • Images of San Bruno Fire/Victims/Wreckage
  - • Images of Camp Fire/Victims/Wreckage
  - Page 2 of 3
  - • United States District Court for the Northern District of California (San Francisco); Petition for
  - Summons for Offender Under Supervision
  - • CPUC Orders PG&E to Implement Recommendations to Improve Its Safety Culture and
  - Operations
  - • Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety
  - Culture; Prepared for the CPUC, May 8, 2017
  - • Northstar Assessment Relevancy to Injury Declaration
  - • California Public Utilities Commission Forum on Governance, Management, and Safety Culture,
  - April 26, 2019. To Improve Utility Performance, Fix the Culture of Entitlement by Scott Hempling
  - • Essay by Scott Hem piing; Utility Workers: Is Their Mistreatment a Commission Responsibility?
  - The Dream
  - Academy Timeline
  - Eureka Timeline- Veteran Supervisor
  - Eureka Timeline – Rookie Supervisor
  - Academy Mileage Log



**Pacific Gas and
Electric Company**

Integrated Disability Management Services
Workers' Compensation
Mail Code B6J
P.O. Box 7779
San Francisco, CA 94120-7779

June 18, 2020

Andrea R. Bates, M.D., M.B.A.
5470 Kietzke Lane, Suite #300
Reno, NV 89511

Re:    Christina Goerss
       D/I: 02/26/2019
       PG&E File No.: 19W0302

Dear Dr. Bates:

Thank you for agreeing to examine, Ms. Christina Goerss, currently 48 years old,
in the capacity of a Panel Qualified Medical Examiner, on 7/9/2020, at ~~1:00~~ a.m.,
at your office located at 2240 St. George Lane, Suite 4, in Chico, CA.  11:00

At the time of the injury, Christina Goerss, was employed as a Gas Service
Representative (GSR) for Pacific Gas and Electric Company and has been
working for Pacific Gas and Electric since 5/5/2003.  A copy of the job function
analysis is enclosed for your review.  <u>Please accept this letter as our
authorization to perform any diagnostic testing you feel is necessary to complete
your examination.</u>

The main purpose of this examination is to determine causation from the alleged
psychiatric injury.

On 2/27/19 Ms. Goerss reported that she has sustained an injury to her psyche
as a result of her employment with PG&E. She alleged that one of her
supervisors was "creeping" on her and started to show up at her job sites. She
said she was sitting in her work truck in October 2018 when her daughter called
and reported she had been date raped. ~~Ms. Goerss said this broke her and she~~ ①
had a severe panic attack.  She said for the next 3 months her supervisor Mr.
Ryan Harriman was all over her and would show up at her jobs.

When the undersigned spoke with Ms. Goerss on 3/8/2019 she said she may
have taken the actions of ~~Mr. Harriman as malicious due to hormone problems.~~ ②
At that time she said she didn't think he did anything wrong but maybe he was
lacking in people skills.

Ms. Goerss advised that she was a Gas Service Rep (GSR) from 2007 through
2013, and then she was asked to work at the Academy (Learning Services) in
January 2013.



Christina Goerss
June 18, 2020
Page 2

She worked at the Academy until September 2016 and then she returned to a
GSR position. She states that while working at the Academy in early 2015 she
was sexually harassed by a student taking a test. After the test she reports that
the student came up behind her and thrust himself up against her. She said she
told her lead instructor and he blew her off. She reported the incident to Ethics
and Compliance. The investigation noted that the student does tend to stand
close when talking and sort of invades personal space and the incident could
have been misinterpreted. However, it was found that the student was in
violation of the Code of Conduct. There was no wrong doing from her lead
instructor.

Ms. Goerss said in February 2019 she received Coach and Counseling due to a
customer complaint. She went on a call at 2 am for a gas leak and the customer
said he had been smelling gas for a month and she responded inappropriately.

Ms. Goerss advised the undersigned that she stress smokes.  She tested
positive for marijuana in 2003 during a random drug test and went thru a
drug/alcohol program at PG&E. She has had many deaths in her family and of
close friends.. In 2013 her mother died from cancer and in 2015 her best friend of
25 years was murdered by her friend's son. Her stepfather died and other
friends as well. She advised that in 2011 she found out her fiancé was sexually
abusing her daughter. Ms. Goerss advised she has 2 daughters which she raised
by herself with no child support. Ms. Goerss admitted to PTSD from personal
stressors. She also admitted to being abused when young but refused to answer
if it was physical or emotional abuse.

Initially Ms. Goerss decided she did not want to pursue her claim. Then on
2/12/2020 she changed her mind. She advised the undersigned that she has no
anxiety about doing her job; her problem is with management and harassment.
She amended her date of injury to 2/26/2019 as that is when she last worked.
Ms. Goerss has served a Statement of Claim dated 3/17/2020 (54 pages) with
attachments to the undersigned and which Ms. Goerss will bring to the
examination.

A recorded statement was obtained from Mr. Daniel Campbell who has been the
Field Service Supervisor in Humboldt since 1/1/ 2019. He met Ms. Goerss
previously in 2018 when he was working as a Lean Coach and visited the Eureka
yard. He stated that he approached Ms. Goerss because of her previous
instructor experience and asked if she would be interested in helping to onboard
3 new GSRs. Ms. Goerss said she would like to be involved with the training. He
mentioned that he asked his employees what shifts they wanted to work and Ms.
Goerss wanted to remain on the 2 pm to 9 pm shift. He stated that from January
2019 to February 2019, when Ms. Goerss stopped working, he received 3 or 4
calls from Dispatch regarding Ms. Goerss being frustrated and taking it out on
Dispatch



Christina Goerss
June 18, 2020
Page 3

He said that Ms. Goerss could be frustrated because of the complexity of certain jobs but other employees were willing to go out and assist if needed. He described Ms. Goerss' hands- on knowledge as average and her book knowledge as good.  He would perform spot checks on all employees and they are performed randomly. He stated that Ms. Goerss never seemed nervous or concerned when he would perform a spot check with her. Mr. Campbell said that she voiced a concern one time regarding the close proximity of Ryan Harriman, saying it made her nervous that Mr. Harriman was looking over her shoulder. There was an incident in January 2019 when Mr. Harriman pointed out a couple of things he felt Ms. Goerss should have addressed and Ms. Goerss disagreed. He believes that Mr. Harriman was trying to help Ms. Goerss. Mr. Campbell said that after Mr. Harriman left the job he was driving back to his hotel and talking with Mr. Campbell on the phone regarding the events of the day.  Mr. Harriman drove by a grocery store and told Mr. Campbell that there was a GSR truck in the parking lot.  He asked Mr. Harriman to check the truck and obtain the truck's number. Ms. Goerss came out of the store at that time and felt that Mr. Harriman was following her. Mr. Campbell told Ms. Goerss that he had been the person instructing Mr. Harriman to identify the truck number in the grocery store parking lot and that Mr. Harriman was acting on instruction by him. Mr. Campbell stated that Ms. Goerss told him she had a disability but she did not provide any additional information and he doesn't know what Ms. Goerss is referring to when she states he downplayed her complaints.  He said he is well aware of PTSD as he spent eleven years as a Marine Corp Infantryman.

Mr. Donnie Humphrey was interviewed.  He is the Manager of Field Services and Gas Operations. He is the direct supervisor of Mr. Campbell. He only met Ms. Goerss one time during a grassroots safety summit in April 2018. He was advised of the customer complaint regarding Ms. Goerss yelling at a customer but to his knowledge there was no formal disciplinary action. He hired Mr. Campbell for the position in Eureka and noted that it is not uncommon for someone to be promoted into a new position that they previously had no experience in. He brought Mr. Harriman into the Eureka yard in September 2018 when the previous supervisor went out for surgery and then retired. Mr. Humphrey noted that Mr. Harriman didn't apply for the supervisor position on a regular basis. Mr. Humphrey said that he felt Mr. Harriman performed okay and he had a very good, in-depth knowledge of a GSR.

Mr. Harriman was interviewed.  He said that he was provided a temporary upgrade to a supervisor position and he would conduct job visits. He did not apply for the position on a regular basis. He stated when he first came to Eureka he was notified by a Dispatcher that Ms. Goerss was having a panic attack. When he arrived on scene, she was in a full blown panic attack, crying and hyperventilating.



Christina Goerss
June 18, 2020
Page 4

He suggested she call EAP (Employee Assistance Program) but she declined stating she just wanted to go home. Ms. Goerss disclosed that she suffered a disability and had PTSD and Mr. Harriman stated he never discussed the event or conversation with anyone else in the shop. He noted an incident in Arcata. Ms. Goerss was at the job and help had been requested. When he arrived the Lead, Ernie Vasquez, was already there. He and Mr. Vasquez discussed what could be done as they were unable to unstick the plunger. They agreed to begin the shoveling process while waiting for construction to arrive. Ms. Goerss went to her truck and sat inside doing paperwork. He knew the claimant was being obstinate about not wanting them to dig and wanted to wait for construction. There was another incident on 1/7/2020 at an apartment complex. Ms. Goerss and another employee both said they didn't need to perform the CO test and Mr. Harriman said it is Company procedure and protocol that if there is yellow tipping a CO test should be completed The following day he forwarded the instructions per the Company manual to Ms. Goerss and the other employee. The following day they were at a location that had spillage. Mr. Harriman said when spillage is found you take a CO read, per procedure, and there was disagreement from Ms. Goerss. Thereafter Ms. Goerss would make comments in front of customers saying Mr. Harriman didn't know what he was talking about. He recalled the incident at the grocery store on 1/7/2019 when he saw the GSR truck in the parking lot and went back around the block to get the truck number. Ms. Goerss came outside and asked if he was following her. He said he didn't have a lot of contact with Ms. Goerss because of her work schedule. They were at a barbeque when he was getting ready to leave to return to Santa Rosa. There was a discussion and some of the group asked what he thought they should do in regard to their new boss. He advised to just do your job and make sure you take your breaks and lunches within their times. Ms. Goerss blew up at him because of his comments regarding breaks and lunches. Mr. Harriman stated he was aware that Ms. Goerss took longer than allowed times and the following day sent Ms. Goerss a document that listed a number of instances when she has been over on her breaks and lunches. At the barbeque she was ranting and said that if someone wanted to talk to her about her breaks and lunches her response time was going to suffer. He responded that she should not put customers at risk because of her perceived anger with the Company.

Following your examination, we ask that you provide us with a detailed report which includes the patient's history, family relationships, social/financial issues, prior stress problems, significant medical illness, natural progression of a pre-existing disorder and any prior industrial stress claims or incidents. Pursuant to Labor Code Section 4663(d), please ask Ms. Goerss to provide you with information regarding any previous permanent disability or physical impairments). Please outline your clinical observations, diagnosis, and prognosis. Please also address the following:



Christina Goerss
June 18, 2020
Page 5


<u>Diagnosis</u>
Please refer to the Diagnostic and Statistical Manual of Mental Disorders, Fourth
Edition, Text Revision (DSM-IV-TR). Please advise what GAF (Global
Assessment of Functioning) score you would categorize her as and include any
DMS IV diagnosis.

<u>Causation</u>

*The threshold of compensability is defined under Labor Code 3208.3. Please
review below carefully and address accordingly as you arrive at your conclusion.*

If it is determined that workplace activities caused or contributed to Ms. Goerss'
psychiatric condition please provide us with an approximate percentage that was
caused as a direct result of workplace activities and the approximate percentage
that was caused by other factor(s) industrial or non-industrial pursuant to Labor
Code 3208.3 which states in part:

> *"(b)(1) In order to establish that a psychiatric injury is compensable, an
> employee shall demonstrate by a preponderance of the evidence that
> actual events of employment were predominant as to all causes combined
> of the psychiatric injury. (2) Notwithstanding paragraph (1), in the case of
> employees whose injuries resulted from being a victim of a violent act or
> from direct exposure to a significant violent act, the employee shall be
> required to demonstrate by a preponderance of the evidence that actual
> events of employment were a substantial cause of the injury. (3) For the
> purposes of this section, 'substantial cause' means at least 35 to 40
> percent of the causation from all sources combined."*

> *"(h)No compensation under this division shall be paid by an employer for a
> psychiatric injury if the injury was substantially caused by a lawful,
> nondiscriminatory, good faith personnel action."*

Furthermore, please outline your causation determination using a Rolda multi-
level analysis:

(1) Whether the alleged psychological injury involves actual events of
employment, a factual/legal determination;
(2) If so, whether such actual events were the predominant cause (i.e.
accounting for 51% or more of the psychological injury), a determination
which requires medical evidence;
(3) If so, whether any of the actual employment events were personnel
actions that were lawful, nondiscriminatory, and in good faith, a
factual/legal determination; and,



Christina Goerss
June 18, 2020
Page 6

(4) If so, whether the lawful, nondiscriminatory, good faith personnel actions were a "substantial cause" (accounting for at least 35% to 40% of causation from all sources combined) of the psychological injury, a determination that requires medical evidence.

Temporary Disability
Please advise parties whether you are in agreement with the period(s) that Ms. Goerss was placed completely off work and/or restricted duties by her personal treating physician.

If not in agreement, please be specific as to the date(s) in which Ms. Goerss should be considered to have been temporarily totally disabled or temporarily partially disabled including what those work restrictions should have been. Please provide basis and support for any difference of opinion from that of the treating physician.

Permanent and Stationary
If it is determined that the injury is pre-dominantly or substantially caused, please advise parties whether Ms. Goerss has reached permanent and stationary status.  Please be specific as to the date that Ms. Goerss is determined to have reached permanent and stationary status.

Permanent Disability
If Ms. Goerss has reached permanent and stationary status for this injury, please provide parties with a ratable report in accordance with the 2005 AMA Guidelines, 5th edition.  Please utilize the Global Assessment of Function (GAF) scale and describe in detail Ms. Goerss' current level of function within that range and how you arrived at your final rating.

Apportionment
If it is determined that there is permanent impairment as a result of the industrial injury/condition, please address apportionment pursuant to Labor Code 4663 and 4664.

In order an apportionment determination to be considered substantial evidence, please ensure to:
- Provide an approximate percentage of permanent impairment that was caused by the injury arising out of and occurring in the course of employment and the approximate percentage of the permanent impairment caused by other factors (industrial, or non-industrial) both before and subsequent to the industrial injury
- Analyze the permanent impairment based on the causation of disability (rather that causation of injury)



Christina Goerss
June 18, 2020
Page 7

- Must be based upon the pertinent facts, examination, and history of the claimant
- Must be based upon reasonable medical probability and
- Please provide basis as to how and why you arrived at this conclusion

Future Medical Care

Should a provision for future medical care be provided to Ms. Goerss on an industrial basis? If so, in accordance with Labor Code 4604.5, please be specific as to the anticipated treatment modalities, their duration and frequency.

Work Restrictions

Please advise if Ms. Goerss should be permanently precluded from her usual and customary duties as a Gas Service Representative (GSR). Please be specific as to the work preclusions so that her employer can determine if they are able to provide permanent accommodations.

Enclosed is a copy of our complete medical file and Job Function Analysis for your review. Subpoenaed medical records are also enclosed for your review from her personal physicians: Mad River Community Hospital; Roberta Nolan, LMFT; Fortuna Community Heath Center; Dr. Shrivastavia; Dr. Edmundo Davila; Mad River Healthcare Clinic, and Francis Muela, MFT. **Please note that to date Ms. Goerss has not released her records prior to 1/1/2016 and therefore we will consider your report as incomplete until such time as we are able to obtain Ms. Goerss' medical history and forward to your office for review.**

Please submit your report and billing to Pacific Gas and Electric Company, PO Box 7779, San Francisco, CA 94120-7779.

Thank you for your assistance.

Sincerely,

Roberta Pena

Roberta Pena
Workers' Compensation Representative, Expert
Phone Number: (925) 270-2915
Fax Number: (415) 973-7828

RP/dxp

cc:    Christina Goerss



Christina Goerss
June 18, 2020
Page 8

Enclosures:   JFA for Gas Service Representative
DEU Form 100, titled "Employee's Permanent Disability
Questionnaire"
DEU Form 101, titled "Request For Summary Rating Determination"

**Copy of Medical Records**
Roberta Nolan, Ph.D.
2019:   08/30
Mad River Community Hospital
2019:   2/28

**Subpoenaed medical records**
Edmundo Ruiz Davila, MD. – Invoice # 3295867
Fortuna Community Healthy Center – Invoice # 3297319
Rinku Shrivastava, MD.  – Invoice # 3307602
Rinku Shrivastava, MD.  – Invoice # 3298698
Mad River Healthcare Clinic  - Invoice # 3306634
Roberta Nolan, LMFT –   Invoice  # 3304126
Mad River Community Hospital – Invoice # 3301978
Francis Muela, MFT – Invoice. 310677

Response to Witness Testimony sent on June 18, 2020:

1. **Please refer to the following excerpt taken from the "Statement of Claim" provided to Roberta Pena on March 17, 2020. This is a more accurate description of what "broke" me. In fact, I was in the process of grounding myself when Dispatch interrupted the grounding process with an emergency call to respond to a Gas Dig-In IR for Arcata, CA.**

*"I was clocked out for break and sitting in my work truck in the Rite Aid parking lot on F St and Henderson in Eureka. I was browsing social media and saw a concerning post from my youngest daughter regarding the trauma we share. I immediately called her to see if she was alright. She explained that she was suffering from frequent flashbacks. She assured me that she was "okay" and that she had an appointment with her therapist scheduled that following Saturday. At that time my daughter shared something deeply personal and equally traumatic with me. The experience she shared would be hard to hear on a level that is difficult to quantify for any parent, in any job. For me, a gas first responder, it was a hard trigger and way too close to home. I could immediately feel my heartbeat accelerate, but I maintained my composure. I did not want to further upset my daughter. I reminded myself that she was a well-resourced adult, who has proven to take good care of herself time and time again. She sounded like she had already tapped her resources and had a plan for treatment. She assured me that she was okay, and I knew she would tell me if she wasn't. We made plans to connect again later when I was not at work. I closed the phone call and ended my break by going "EnRoute" to my next job[1]. I was distracted but trying to ground myself by focusing on the job ahead. As I was about to leave the Rite Aid parking lot, I received a call from Emergency Dispatch to respond to an "Immediate Response/Dig In"[2]. I gave Dispatch my ETA, entered the address into my GPS and went EnRoute to the IR[3].*

*I got as far as four blocks when I suddenly felt the panic well up inside me, as I reviewed in my mind the scope of the job ahead and the many moving pieces of the procedure. Flashbacks flooded my mind like a tsunami. It felt like a slap in the face or like the wind had been knocked out of me. The emotional pain was excruciating. Luckily my years of safety training kicked in and I immediately identified that I needed to pull safely over to the side of the road and I did so. Remembering my time constraints, I immediately contacted dispatch to let them know I was unable to respond to the IR. I was crying hysterically and still*

---

[1] Going "EnRoute" is a reference to a computer function on the Field Automation System for Field Services. When a GSR goes "EnRoute" they are announcing travel to the next field order.

[2] A "Dig In" is an event where someone has struck the high-pressure gas line underground. This call type involves interacting with the "Dig In team" and the GDCC (Gas Distribution Control Center). The scope of the job involves crowd control and make safe procedures that may include the mitigation of an uncontrolled release of high-pressure gas. The job also involves evidence collection, documentation completion and possible interaction with emergency services or press, depending on the circumstances. "Immediate Response – see footnote below.

[3] IR stands for "Immediate Response". Job types include gas odor complaint and leak investigation, carbon monoxide remediation, dig-in, hi-low pressure complaint, structure fire, etc. Gas Service Representatives are PG&E's first responders for gas. We are the first to touch all gas emergencies that are reported to PG&E. PG&E's first goal for response time is 22mins, but no more than an hour (if possible). Eureka's Gas Service territory spans from Rio Dell, CA to McKinleyville, CA.

*in mid panic, but I had no time to waste. The dispatcher was kind and very professional. She assured me that she would take care of it and contact my supervisor, Ryan Harriman (as per protocol)."*

2. **These are not my words. I never said anything about a "hormone problem". I stated that Ryan Harriman had confided in me that he also suffered from panic attacks and that his anxiety around the job may be exacerbating this condition.**

3. **Please refer to the following excerpt from my "Statement of Claim" for a more accurate description of what happened when I told my lead instructor what had happened:**

*"As soon as we were out of ear shot of the participants, I immediately addressed the issue with my lead instructor Glenn Pritchard. As Jose, Glenn and I walked toward the cafeteria I exclaimed to Glenn that I "almost punched that guy in the face!" I was holding a great deal of anger in at the time and struggling to contain the energy. I have no doubt my demeanor matched my outrage. Glenn laughed. I wasn't laughing. "Did you see him? He was right up on me?". What Glenn did next; I had no response to. As a woman, I could have never anticipated it. In fact, I was already standing beside myself mentally and emotionally when Glenn laughed playfully and pressed his body up against mine from behind, almost exactly the same way the participant had. He then said jokingly, "What?! You don't like it when guys rub up against you?" Both he and Jose burst into laughter. I still wasn't laughing. I was frozen with trauma, fear and rage. I was reaching out to the person in charge for help and not only did he not take me seriously, but his best instinct was to replicate the exact offense I had just suffered and was coming to him for help about. Not to mention he did this while making me the butt of the joke in front of Jose. I did NOT see the humor, not at all. In fact, I was completely devastated. And furthermore, how did he know exactly what Gene Burns had done? Had he actually seen it with his own eyes? I can't imagine how else he would've known to replicate the exact offense. It was all way beyond my capacity to process. Dr. Nolan points out that the science suggests that it can take several years for trauma to fully register in the body of a survivor. I wouldn't understand this until connected with an expert. I only knew I was deeply shattered in that moment and felt completely isolated with nowhere at all to turn."*

4. **Please refer to my "Statement of Claim" for an accurate description of the unwanted touching and full body contact I experienced on October 17, 2014:**

*"As I was reviewing the documents on the desk in front of me, I felt someone press their entire body up against my backside. I could feel full body contact from the back of my knee to the back of my shoulder on my left side. I immediately recoiled and gave him a dirty look. In a very stern and audible voice I said, "Excuse me, can I help you? What are you doing?" His only response was a creepy laugh, "Heh heh heh"."*

This was not a "misinterpretation" of a student who was "invading personal space". This was full body contact from behind. I have told everyone I have spoken to that the student "pressed his body up against me from behind" and that I could feel him from the "back of my calf to the back of my shoulder on the left side." In fact, the Compliance and Ethics Intake Notes included in my non-medical documentation illustrates this exact verbiage. It is also worthy noting that my verbal rebuke of the unwanted touching and inappropriate behavior was omitted on the "Intake" report. I clearly stated to

Kelly Applegate, the interviewing attorney, that his "creepy laugh" was a response to my verbal rebuke. For some reason, she failed to include this fact in her notes.

5. **My stepfather died in 1998. I have no recollection of this statement. I was not heavily impacted when my stepfather died. The passing of my stepfather is not something I have every viewed as a stressor. I have noticed a recurring theme of misinterpretation, omission and projection when it comes to PG&E witness testimony transcription. This is why I provided a written Statement of Claim, so that my words could not be misinterpreted by someone projecting their own thoughts into my statements.**

6. **I did not "amend my date of injury". I have always stated that my injury occurred on February 26, 2019. I do not know where the October 1, 2018 date came from. I explained to Roberta Pena, when she pointed it out to me, that it must have been a mistake on their part. I never claimed to have an injury in October 2018. I made the call to the 24-hour Nurse's Hotline on February 27, 2019 at 4:47 am. It was at this time that I woke up from a violent nightmare (See attached) in a full-blown panic attack. I had never experienced a panic attack before October 2018. I had certainly been upset and crying before, but never to the extreme that I could not ground myself or calm myself down. The fact that I was waking up from sleep into a full-blown panic attack was alarming to say the least. I called immediately after making this realization. I have never claimed any other injury date.**

7. **I was the one to approach Daniel Campbell regarding helping out with training the new employees.**

8. **The only time I ever "stopped working" was when I was "waiting for work" or on "rain delay". It was my common practice to sit in the yard under these circumstances. I would stock my truck, complete Web Based Training, study procedures or fill hot tank cylinders when I was on unavailable "waiting for work" or on "rain delay" status. If PG&E were inclined to investigate, my GPS data would corroborate this fact.**

9. **Daniel Campbell never had any conversations with me regarding my work or any complaints that were made from Dispatch against me. I specifically asked for "open and honest communication" as a reasonable accommodation for my disability. (See Statement of Claim excerpt below)**

*"I truly did not anticipate what happened next. It felt like an ambush, my many requests for open dialogue where ignored. Neither Daniel nor Ryan called me with any feedback or questions regarding my work. At one point, I even heard from Brad that Ryan and Daniel were trying to figure out how to manage my workload and they were not including me in the conversation at all. Ryan couldn't even bring himself to ask me about Mario Ruiz, the new hire that had put me down on his application as a reference. They seemed diametrically opposed to any input I might have. They completely circumvented me and advised the day guys to try and complete my night work without my knowledge. I was already in the practice of attempting to complete my 5-8 appointments before 5. I did not like that the work on my screen was being taken off to duplicate my efforts. I preferred to*

*familiarize myself with my nightly workload ahead of time. It helped me plan my evening accordingly. They were talking to the day shifters about how to complete my night shift work, while deliberately keeping ME out of the conversation. It was mind boggling. All that said, I stayed out of it. I kept my head low, but in the end it wouldn't be enough. Everyone has a breaking point. Ryan Harriman and Daniel Campbell dug for mine."*

I have provided documentation to prove that I had been trying to communicate my concern for the fact that the North Coast dispatcher had a chronic issue with not answering the phone when called. (See CAP 114531041, Initiated 4/24/2018) I was experiencing push back from Dispatch for reporting them. The North Coast nighttime dispatcher was notorious for not staying at his desk and not paying attention to the workload. In fact, Crystal Fugere told me that she had witnessed the dispatchers chatting in the break room away from their desks many times. She was a RIM Coordinator and often worked on the same floor as Dispatch. This detachment had a profound impact on the night shift in Eureka. There were only two of us on shift after 4:30pm and I was alone after 6:30pm. It was crucial for us to have an engaged dispatcher. But no matter how many times Brad and I complained, nothing was done about it. The CAP I submitted did nothing but put a big target over my head. I am not surprised at all to see that Dispatch was complaining about me. I am surprised that Daniel Campbell did not bring it up to me at all. Even though I repeatedly asked for "open and honest communication".

10. **The only frustration I ever expressed on the job was the lack of accountability from management and the other groups, like Dispatch, tasked to support Field Services and the harassment coming from Ryan Harriman. This highlights the tone-deaf approach leadership takes in regard to the workers they are charged to support. I articulated my concerns very clearly and never once did I complain about the complexity of the job. In fact, there are many complex work examples to pull from if PG&E was inclined to investigate. The examples I could provide are a clear reflection of the competency and efficiency I was known for throughout my time in Field Services. I am happy to provide service addresses if asked. Every job that a GSR completes is recorded and time stamped and kept for legal record. It would not be difficult at all to disprove this uneducated speculation of my work prowess. Mr. Harriman and Mr. Campbell insisted on speculating (as he does here) on what was "bothering" me. For some reason they could not comprehend the very clear words that were coming out of my mouth. There is nothing more frustrating than being in deep need of medical care and having everyone around you project what they think is wrong with you. It's dehumanizing and degrading. I am very articulate. I cannot understand why neither of these men could process my multiple pleas for support. The fact that Beacon and several of the medical providers I spoke to treated me the same way was excruciating. It wasn't until I found Dr. Nolan that I felt heard and supported.**

11. **This is an interesting observation coming from someone with only three years' experience with the company and who has never done the job he was tasked to supervise. Daniel Campbell only job checked me once and at that time he hadn't even attended the Field Services school that supervisors are urged to attend. As I stated in my "Statement of Claim", Daniel Campbell was not in the yard full time until February 25, 2019. He pulled me in for discipline by mid-day of his second full uninterrupted day in Eureka.  I'm struggling to**

4

understand how he feels confident to assess my work properly with such limited exposure to the work he was assessing both figuratively and literally. This points to the exact hubris I spoke about in my statement. Daniel Campbell came into Field Services with an inflated idea of his skills in relation to the job. His over inflated sense of self proved time and time again to be problematic for the workgroup. Furthermore, in the Performance Appraisal I provided (dated 5/1/2018), Christopher Nelson states, under "Service Quality/Customer Relationship Management" the following:

*"As mentioned in the previous category, Christina is very efficient in her work practices. She is also very good with customer both externally and internally. She is great at making the best of her time alone in the evening while responding to IR's in the timeliest manner. While the work quality reviews are no longer scored in a percentage method, she did very well and received compliment from the reviewer for her attention to procedures."*

12. **The complaint I made to Daniel Campbell on January 7, 2019 is accurately described in my "Statement of Claim":**

*"After this encounter I travelled to the yard and made a formal complaint to my new supervisor Dan Campbell. I thought it was wildly inappropriate for Ryan to "roll up" on me while I was on lunch alone after dark. I told Dan that Ryan's actions were starting to "creep me out". I specifically explained that I had a very low "creep tolerance". Ryan's insistence on questioning my decisions in front of customers and co-workers put me on edge, especially when the procedures did not support his argument. I requested that Dan do the "job checking" instead of Harriman. Harriman was clearly abusing his power and I did not feel comfortable with him alone. He seemed obsessed with proving his superiority over me and was desperately trying to find something wrong with my work. There is absolutely nothing in my work history that warranted the "special" attention I was getting from Harriman. Whatever was happening with Ryan Harriman felt deeply personal. Ryan's behavior was getting more and more bold and I needed someone to intervene on my behalf."*

I never said anything about being "nervous that Mr. Harriman was looking over [my] shoulder". And I also think it worth noting that Daniel Campbell said nothing to me that night about his claim that he was the one that instructed Mr. Harriman to do so. He didn't make that statement until he met me on a job, on January 10, 2019 (10 days after he was hired), at that time he was more focused on covering for Ryan than he was actually assessing my work.

13. **It would be easier to address this allegation if Mr. Harriman had provided specifics. I cannot speak to such generalizations. I can offer that Ryan Harriman and I did not see eye to eye on how to manage and perform the work. He was coming from a yard that had plenty of support from other service centers and was appropriately staffed. Eureka Gas Service was not the same as Santa Rosa. He kept comparing the two and seemed to be unable to discern the differences. Furthermore, he and Daniel Campbell both demonstrated a "cowboy mentality". This has been proven to be a very problematic approach to the work we do in Field Services. I have worked diligently throughout my time as a safety leader to help the work force evolve beyond this backwards mentality. The fact that Ryan Harriman and Daniel Campbell demonstrated these traits so unapologetically concerned me deeply. As a long-time safety chair, I felt the responsibility to dispel this dangerous mentality before it infected the new employees. Once the idea sets in, it is nearly impossible to dislodge. That has been my**

5

experience. The fact that is was being promoted my management was very concerning to say the least.

14. Talking on the phone while driving is against company policy.

15. This is highly irregular behavior. In all of my years as a GSR, I have never had a supervisor approach me unannounced when I was on shift alone after dark. And I have spent most of my time as a GSR working the night shift. If there was a policy change regarding this, it should have been addressed with the group. There is no reason for Mr. Campbell to wish to retain the truck number. Mr. Harriman had just left a job in Arcata we were both working on together. He knew Brad had already gone home, because Brad had expressed as much when we all left the job Mr. Harriman met Brad and I on. It was after 6:30pm, both Mr. Campbell and Mr. Harriman should have been aware of the fact that I was the only GSR on shift at that time. I was "unavailable" on lunch, not on company time. Collecting the truck number makes absolutely no sense at all, unless it is meant as intimidation tactics.

16. Mr. Harriman was not checking the truck number when I came out of the grocery store from getting food for my break. He was walking away from the truck and toward me when I exited the grocery store and exclaimed, "What are you doing here?! I'm on lunch. GO AWAY!!" If PG&E were inclined to do an investigation, I could provide a witness to the conversation as I had my best friend Crystal Fugere (former PG&E employee) on the phone with me at the time. Furthermore, my "Statement of Claim" states that Mr. Harriman, in fact, yelled from across the street before leaving the job in Eureka that he met Brad and I on, that he was going to "follow [me] all night". If Mr. Harriman's mind reading skills indicated to him that I "felt at that time" that he was following me, that might be where I got the impression.

17. I discussed my PTSD with Daniel Campbell on January 10, 2019 and on February 26, 2019. I explained to Mr. Campbell that due to my disability I am hypervigilant and require open and honest communication and I require that he be the one to perform any job checks (see below).

*"Monday January 7, 2019 20:14, 2475 Myrtle Ave, Eureka*

***Third Request for Reasonable Accommodations***

*After this encounter I travelled to the yard and made a formal complaint to my new supervisor Dan Campbell. I thought it was wildly inappropriate for Ryan to "roll up" on me while I was on lunch alone after dark. I told Dan that Ryan's actions were starting to "creep me out". I specifically explained that I had a very low "creep tolerance". Ryan's insistence on questioning my decisions in front of customers and co-workers put me on edge, especially when the procedures did not support his argument. I requested that Dan do the "job checking" instead of Harriman. Harriman was clearly abusing his power and I did not feel comfortable with him alone. He seemed obsessed with proving his superiority over me and was desperately trying to find something wrong with my work. There is absolutely nothing in my work history that warranted the "special" attention I was getting from Harriman. Whatever was*

*happening with Ryan Harriman felt deeply personal. Ryan's behavior was getting more and more bold and I needed someone to intervene on my behalf."*

**From the California Department of Fair Employment and Housing website:**

*"The California Fair Employment and Housing Act requires employers of five or more employees to provide reasonable accommodation for individuals with a physical or mental disability to apply for jobs and to perform the essential functions of their jobs unless it would cause an undue hardship. Reasonable accommodation can include, but is not limited to, the following:*

- *Changing job duties*
- *Providing leave for medical care*
- *Changing work schedules*
- *Relocating the work area*
- *Providing mechanical or electrical aids*
  *Employees with disabilities may have separate rights to unpaid leave under the Federal Family and Medical Leave Act or the California Family Rights Act.*

*Employers must initiate an "interactive process" when an applicant or employee requests reasonable accommodations. The employer must also offer to initiate an interactive process when the employer becomes aware of the possible need for an accommodation. This awareness might come through a third party, by observation, or because the employee has exhausted leave benefits but still needs reasonable accommodation.*

*In California, it is unlawful for an employer to fail to engage in a timely, good faith, interactive process. The point of the process is to remove barriers that keep people from performing jobs that they could do with some form of accommodation.*

*The process requires an individualized assessment of both the job and the specific physical or mental limitations of the individual that are directly related to the need for reasonable accommodation.*

*The DFEH has created a sample Request for Reasonable Accommodation package to assist employers and employees in engaging in the interactive process. The law does not require the use of these or any other forms to make a request for a reasonable accommodation or to engage in an effective, good faith interactive process. The use of these forms does not insulate a user from liability or create a presumption that discrimination did not occur. However, they may be a useful tool for both employers and employees.*

Neither Ryan Harriman nor Dan Campbell entered into a good faith conversation with me regarding my disability. They did not inquire further or attempt to understand my needs. In fact, my multiple requests for accommodation were not only circumvented, but my disability and need for care was exploited and abused first by Mr. Harriman and then by Mr. Campbell. It wasn't until I was injured that I discovered that the company had a "Reasonable Accommodations" department that probably would have been happy to assist Mr. Harriman or Mr. Campbell in facilitating that "good faith' conversation I was entitled to. They did not ask about it, research it nor did they address the matter in any way other than to press even harder on me until I became more and more agitated. These moments of frustration were not only

7

used to create the perfect scenario to discipline me, but they are using these same frustrations to slander me in their testimony here.

18. I'm not sure what he means by "downplayed my complaints"; again, this is too general. He certainly downplayed the role that Ryan Harriman played in creating a hostile work environment during the time Mr. Harriman was in Eureka, from October 2018 to February 2019. Mr. Campbell is doing it in this very statement, as is Donnie Humphrey. As far as my disability is concerned, he didn't "downplay" it. He ignored it completely. Even when I referenced the fact that he had served in the Marine Corp and must have a working knowledge of PTSD. (It's actually laughable that he is using this angle in his testimony, considering I was the one who made the connection.) When I said this he just looked at me blankly. I did not get from him that he was understanding in any way. On March 8, 2019, when I expressed my confusion with Gil Acosta, onsite EAP representative, Mr. Acosta explained to me that Mr. Campbell's time in the military does not mean he is automatically sympathetic to sufferers of PTSD. He went on to say that those who don't suffer from it often see it as a "weakness". Dr. Nolan confirmed this notion. Dan Campbell's only notable response to my request for support was to threaten me with a "Fit for Duty" on March 27, 2019. I had no idea what a "Fit for Duty" was at the time, but it didn't make me feel heard or supported in anyway. In fact, it was a hard trigger as it felt like yet another threat to my livelihood. As a single mother, this is my kryptonite. I was sure they were not going to use a doctor to assess my situation and I was right. When they later performed a "fit for duty" on Ernie Vasquez, they "came out with a clipboard and observed his work". That was the extent of the "fit for duty". This tells me that they are not interested in what the professionals have to say on the matter. Daniel Campbell sounds like he considers himself something of an expert on PTSD. If he is so experienced in the matter, why didn't he initiate a good faith conversation with me, as the law dictates? Is this just another example of Mr. Campbell's over inflated self-image? It doesn't seem that Mr. Campbell learned much of anything in his "eleven years as a Marine Corp Infantryman". In fact, Dr. Robin Nolan possesses over twenty years of experience working with Marine Corp veterans who suffer from severe PTSD and she has expressed to me that his behavior is not at all becoming of the oath he took as a Marine Corp service member.

19. This is an interesting statement, as it proves that Donnie Humphrey is aware of my pending Worker's Compensation claim. If Mr. Humphrey, "Manager of Field Services and direct supervisor of Mr. Campbell", knows that my Worker's Compensation claim is still pending, why did he have Lisa Green call me on June 22, 2020 at 10:21 am and leave a voicemail stating that "Donnie asked [her] to give [me] a call because [I] was officially leaving the company" and that she needed to get my "PG&E equipment" from me. Doesn't he know that there are procedures and due process to adhere to regarding Worker's Compensation claims and Long-Term Disability? This is a prime example of the hostile work environment that I have been dealing with for the last seven years with PG&E management. They demonstrate no respect or adherence to their own company policies. They wantonly ignore state and federal laws. They seem to think they are untouchable. I wonder where they got that idea. My livelihood has been threatened multiple times during this process, for NO good reason. I told Ryan Harriman on November 1, 2018 that "if he continued to threaten my livelihood, it would send me over the edge." I guess I gave him the weapon he would use to destroy me. I am gullible. I, unfortunately, want to believe the best in people. I am a dedicated worker with a reputation for sixteen years of excellent service to the company. PG&E has allowed these three men to bully and abuse me without consequence. Compliance and Ethics and Worker's Compensation

refuse to perform a proper investigation or live up to PG&E's claims of "equal opportunity" and a "speak up culture". After seeing how my case has been handled from the first signs of disability to the present, I can see how this "culture of entitlement" that Scott Hempling speaks of is so problematic for the future of the company (See included essay submitted to the CPUC). From where I stand PG&E has no intention of correcting their "dysfunctional culture". Clearly, their only intention in this regard is to silence anyone who dares dissent and speak up in the name of safety, accountability and affordability.

20. I met Mr. Humphrey at least three times. He was introduced during the safety summit in April 2018. He hosted an anniversary award luncheon, with Christopher Nelson, at Tres Chiles Picosos in Eureka during the summer, and he came up once to parrot Mr. Harriman when trouble started to brew in Eureka. The fact that he only remembers one of those encounters speaks to his lack of interest and detachment regarding the Eureka yard.

21. I have never yelled at a customer in my life. Please refer to the following excerpt from my "Statement of Claim" for an accurate description of the events that took place on February 18, 2020:

*"I received a phone call from Arcos for an inside odor complaint. This was day 4 of 5 in a row of being on call over the three-day weekend. It was not the first time, while Ryan Harriman was in charge, that I had been required to work multiple 212 days stacked over a holiday weekend. I was getting increasingly common. I was on my second call out of the night and I hadn't been to sleep at all. The customer smelled like alcohol and it was 2am in the morning by now. Once I assessed the scope of the job and recognized the increased level of difficulty the procedure called for. I made the mistake of asking the question "How long have you been smelling this leak?" It's a question I usually avoid, but I was exhausted and overwhelmed and I let it slip. The customer said he had been smelling the leak for "like a month". Before I even knew what I was saying, I quipped, "And you decided to call it in at 2am in the morning?" The customer came UNGLUED. Keep in mind: it was 2am in the morning, he smelled like alcohol and I was standing in HIS living room, a complete stranger. He yelled at me, "Are you REALLY being rude with me right now? How DARE you! F\*\*K you!!". Again, I was in shock. I didn't know how to react. I knew I shouldn't have said what I said and that there was a lot of work that needed to be done before I could safely leave. I just stood there frozen. He stormed out of the house and went to sit in his car in the driveway. I took a deep breath, grounded myself and calmly explained to the female occupant that I was "NOT going to let him get to me" and that "I [had] a job to do". I told her we could revisit the conversation once I was finished with my work and I knew they were safe. And, that is exactly what I did. It took about 45 minutes to an hour to complete all the work that needed to be done there. It appeared to be the fault of <u>another</u> leak left behind by Ryan Thompson. This added to my frustration as Ryan Thompson's work often did. If anyone in the yard called for the special attention supervision reserved for me, it was Ryan Thompson. Strangely Thompson seemed to go by largely untouched. Maybe because he liked to tattle tale on his fellows to boost himself up or because his own work was so questionable and it took the spotlight off of him. Afterall, a tattle tale can be a valuable tool in the eyes of the unimaginative. But, I digress.*

*When I was done with the work, I calmly went over to the car where they were both sitting and politely asked if we could start the conversation over. I immediately admitted where I was wrong and asked for their forgiveness. I explained it had been a long night and I would normally never lose my cool like that. I explained to them that they should always feel comfortable to call. That they should never hesitate, and I*

*apologized if I left a negative Impression. The customer had calmed down at this point and was equally apologetic. He said that he was not in the habit of losing it like that either and that he just wasn't feeling well. I told him that I understood and apologized again for my behavior. I explained to them that there was a leak at the meter that I was unable to repair for safety reasons, but that I would be back the following day to complete the repair. I explained that the meter was off and secured from the leak, but that I wanted to make sure the repairs were completed as soon as possible. I was working a full shift the next day on President's Day. I knew the work was safer to complete during daylight hours after I had gotten some rest. Also, I had to stay available for any possible emergencies that would come in overnight. As luck would have it, I did get another call later that morning which further impeded my ability to get any rest before my POT holiday shift.*

*That was an incredibly difficult night to keep a stiff upper lip. Each time I would get home exhausted from the previous job and pile into bed, I would get a phone call just as I was nodding off. The calls started coming in at 11:30pm and did not stop until 6am. I was scheduled to work at 8am that holiday morning and calling in sick on a prescheduled holiday when everyone else was on vacation, was not an option. These are the hazards of working a work group so close to the edge for so long. Eureka Gas Service had been worked this thin for at least the two years I was there. Sounded like, from the guys, it was long before that. Chris Nelson kept putting in requests for manpower but kept getting turned down."*

**\*Documentation Reference: OSHA Code of Safe Practices**

22. **Please refer to the following excerpt from the "Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture", prepared for the CPUC on May 8, 2017 by NorthStar Consulting Group:**

*"On June 24, 2011, the IRP issued its report, **citing a "dysfunctional culture" at PG&E in which the goals of its enterprise risk management process were disconnected from the reality,** decisions, and actions throughout the company. "...[PG&E] management made a faulty assumption. It did not make the connection among its high-level goals, its enterprise risk management process and the work that was actually going on in the company. The IRP Report determined, "this failing is a product of the culture of the company – a culture whose rhetoric does not match its practices. This dysfunctional culture, the IRP Report concluded, appeared based on excessive levels of management, **inconsistent presence of subject matter expertise in the management ranks, an appearance-led strategy setting, an insularity that impeded its ability to judge its effectiveness, and an overemphasis on financial performance.**"*

I have provided the full report, with relative comments regarding my claim, for review. I have also included the press release titled, *"CPUC Orders PG&E to Implement Recommendations to Improve Its Safety Culture and Operations"*. I have had a number of PG&E ratepayers, including Dr. Nolan, express their deep concern when confronted with the idea that PG&E hires such inexperienced supervisors to oversee such a safety critical position. The fact that GSRs are directly responsible for the safety of gas customers in their own home is not missed on them at all.

23. **This seems like a disingenuous statement, as I was informed by a fellow employee that Mr. Harriman was "taken off of the list" of consideration for a management position due to the multiple complaints received about him. If PG&E were inclined to investigate, I have the names of the GSRs who had similar interactions with Mr. Harriman.**

24. Mr. Harriman did not suggest I call EAP and I did not decline. This is a ludicrous statement considering the fact that I told Mr. Harriman on November 1, 2018 that I was working with EAP to find a care provider but was having difficulty finding one due to Eureka's remote location. I told him that I had already spoken to Gil Acosta regarding my need for care on the day of my panic attack. In fact, I may have been able to focus on my access search more appropriately if I wasn't being so relentlessly bullied, harassed and poorly managed during that time.

25. Ryan Harriman did not attempt to enter into a good faith conversation with me regarding my disability. He, instead, began to press on me almost immediately after discovering my condition. The harassment began on October 29, 2018 and continued until January 7, 2019, at which point a made a formal complaint to my new supervisor Daniel Campbell, who did nothing about it. I did not trust Mr. Harriman, nor did I appreciate the brutish way he treated me and the other GSRs. Daniel Campbell dismissed Mr. Harriman's role in creating such a hostile work environment for an already stressed and thinly stretched work group. He insisted it must be a "personality conflict' but showed no interest in my offer to have a sit down with Mr. Harriman to clear the air. He instead chose to pick up Mr. Harriman's baton and run with it. And apparently it has worked out well for his career. He has already been awarded with a lucrative position for his wife and is training the new supervisor in Redding. Sounds like Mr. Campbell is on a management fast track. Please refer to the following excerpt from the "Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture", prepared for the CPUC on May 8, 2017 by NorthStar Consulting Group:

## Attachment 1
### Significant PG&E Safety-Related Accomplishments since San Bruno

*As a result of NTSB and IRP analyses and the San Bruno incident, PG&E undertook a number of safety-related programs. The following list provides highlights of some of the significant changes. This list is not intended to be comprehensive. Additional initiatives, programs, and events are described throughout the Report.*

- *Retrained its leaders to promote an open exchange of ideas rather than a command and control environment.*

If this is true, then Daniel Campbell and Ryan Harriman did not get the memo. Mr. Harriman kept insisting his orders where coming from above him. This was difficult to gauge as Mr. Humphrey was hardly ever around. Either way, the entire yard was feeling the pressures being imposed by the new management team. This explained the cryptic comment Christopher Nelson made to me before leaving that he "was just not going to do what they wanted him to do." The fact that Daniel Campbell had one of his top performers being publicity targeted for discipline by mid-day of his second full day in Eureka does NOT speak to a moving away from "command and control". I have seen the effect that my "take down" has had on my peers and it is not positive. It certainly is not conducive to a healthy "speak up culture".

26. This statement is completely false. Ryan Harriman was the first to arrive on site. I had not called him; I had called Ernie Vasquez. Mr. Vasquez did not indicate that Mr. Harriman was with him or that he was planning on showing up. Mr. Harriman arrived before Mr. Vasquez and seemed to be pleased that he caught me by surprise. Mr. Vasquez did not "agree with Mr. Harriman to begin the digging process" and that is all beside the point because, as I stated in my "Statement of Claim", it is squarely against company procedure to dig without first locating and marking the line. There are many safety reasons for this very important step. There are obvious threats to personal safety and destruction of property. I expressed this to Mr. Harriman when he began digging (before Mr. Vasquez arrived). I vehemently insisted that he stop digging until the crew could mark the line. When he refused to listen to me, that was when I went to my truck to do the paperwork. This was a total violation of company safety procedures and he knows it. That may be why he is lying about when Mr. Vasquez arrived. Mr. Vasquez arrived when Mr. Harriman and I were arguing about the fact that Mr. Harriman was violating company procedure.  Mr. Vasquez is very intimidated by management and is well known to be a "yes man". He does not question management's poor decision making, he just goes along with it. It's sad really, because he has a wealth of field knowledge and is an amazing GSR. The company needs experienced men like him to stand up for what is safe, but Mr. Vasquez is not that guy. He does what he's told and does not question it, no matter how blatantly wrong it is. That may be why Mr. Harriman feels emboldened enough to lie in this case. He probably knows that Mr. Vasquez will corroborate his story, no matter how false it is. Luckily, it is easy to prove that there was no USA ticket obtained before the "digging process" began. There were plenty of witnesses to this fact, including the crew that responded to the incident. And even if everyone on the job choses to corroborate Mr. Harriman's false interpretation of events, it would not be hard to prove the absence of a USA ticket number in relation to this job. This information is required for every job where a shovel or other piece of equipment breaks ground.

27. I was not being "obstinate" I was trying to remind Mr. Harriman of the procedure, that he was blatantly and for no good reason, ignoring. The gas was contained, the crew was on their way, there was no immediate hazard. There was ZERO reason to dig at all. To dig without a mark was just plain preposterous. If standing up for the procedure is being "obstinate" I proudly stand guilty as charged.

28. Please refer to the following excerpt from my "Statement of Claim" for an accurate description of these events:

*"I was called for an outside odor complaint at a six-unit apartment complex. Customer said they were smelling gas in a common area near the mailboxes. After completing initial sweeps, I followed the odor under the building to a floor heater that had a pilot out. The access under the house was riddled with obstacles but I could traverse the crawl space on my feet hunched over, which made it easier to dodge the hazards. I called Brad Boley for assistance to lesson my need to go back and forth. Once the floor heater was disconnected, we both went inside to complete the leak investigation. Brad was inspecting the wall furnace and I was talking to the customer in the kitchen. I was explaining to the customer that the wall heater burner was yellow tipping a little bit and that*

*the burner should be pulled and cleaned by a professional. This is when Harriman slipped in unannounced through the customers opened front door. Harriman inserted himself and suggested we test it for Carbon Monoxide. Neither Brad nor I thought it was necessary as the burner was only slightly yellow tipping. Brad had tried to brush the venturi but his brush was falling apart. He didn't want to make the situation worse so we decided to back off and refer to a licensed contractor. The burner needed to be pulled and cleaned to address the issue properly. Ryan insisted we test the furnace for CO, so I did. I told him I was getting 96ppm air free in the flu which was below the threshold to act. The as measured read was 30ppm. The only requirement at that point was to advise the customer to contact a dealer for repair. Normally I would pull the burner and blow it out, but Brad and I were the only ones on shift. I had committed work on my screen and I needed to stay available to respond to IR's after Brad was gone. As a precaution, I scheduled a next day follow up to properly clean the burner while there were more people on shift. The landlord, Floyd Squire, was infamous in the area. I knew nothing would be done on the customer's behalf.*

*Harriman asked me, after we left the house and were standing on the front porch, why I didn't test the heater again. He seemed concerned that the reads were so close to the threshold that requires us to "take action". I explained to him that the threshold he was thinking of was the "as measured" read which, at 30ppm, was well below the 100ppm threshold where a GSR is required to act. He seemed confused about this part of the CO procedure and the relative reads on the CGI display. I wasn't surprised. It's a common misconception. Co procedure is complicated, it has a lot of moving pieces. There are a lot of steps to the procedure along with documentation requirements. Besides all that, the stakes are high as it directly relates to customer safety. It is literally a life and death procedure. It is common for GSRs to get lost in the weeds on this one. He did not seem to appreciate my clarification. He seemed embarrassed that I corrected him in front of Brad. He scampered off to his truck. **By this time, it was dark and Brad's shift was ending soon. Ryan "joked" from across the street that he was going to "follow me around all night". I thought he was joking at first, but apparently he wasn't.***

**The incident of "spillage" that Mr. Harriman is describing did not happen the "next day" it happened the same day. In fact, it was the very next job. He had followed me, just as he had threatened to. (All of this could be confirmed with a simple investigation into the addresses and times I provided. Each tag is saved and recorded for legal record. My comments should reflect the work that was done there. If PG&E were inclined to investigate, it would not be difficult to prove this assertion.)**

**The incident of "spillage" went as follows (from my "Statement of Claim"):**

*"Harriman followed me in to do a routine safety check on a wall heater. Once we arrived, the customer said a contractor had been out to repair the wall heater, but that the landlord had suggested she keep the appointment to be sure the heater was repaired properly. During the inspection, Harriman appeared to be unfamiliar with the type of heater/burner I was inspecting. I had only seen the burner type a few times but I had no issue with its appearance. He told me I should test it for CO. I explained to him that I was familiar with the type of burner and that the flame was clean, it was burning sharp and blue. I saw no reason to test for CO. The customer overheard us and requested that the heater be tested. So I did. While I was testing for CO at the flu, Harriman was crouched under me testing the pilot generator with my multi-meter. The heater had just been serviced. I didn't know what he was looking for. The multi-meter is a troubleshooting device, we weren't there to troubleshoot. We were there to inspect a freshly serviced unit.*

*At this point, I was <u>really</u> feeling impinged upon. He was invading my personal space and again trying to take over the job. My mentor always taught uniformity when approaching any job. A regular routine fosters confidence, highlights missed steps and helps me develop my cadence as the night progresses. I enjoy the autonomy of working alone. It suits me. Harriman put me on edge when he came around. He always seemed to blow things out of proportion and then leave me there to clean up the mess. But, he was my acting boss, so I just let him take over again. As I suspected, the wall heater was operating well within design limits at 4ppm air free in the flu. On the way out, he asked me why I didn't want to test the heater for CO. I told him I saw no need to, the flame was nice and sharp, and the heater was clean. There were no signs of incomplete combustion, there wasn't even ash build up. The customer did not complain about any symptoms and there were no other warming signs present. He explained that he tests for CO on most wall heaters. I told him, "that sounds like lack of confidence to me". It just slipped out. I was getting exceedingly irritated with his constant intrusions and his anxiety around the job made me nervous."*

It's important to note that there was no "spillage" on that wall heater. It was in perfect operating condition.

29. I did not "blow up at him because of his comments regarding breaks and lunches". If PG&E was inclined to investigate, the record would show that I had no issue with taking longer than awarded breaks and lunches. The "document" that Mr. Harriman provided displayed a small swatch of instances where I took a bit longer than usual. This usually happened if I needed to go to the bathroom or was held up in some other way. As a female GSR, I did not have the luxury to just walk down the hall and go to the bathroom. It was a bit more complicated than that. Mr. Harriman's admission here is a perfect example of micromanaging; the favorite default of the unimaginative and insecure. Normally this circumstance is handled by a quick phone call from the supervisor to get the GSR's side of the story. Neither Mr. Harriman nor Mr. Campbell <u>ever</u> paid me the respect of this important step; even though I specifically asked for "open and honest communication". Generally speaking, I was not one to get very many of these phone calls, but it did happen from time to time in my early days when I was establishing my GSR legs. Once I had done so, I hardly ever heard from any of my supervisors. If I ever did, it was usually the inexperienced ones and it was because they hadn't done the appropriate homework before making the call. An experienced supervisor, like Mr. Nelson, looks at the big picture and doesn't get lost in the weeds when it comes to the "Operational Excellence" tool. In the two years I worked under Christopher Nelson, I NEVER received this type of phone call from him.

As I have stated before, Mr. Harriman was desperately trying to find something wrong with my work. Looking at a small swatch of work and then broadcasting it to the group as my normal behavior is a perfect example of the bullying and slander I was subjected to for the four months before my collapse. It is also a periscope into the internal struggle Ryan Harriman was dealing with when it came to me. I was very meticulous about my breaks and lunches. The fact that Mr. Harriman is saying otherwise is easy enough to disprove, but PG&E refuses to investigate. Furthermore, I was not acting belligerent in any way. I was asserting myself. Mr. Harriman seemed to struggle with this part of my personality. I stand firm against

injustice. I don't apologize for that. In actuality, I was pointing out the blatant lack of accountability and propriety being demonstrated by management and other departments that were meant to support Field Services. I reminded Mr. Harriman that the supervisor does not get his "big fat STIP check" without the help of the workgroups they support. That is a FACT, not a threat. I made the connection to demonstrate that we are a team and that management does not succeed without the hard work and sweat of the work group they were, at the time, oppressing. I thought the group deserved to be treated with more respect than to be bullied, harassed and pressed down into submission. Eureka is one of the best work groups I have had the pleasure to work with. We were more than a team when Ryan Harriman showed up, we were a family. We were already under a great deal of pressure in the field with PG&E's public image eroding and all the overtime we were expected to do. These things take a great toll on a workgroup, although PG&E refuses to acknowledge that fact.

The work group was very apprehensive about Daniel Campbell as he had already started turning the screws before he even got to the yard (another behavior trait I had not seen before). That was what initiated the conversation Mr. Harriman is referring to. Mr. Campbell had already scolded Brad Boley about charges made on his P-card and had got upset with Chris Fee for speaking up regarding an expensive head lamp he requested. He hadn't even technically started yet. He was awarded the job, but his start date wasn't until January 1, 2019. These exchanges with Brad and Chris took place before Christmas. This was a clear indication to me that Mr. Campbell was making the typical error an inexperienced supervisor often makes, he was focusing on the "bottom line" because it was directly relative to the size of his STIP check. The work group was anxious and expressing their concern at the BBQ. As a company leader, I felt the need to speak up on behalf of the group. I never said ANYTHING about "response times". I would NEVER use response times in such a grotesque manner. The suggestion is preposterous and VERY easy to disprove. My response times where my best asset and my biggest contribution to the Eureka service territory. A simple investigation into the response times I consistently maintained could easily squash such a ridiculous proposal. Again, another example of management's disengagement and lack of accountability. From their narcissistic perspective, this is all my fault. I was the angry, hysterical female that caused nothing but chaos and disruption; poor innocent Ryan Harriman and Daniel Campbell.

It is worth noting that my nearly sixteen-year record with the company tells a very different story than what is portrayed in these testimonies. I have exceeded the expectations of the company, year after year after year. I have been thrown to the wolves by management and come out leading the pack, time and time again. I have been proud to be such an esteemed member of a thriving Field Services department. I have always given the credit of my success to the man who trained me. I was blessed with an amazing mentor. I always spoke with great pride in the department. I had a unique perspective. I saw the positive growth Field Services had undergone during my time with the academy. Just like a grandparent that marvels at how much a child has grown in the time they have been away; I was beyond proud of the strides the department had made during those four years; while so many other departments were mired in controversy. That was a huge accomplishment in my mind. I was honored to be a member of such a dynamic work force again. What Mr. Humphrey, Mr. Harriman and Mr.

Campbell have done to my home yard in Eureka is abhorrent. The team is scared to death to speak up after what they have done to me. The management style of these three men could not be more opposed to the direction the CPUC is urging the company to move in and yet the only person experiencing ANY consequences is me. I have been stripped of my title, my company assets and the position of stature I worked so diligently for. My reputation has been destroyed, my lucrative career lies in shambles and my body and mind are broken, possibly beyond repair. There are no words to express the desolation of spirit I experience on a daily basis in relation to this deep loss. If not for my faith in God, I shudder to think where I would be. The grief I feel is immeasurable. I LOVED my job and I was damn good at it. (Also, very easily proven if PG&E were inclined to investigate or live up to their lofty claims of equal employment and ZERO tolerance for retaliation and hostile work environment and a "Speak Up" culture.) I deserved none of this. But that didn't stop these three men from delivering me to the diminished state that is now my daily reality.

I think it's worth noting that it was at this same Christmas BBQ that Ryan Harriman expressed that I reminded him of his mother. That didn't seem to be a positive thing for him, given his reaction. I don't think I should have to pay for the sins of Mr. Harriman's mother, whatever they may be. Furthermore, if Mr. Harriman has issues with anxiety and his relationship with his mother, maybe he should call EAP.

I have included a copy of the "Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture", prepared for the CPUC on May 8, 2017 by NorthStar Consulting Group. I hope this will be reviewed. I couldn't agree with the findings of this investigation more. What I have seen take place in Eureka is a far cry from the PG&E Safety Culture I fought so hard for during my many years as a gas safety steward and instructor. I am not only speaking up on my behalf, I am speaking up on behalf of the thousands of PG&E employees that come home exhausted and filthy dirty. The men and women in the blue jeans that deliver safe, reliable service every single day and night; in all forms of inclement weather deserve better. I am also speaking up for the ones who don't get that opportunity, the ones who don't make it home safe. This group of individuals are some of the best and the brightest California has to offer. They have made an indelible mark on my personal development. I would not be the woman I am today, if not for them. It breaks my heart into a million pieces to see where the company is unapologetically headed. I am absolutely devastated, dehumanized and fearful for California's future. There is an old saying in the company that the Code of Safe Practices is written in blood. Energy is a very dangerous business and PG&E needs a talented and vibrant work force to address the many safety concerns set before them. What hope do we have if these urgent recommendations are to be so blatantly disregarded and such injustices are to be left completely unchecked and even rewarded? I truly shudder to the bone to think of it. And now that I have been shown the door, the power to be part of the solution (as I have been for so many years) has been violently ripped from my hands by men that were threatened by my hard earned example and by a system that protects and enables their indolence and exemption. I will pray for the future of the company and for the state of California as a whole. I have been left with nothing else I can do in this regard.

**DECLARATION**

I, the undersigned, declare under penalty of perjury that the statements made in the above declaration are true and correct to the best of my knowledge, information and belief.

Signed – Christina Goerss/Employee ID: 00113690                    Date

**Christina M Goerss**
**1565 Anderson Ave**
**McKinleyville, CA  95519**
**Email: goerss1171@sbcglobal.net**
**Phone: (707) 834-0570**

May 27, 2020

Roberta Pena/ Mail Code B6J
Pacific Gas & Electric Company
Integrated Disability Management Services
Worker's Compensation
PO Box 7779
San Francisco, CA  94120-7779

Dear Ms. Pena:

This letter will confirm that you have requested that I select a qualified medical evaluator pursuant to Labor Code Section 4061(d) because you disagree with the findings of the treating doctor, Dr. Robin Nolan.

Although I will comply to your request, please be advised that I do not dispute the findings of Dr. Nolan and that I will, in fact, be relying upon the findings should this matter proceed to trial.

I would also like to inform you that, after careful consideration, I have retained the records we discussed over the phone on Wednesday May 20, 2020. I have, in fact, made several attempts to obtain my PHI records from Beacon Health prior to submitting my claim of injury. My written requests to BHO were made on November 12, 2019 and then again on January 1, 2020. I never received the records I requested. Therefore, I will be retaining the records they sent to me at my home address as a fulfillment of said prior requests.

To address the matter of your request for PHI, I have attached an amended copy of my record request to Beacon Health Options to reflect the following requirements:

***Minimum Necessary***. *Covered entities are required reasonably to limit the amount of protected health information disclosed under 45 CFR 164.512(l) to the minimum necessary to accomplish the workers' compensation purpose. Under this requirement, protected health information may be shared for such purposes to the full extent authorized by State or other law.*

As previously stated I am deeply traumatized and affected by the abuse and mishandling I have experienced from PG&E and have no reason to believe the company with act on "good faith" regarding my claim. They have had over a year to act appropriately on my behalf and have failed to at nearly every turn. This is not meant as an affront to you personally. As I have stated many times before, your kindness and compassion are deeply appreciated.

Simply put, these are <u>very</u> sensitive matters and I must protect my PHI and the PHI of my family at all turns. It would be irresponsible for me, after all I've been through at the company's hand, to do otherwise. I have **zero** reason to trust the company to handle my information in "good faith". Therefore, I reserve the right to entrust my personal health information to the Qualified Medical Evaluator alone.

Please refer to the following legal excerpt to support this assertion:

***ARTICLE 2.5. Medical-Legal Expenses [4620 - 4628]***
 *(Article 2.5 added by Stats. 1984, Ch. 596, Sec. 4.)*

***4628.***
*(a) Except as provided in subdivision (c), no person, other than the physician who signs the medical-legal report, except a nurse performing those functions routinely performed by a nurse, such as taking blood pressure, shall examine the injured employee or participate in the nonclerical preparation of the report, including all of the following:*

*(1) Taking a complete history.*

*(2) Reviewing and summarizing prior medical records.*

*(3) Composing and drafting the conclusions of the report.*

Please rescind any prior authorizations given to Beacon Health Options in regard to my claim for compensation. I have advised BHO of this change. I will confirm with them in writing as well.

As we have discussed before, I would appreciate it if any response you have to this letter be done in writing. It is extremely physically demanding and very detrimental to me to have phone conversations of this nature with representatives of PG&E. I suffer <u>very</u> physical symptoms when triggered. These disruptions can take weeks to subdue as a result. A written response allows me the opportunity to consult with my doctor in a controlled environment and ground myself under her supervision.

I deeply appreciate your help in this regard. You have been very conscientious around this fact and I am truly grateful for that.

Thank you again for all you do. Wishing you and your family well during this difficult time.

Warmest regards,

Christina Goerss
Employee ID: 00113690/Claim # 19W0302



**California Public Utilities Commission**
**505 Van Ness Ave., San Francisco**

**FOR IMMEDIATE RELEASE**
Media Contact: Terrie Prosper, 415.703.1366, news@cpuc.ca.gov

**PRESS RELEASE**
Docket #: I.15-08-019

## CPUC ORDERS PG&E TO IMPLEMENT RECOMMENDATIONS TO IMPROVE ITS SAFETY CULTURE AND OPERATIONS

SAN FRANCISCO, November 29, 2018 - The California Public Utilities Commission (CPUC) today ordered Pacific Gas and Electric Company (PG&E) to implement the safety recommendations of CPUC staff as outlined in a report by an independent third-party.

Today's decision comes in the CPUC's investigation to determine whether PG&E's and PG&E Corporation's organizational culture and governance prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards.

The CPUC's Safety and Enforcement Division evaluated PG&E's and PG&E Corp.'s organizational culture, governance, policies, practices, and accountability metrics in relation to PG&E's record of operations, including its record of safety incidents. The Safety and Enforcement Division produced a report on the issues with the assistance of an independent consultant, NorthStar Consulting Group.

The recommendations that PG&E is ordered to implement include: development of a comprehensive safety strategy, with associated timelines/deliverables, resource requirements and budgets, personnel qualifications, clear delineation of roles and responsibilities; action plans, assignment of responsibility for initiatives; and associated metrics to assess effectiveness.

"The CPUC initiated this proceeding after the pipeline explosion in San Bruno occurred to determine whether PG&E has an adequate safety culture. Sadly, the events of September 9, 2010, continue to echo today. Evidence shows that, although there are a few bright spots, PG&E appears not to have a clear vision for safety programs and instead pursues many programs without thought to how they fit together, despite eight years passing since the explosion in San Bruno," said CPUC President

1



Michael Picker. "I plan to open a new phase in this proceeding to examine the corporate governance, structure, and operation of PG&E to determine the best path forward for Northern California to receive safe electrical and natural gas service. As I reviewed the Northstar report, I found myself asking how Northern California can be served better and whether there is a different model to ensure safe and reliable electric and natural gas service. One of the challenges of changing an institution such as PG&E is that the utility must continue to operate every day. To operate the grid in a safe manner, PG&E must be able to sign contracts and raise capital. This is a bit like remodeling an airplane in mid-flight. We don't want to crash the plane while we are trying to make it safer; that's bad for the passengers."

"I am committed to continue looking seriously at structural issues at PG&E and our regulation of the company. Achieving a genuine safety culture at the utility is paramount," said Commissioner Liane M. Randolph.

"This assessment, the first of its kind at the CPUC, produced a multitude of improvements for PG&E to act on and should be just one step in an ongoing process of improvement for PG&E. I hope this process can produce similar results for our other electric utilities," said Commissioner Clifford Rechtschaffen.

The proposal voted on is available at:
http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M243/K614/243614812.PDF.

The CPUC regulates services and utilities, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. For more information on the CPUC, please visit www.cpuc.ca.gov.

###

California Public Utilities Commission

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Francisco Venue

---

### Petition for Summons for Offender Under Supervision

---

| | |
|---|---|
| **Name of Offender** | **Docket Number** |
| Pacific Gas and Electric Company | 0971 3:14CR00175-001 WHA |

**Name of Sentencing Judge:**  The Honorable Thelton E. Henderson
Senior United States District Judge

**Date of Original Sentence:**  January 26, 2017

**Original Offense**
Count One: Obstruction of a National Transportation Safety Board Investigation, 18 U.S.C. § 1505, a Class D Felony;
Counts Two, Five, Six, Seven, Eight: Natural Gas Pipeline Safety Act, 49 U.S.C. § 60123, a Class D Felonies.

**Original Sentence:** Five years probation
**Special Conditions:**  special assessment $2,400; fine $3,000,000; not commit another federal, state or local crime; comply with third-party monitor; within six months of judgment, develop and submit effective compliance and ethics program; within 60 days of judgment, place full-page advertisement; for three months after sentencing and no later than 60 days after sentencing, air television commercial which publicizes offenses committed by PG&E; shall submit to a reasonable number of regular and unannounced examination of books and records and interrogation of knowledgeable individuals; perform 10,000 hours of community service, at least 2,000 of these hours must be performed by high-level personnel; shall notify the probation officer and monitor of adverse change in business or financial prospects, commencement of bankruptcy proceedings, major civil litigation, criminal prosecution, administrative proceeding against the organization, or any investigation or formal inquiry by governmental authorities; pay fine and special assessment within 60 days of judgment.

**Prior Form(s) 12:** None

| | |
|---|---|
| **Type of Supervision** | **Date Supervision Commenced** |
| Probation | January 26, 2017 |
| **Assistant U.S. Attorneys** | **Defense Counsels** |
| Hallie M. Hoffman; Jeffrey Benjamin Schenk | Steven Bauer; Sean P.J. Coyle; Benjamin William Snyder; James Scott Ballenger; Adam F. Shearer  (Retained) |

---

### Petitioning the Court

The issuance of a summons for Pacific Gas and Electric Company to appear in court before the Honorable William Alsup on January 30, 2019, at 9:00 a.m.

I, Jennifer Hutchings, a Probation Officer employed in the United States District Court for the Northern District of California, solemnly affirm and declare, under penalty of perjury, that to the best of my information and belief, the facts set forth in this affidavit are true and correct. The factual affirmations made below are based on my personal knowledge, on official records or documents generated and maintained by my agency in the course of performing its functions, on official records or documents generated and maintained by other government agents or agencies in the course of performing their functions, or on information provided to me orally or electronically by employees or agents of other public agencies (information developed or acquired in the course of performing official agency functions).

| Charge Number | Violation |
|---|---|
| One | There is probable cause to believe that Pacific Gas and Electric (PG&E) violated special condition number eight that they shall notify the probation officer and monitor immediately upon learning of (A) any material adverse change in its business or financial condition or prospects, or (B) the commencement of any bankruptcy proceeding, major civil litigation, criminal prosecution, or administrative proceeding against the organization, or any investigation or formal inquiry by governmental authorities regarding the organization. |

On October 3, 2018, Pacific Gas and Electric (PG&E) entered into a settlement with Butte County for $1.5 million. The settlement agreement was related to three Butte County fires in October 2017 that were alleged by Cal Fire investigators to have been caused by vegetation contacting PG&E distribution lines. Two of the fires, the LaPorte and Cherokee Fires, were determined by Cal Fire to have been started through an extreme wind event unexpectedly blowing branches onto PG&E lines, sparking large destructive fires. However, no criminal liability on the part of PG&E was alleged as vegetation in the area of the fires origins was properly trimmed back.

The third fire, the Honey Fire, ignited on October 9, 2017. Cal Fire was able to stop the forward progress of the fire and contain it to 150 acres. Cal Fire determined the cause of the Honey Fire to be a tree branch coming into contact with a PG&E transmission line. This tree branch showed outward signs of decay that would have been apparent on what should have been routine inspections. On May 24, 2018, Cal Fire investigators submitted their reports on the Honey Fire for a possible misdemeanor prosecution of PG&E based on an alleged failure to properly trim decaying branch away from its lines.

Specifically, Cal Fire alleged that PG&E violated Public Resource Code § 4293. Public Resource Code § 4293 states except as otherwise provided in Sections 4294 to 4296, inclusive, any person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts,12 four feet (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, 14 six feet (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard. The director or the agency which has primary responsibility for the fire protection of such areas may permit exceptions from the requirements of this section which are based upon the specific circumstances involved.

The Butte County District Attorney's Office began negotiations with PG&E, which led to a settlement agreement, forgoing any criminal prosecution or punishment.

At no time did Pacific Gas and Electric Company report this investigation by the Butte County District Attorney's Office to the probation office. At no time did Pacific Gas and Electric Company report to the probation office that Cal Fire had deemed them responsible for the Honey Fire; that there was the possibility of criminal prosecution; or that they entered into a settlement agreement with Butte County to avoid such criminal prosecution.

This is evidenced by Cal Fire investigative report dated October 9, 2017; a certified Arborist report dated October 11, 2017; the settlement agreement between the State of California and Pacific Gas and Electric Company dated October 3, 2018; and the testimony of this officer.

Based on the foregoing, there is probable cause to believe that  Pacific Gas and Electric Company violated the conditions of their Probation.

Respectfully submitted,                          Reviewed by:

*[signature]*                                    *[signature]*

_____               _____
Jennifer Hutchings                               Aaron Tam
U.S. Probation Officer                           Supervisory U.S. Probation Officer
Date Signed: January 9, 2019

---

Having considered the information set forth above, the court finds there is probable cause to believe there has been a violation of the conditions of supervision and orders:

☑    The issuance of a summons for Pacific Gas and Electric Company to appear in court before the Honorable William Alsup on January 30, 2019, at 9:00 a.m.

☐    Other:

_____January 9, 2019_____               *[signature]*_____
Date                                            William Alsup
                                                United States District Judge

**RE:** Pacific Gas and Electric Company                                          5
0971 3:14CR00175-001 WHA

*Pursuant to 18 U.S.C. § 3565(a), if the defendant violates a condition of probation at any time prior to the expiration or termination of the term of probation, the court may 1) continue the defendant on probation, with or without extending the term or modifying or enlarging the conditions; or 2) revoke the sentence of probation and resentence the defendant.



**Pacific Gas and
Electric Company**

Enterprise Health and Safety
Occupational Health
Workers' Compensation
Mail Code B6J
P.O. Box 7779
San Francisco, CA 94120-7779

August 25, 2020


Christina Goerss
1565 Anderson Ave
McKinleyville, CA 95519

Re:  Your Injury Of:   02/26/2019
     PG&E File No.:   19W0302

## NOTICE OF DENIAL OF CLAIM

## FOR WORKERS' COMPENSATION BENEFITS

Dear Ms. Goerss:

This notice is to advise you of the status of benefits for your workers'
compensation injury on the date shown above.

After careful consideration of all available information, we are denying liability for
your claim of injury.  Workers' compensation benefits are being denied because
the report of the Qualified Medical Evaluator, Dr. Andrea Bates,  dated
8/15/2020, indicates that your disability and need for treatment are nonindustrial.

Pursuant to Labor Code Section 5405, you have one (1) year from the date of
injury or from the date benefits were last provided to file an Application for
Adjudication of Claim before the Workers' Compensation Appeals.

For claims reported on or after April 19, 2004, regardless of the date of injury, if
you submitted a claim form to your employer or claims administrator, Labor Code
section 5402(c) provides that within one working day after you file the claim form,
the employer shall authorize the provision of all treatment, consistent with the
applicable treating guidelines, for the alleged injury and shall continue to provide
such medical treatment until the claims administrator accepts or denies liability
for the claim.  Until the date the claim is accepted or rejected, liability for medical
treatment under this Labor Code section shall be limited to a maximum of ten
thousand dollars ($10,000).

Unless you have done so already, you should send me all medical treatment bills
for consideration of payment.

Christina Goerss
August 25, 2020
Page 2

We accept the comprehensive medical evaluation of Dr. Bates dated 8/15/2020. If you choose to dispute this decision you may file an Application for Adjudication of Claim with the Workers' Compensation Appeals Board (WCAB).

Since you have already received a comprehensive medical evaluation, if you disagree with the decision to deny your claim, please contact Roberta Pena to arrange to return to the same medical evaluator for a new evaluation.

*Effective January 1, 2018*, as a PG&E Employee who is eligible to contribute to the State Plan, you are automatically eligible for coverage under PG&E's Voluntary Plan unless you opted out of coverage. Please note all time off work, including time related to Workers' Compensation will run concurrently with your Voluntary Plan Disability Insurance (VPDI). PG&E is entitled to a credit for any payments received during your time off work while participating in the Voluntary Disability Insurance Plan.

Please note all time off work, including time related to Workers' Compensation, will run concurrently with your Family Medical (FMLA) and California Family Rights Act (CFRA) leave of absence if applicable, assuming you are eligible. FMLA/CFRA provides you with up to 12 weeks of unpaid time off for your own serious health condition. You must contact Sedgwick at (855) 732-8217 to file for FMLA/CFRA if you will be absent from work more than 3 consecutive days or continue to need intermittent time off due to this illness/injury. If you have other general HR questions or concerns, please contact your Human Resources representative. Information regarding how to contact your Human Resources representative can be found on PG&E's HR intranet site or contact the HR Service Center at HR Helpline 1-800-788-2363 or (415) 973-4357.

Additional information may be found in the publication *Workers' Compensation in California: A Guidebook for Injured Workers.* A copy of the *Guidebook* may be obtained on the Division of Workers' Compensation website http://www.dir.ca.gov/InjuredWorkerGuidebook/InjuriedWorkerGuidebook.html or by contacting an Information and Assistance (I&A) Officer of the Division of Workers' Compensation. Chapters 2, 4, and 9 of the Guidebook contain information addressing the determination of liability for a workers' compensation claim and the QME process.

Chapter 2: After You Get Hurt on the Job
http://www.dir.ca.gov/InjuredWorkerGuidebook/Chapter2.pdf
Chapter 4: Resolving Problems with Medical Care and Medical Reports
http://www.dir.ca.gov/InjuredWorkerGuidebook/Chapter4.pdf ; Chapter 9: For More Information and Help
http://www.dir.ca.gov/InjuredWorkerGuidebook/Chapter9.pdf



Christina Goerss
August 25, 2020
Page 3


**The State of California requires that you be given the following information:**

You have a right to disagree with decisions affecting your claim.  If you have any
questions regarding the information provided to you in this notice, please call me
at (925) 270-2915.  However, if you are represented by an attorney, you should
call your attorney, not the claims adjuster.  For information about the workers'
compensation claims process and your rights and obligations, go to
www.dir.ca.gov or contact an Information and Assistance (I&A) Officer of the
State Division of Workers' Compensation. For recorded information and a list of
offices, call (800) 736-7401.

You also have a right to consult with an attorney of your choice.  Should you
decide to be represented by an attorney, you may or may not receive a larger
award, but, unless you are determined to be ineligible for an award, the
attorney's fee will be deducted from any award you might receive for disability
benefits.  The decision to be represented by an attorney is yours to make, but it
is voluntary and may not be necessary for you to receive your benefits.

To resolve a dispute, you may apply to the Workers' Compensation Appeals
Board.

**Keep this notice. It contains important information about your workers'
compensation benefits.**

Sincerely,

Roberta Pena

Roberta Pena
Workers' Compensation Representative, Expert

RP/dxp

Enclosures:   Workers' Compensation Return to Work Action Items
              DWC fact sheet E – QME/AME (Rev. 03/2013)
              Proof of Service

cc:     Roberta Nolan, LMFT



Christina Goerss
August 25, 2020
Page 5

## PROOF OF SERVICE

Dora Ponce, declares:

I am over the age of 18 years, not a party to this action, am employed in the City and County of San Francisco, and that my business address is 77 Beale Street, San Francisco.

On August 25, 2020, following ordinary business practices, I placed for collection and mailing at the office of Pacific Gas and Electric Company, 77 Beale Street, San Francisco, California, a copy of the attached:

DENIAL NOTICE
DATE OF NOTICE:  08/25/2020
CLAIM NUMBER: <u>19W0302</u>

in a sealed envelope, with postage thereon fully prepaid addressed to:

Christina Goerss
1565 Anderson Ave
McKinleyville, CA 95519

Roberta Nolan, LMFT
615 Harris St.
Eureka, CA 95503

I am readily familiar with the business's practice for collection and processing of correspondence for mailing with the United States Postal Service and, in the ordinary course of business, the correspondence would be deposited with the United States Postal Service on the day on which it is collected at the business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8/25/2020
_____
Dated

_____
Dora Ponce


**Pacific Gas and
Electric Company**

## MEMORANDUM

DATE:    10/29/20

TO:      CHRISTINE GOERSS                          Sent via regular USPS

FROM:    HUMAN RESOURCES
         Paula M. Jean, HR Investigations Business Operations Specialist, Expert

CC:      Kimberly Thomas, HR Investigations
         Manager

RE:      NOTICE TO COMPLAINANT OF INVESTIGATION COMPLETION CMS #20-0860

Please be advised that the company's investigation of your concerns has been completed. PG&E investigated concerns that employees retaliated against you and/or harassed you due to your gender or disability and/or created a hostile work environment and/or ignored requests for accommodationn violation PG&E's Code of Conduct.

The investigation consisted of interviews of individuals, including you, and a review of other relevant information, including any material provided by you or other witnesses, and company policies.

As a result of the investigation, the allegations were not substantiated and no policy violations were identified. At least some of the claims made in this complaint were addressed in prior investigations. Related to the remaining claims, the investigation was unable to corroborate the allegations made.

PG&E supports every employee's ability to speak up and prohibits retaliation against any person who filed a complaint or participated in the investigation of a complaint. If you have any concerns about retaliation for your participation in this investigation, please do not hesitate to contact me at (408) 282-7104, the Compliance and Ethics Helpline at (888) 231-2310, or any leader within the company.

We appreciate the opportunity to investigate and address your concerns. It is important that you raised this matter to our attention in order for the company to follow up. Please do not hesitate to ask questions and continue speaking up about matters that concern you.

# Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture

## Prepared for
## California Public Utilities Commission
## May 8, 2017

# Final Report



# NorthStar Consulting Group
### Management Consultants

### Santa Maria, CA ◆ Las Vegas, NV ◆ San Francisco, CA ◆ San Diego, CA

# TABLE OF CONTENTS

**I.   EXECUTIVE SUMMARY**

    A.  Summary ................................................................................................. I-1
    B.  Background ............................................................................................. I-2
    C.  Safety and Culture ................................................................................. I-3
    D.  Scope and Objectives ............................................................................ I-4
    E.  Key Conclusions .................................................................................... I-6
    F.  Critical Recommendations .................................................................. I-10
    G.  Recommendations for PG&E .............................................................. I-10
    H.  Recommendations for the Commission ............................................... I-16

**II.   BACKGROUND**

    A.  Pacific Gas and Electric Company ....................................................... II-1
    B.  Events Leading to the Investigation ..................................................... II-8
    C.  Safety and Culture .............................................................................. II-11
    D.  Scope and Objectives ......................................................................... II-12
    E.  Work Activities ................................................................................... II-16
    F.  Organization of this Report ................................................................ II-17

**III.   STRATEGY AND GOVERNANCE**

    A.  Background .......................................................................................... III-1
    B.  Evaluative Criteria ............................................................................. III-5
    C.  Findings and Conclusions ................................................................... III-5
    D.  Recommendations ............................................................................. III-21

**IV.   ORGANIZATION**

    A.  Background ........................................................................................... IV-1
    B.  Evaluative Criteria ............................................................................ IV-12
    C.  Findings and Conclusions .................................................................. IV-12
    D.  Recommendations ............................................................................. IV-24

**V.   FIELD OPERATIONS**

    A.  Background ............................................................................................ V-1
    B.  Evaluative Criteria .............................................................................. V-4
    C.  Findings and Conclusions ..................................................................... V-5
    D.  Recommendations .............................................................................. V-23

**VI.   BUDGETING AND SPENDING**

    A.  Background ........................................................................................... VI-1
    B.  Evaluative Criteria ............................................................................ VI-10
    C.  Findings and Conclusions .................................................................. VI-10
    D.  Recommendations ............................................................................. VI-31



## VII. COMPENSATION AND PERFORMANCE MANAGEMENT

A. Background ............................................................................................... VII-1
B. Evaluative Criteria .................................................................................... VII-8
C. Findings and Conclusions .......................................................................... VII-8
D. Recommendations .................................................................................... VII-19

## VIII. RECRUITING AND TRAINING

A. Background .............................................................................................. VIII-1
B. Evaluative Criteria ................................................................................... VIII-11
C. Findings and Conclusions ........................................................................ VIII-11
D. Recommendations ................................................................................... VIII-47

## IX. COMMUNICATIONS

A. Background ............................................................................................... IX-1
B. Evaluative Criteria .................................................................................... IX-16
C. Findings and Conclusions .......................................................................... IX-16
D. Recommendations .................................................................................... IX-38

## X. SAFETY REPORTING/CORRECTIVE ACTION

A. Background ............................................................................................... X-1
B. Evaluative Criteria .................................................................................... X-13
C. Findings and Conclusions .......................................................................... X-14
D. Recommendations .................................................................................... X-37

## XI. CONTRACTOR SAFETY

A. Background ............................................................................................... XI-1
B. Evaluative Criteria .................................................................................... XI-9
C. Findings and Conclusions .......................................................................... XI-9
D. Recommendations .................................................................................... XI-36

## APPENDIX A – ACRONYMS AND ABBREVIATIONS

## APPENDIX B – INCIDENT REPORTING SYSTEMS



# CHAPTER I:  EXECUTIVE SUMMARY

On August 27, 2015, the California Public Utilities Commission (CPUC or Commission) opened an investigation to determine whether Pacific Gas and Electric Company's (PG&E) and PG&E Corporation's (PG&E Corp.) organizational culture and governance prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards (I.15-08-019 *Order Instituting Investigation to Determine Whether PG&E and PG&E Corporation's Organizational Culture and Governance Prioritize Safety* (Safety Culture Investigation or OII)).  During the first phase of the proceeding, the Commission directed the Commission's Safety and Enforcement Division (SED) to evaluate PG&E's and PG&E Corp.'s organizational culture, governance, policies, practices, and accountability metrics in relation to PG&E's record of operations, including its record of safety incidents, and to produce a report on the issues and questions contained in the OII.

NorthStar Consulting Group, Inc. (NorthStar) was selected to perform the assessment. The review began in April 2016.  Detailed fieldwork was conducted from May through December 2016.  On December 30, 2016, PG&E provided NorthStar with a detailed "whitepaper" describing the safety-related activities that it had undertaken since San Bruno. During the course of the investigation, NorthStar reviewed the responses to nearly 900 information requests and conducted more than 250 interviews.  A number of the interviews were field visits which resulted in discussions with more than one employee.

## A.  SUMMARY

While PG&E is committed to safety and efforts have been made to reduce incidents and increase the organizational focus on safety, these efforts have been somewhat reactionary — driven by immediate needs and an understandable sense of urgency, rather than a comprehensive enterprise-wide approach to addressing safety.  PG&E moved quickly to address the issues with its gas system surfaced by San Bruno, but was slower in addressing its safety culture.  As a result, the extent to which the desired culture is embedded in the organization varies among lines of business (LOB) and other organizations, and between the corporate offices and the field.  Gas Operations and Power Generation have more robust implementation than Electric Transmission & Distribution (Electric T&D).  PG&E has placed considerable emphasis on changing the culture of management personnel and this is evident in the corporate offices.  Field personnel generally believe management is committed to safety, but in many respects it is business as usual in the field, or the field locations are working to address safety issues on their own.

With the exception of the change in the discipline policy and its efforts to foster a "speak up" environment, PG&E has only recently begun to address safety culture on an enterprise-wide basis. The absence of a comprehensive strategy has resulted in the lack of coordination between corporate safety and the field functions and the introduction of numerous initiatives aimed at improving safety without a coordinated approach.  Initiatives driven by the field or lessons learned within an LOB are not adequately transmitted across the organization to maximize the benefit of internal best practices.   Delays in the development or

implementation of a plan have been exacerbated by the two-president model, line of business silos, the lack of management personnel with safety experience, re-organization and considerable turnover within corporate safety, and the lack of a comprehensive understanding of the issues and underlying causes.

## B. BACKGROUND

On September 9, 2010, at approximately 6:11 P.M., a portion of PG&E's 30-inch diameter underground natural gas transmission system (Line 132) suddenly ruptured. Operating at approximately 386 pounds per square inch gauge (psig), the pipeline was located under the asphalt paving at the intersection of Glenview Drive and Earl Avenue in a residential area of San Bruno, California. Installed in 1956, the 28-foot long section of Segment 180 Line 132 that failed consisted of five segments which were propelled into the air and landed about 100 feet away. An explosion ensued, fueled by blowing natural gas. The explosion and fire resulted in the loss of eight lives and the total destruction of 38 homes. Sixty-six people were injured.[1] Seventy homes sustained damage and eighteen homes adjacent to the destroyed dwellings were left uninhabitable.[2]

On September 23, 2010, the CPUC approved Resolution No. L-403, which included the formation of an Independent Review Panel (IRP) of experts. The IRP's purpose was to gather and review facts and make recommendations to the CPUC for the improvement of the safe management of PG&E's natural gas transmission lines.

On June 24, 2011, the IRP issued its report, citing a "dysfunctional culture" at PG&E in which the goals of its enterprise risk management process were disconnected from the reality, decisions, and actions throughout the company. "…[PG&E] management made a faulty assumption. It did not make the connection among its high level goals, its enterprise risk management process and the work that was actually going on in the company."[3] The IRP Report determined, "this failing is a product of the culture of the company – a culture whose rhetoric does not match its practices."[4] This dysfunctional culture, the IRP Report concluded, appeared based on excessive levels of management, inconsistent presence of subject matter expertise in the management ranks, an appearance-led strategy setting, an insularity that impeded its ability to judge its effectiveness, and an overemphasis on financial performance. The IRP also cited a lack of "process excellence," which was explained as a failure of communication resulting from siloed, or segregated, business enterprises that should have, but failed to, communicate with each other. Importantly, the IRP indicates that PG&E's culture failed to explain and acculturate the live link that must be maintained between the executive, management, and field operations ranks; between individuals and

---

[1] http://abc7news.com/news/san-bruno-residents-remember-those-killed-in-pipeline-explosion/302058/

[2] June 24, 2011, Report of the Independent Review Panel San Bruno, prepared for the California Public Utilities Commission.

[3] *Report of the Independent Review Panel – San Bruno Explosion – Prepared for the California Public Utilities Commission*, June 24, 2011 (IRP Report) at 16

[4] *Report of the Independent Review Panel – San Bruno Explosion – Prepared for the California Public Utilities Commission*, June 24, 2011 (IRP Report) at 16



their actions; between divisions and subdivisions; and between processes, functions, and overarching safety goals.[5]

On August 30, 2011, the NTSB issued its Accident Report investigating the San Bruno explosion and fire, which identified specific violations that led directly to that event. Many of those specific violations were also the subject of the Commission's San Bruno Investigations. The NTSB spoke of a deeper failure underlying the specific violations, which made the San Bruno event an "organizational accident."

## C. SAFETY AND CULTURE

An organization's culture is the collective set of that organization's values, principles, beliefs, and norms, which are manifested in the planning, behaviors, and actions of all individuals leading and associated with the organization, and where the effectiveness of the culture is judged and measured by the organization's performance and results.

A strong safety culture requires commitment and accountability throughout an organization. A company's leadership and executive management must display a positive commitment to safety that is recognized throughout the organization. This commitment must be evident in the actions of management and the support they provide to the workforce. The organization must provide its people with the tools, resources, training and oversight necessary to ensure safe operations. Rules and requirements must be clear and consistent. Management must take a thoughtful approach to incidents and the implementation of new rules and standards. Employees should feel accountable for their own safety and the safety of their co-workers. They should feel comfortable stopping work during unsafe conditions or stepping in if they see another employee placing themselves, others or the public at risk. Employees should feel comfortable reporting potential hazards and incidents without fear of retribution as these can provide valuable lessons learned to improve safety practices. Disciplinary procedures should be consistently applied, recognizing the difference between human error, process defects, insufficient controls and a wanton disregard for safety rules.

As defined in the OII, a positive safety culture includes, among other things:[6]

- A clearly articulated set of principles and values with a clear expectation of full compliance.

- Effective communication and continuous education and testing. "Employees will do it right sometimes if they know how. They're more likely to do it right every time if they fully understand why."

- Uniform compliance by every individual in the organization, with effective safety metrics, recognition, and compensation, and consequences or accountability for deviating or performing at, above, or below the standard of compliance.

- Continuous reassessment of hazards and reevaluation of norms and practices.

---

[5]  I.15-08-019
[6]  I.15-08-09, pp 5-6



The success of a safety culture depends on *leadership* committed to making safety its first priority. This is particularly true in companies such as utilities where there are many layers of employees. The commitment to safety must extend to every employee and contractor of the organization, with consistent execution of the principles, values, and norms to foster a strong safety culture.

## D. SCOPE AND OBJECTIVES

Previous analyses of PG&E's safety record and management focused on specific areas. The NTSB focused on PG&E's design, operation and maintenance of its gas transmission and distribution activities and policies.[7] The IRP's central focus was PG&E's pipeline integrity management, but it expanded its scope to address such areas as emergency response and company culture.[8]

The objective of this safety culture investigation is to review the principles, values, qualities, factors, and metrics used to define, promote, and measure the effectiveness of PG&E's safety culture. In I.15-08-019, the Commission posed the following questions:

- Do PG&E's organizational failures cited by the NTSB continue?

- Does PG&E's progress suffer from impediments to process excellence within the control of the company?

- Is PG&E presently undergoing improvement with optimal risk management and strategic planning?

- Is PG&E designing accountability metrics and measures to achieve a high-functioning safety culture?

- Is PG&E realizing improvement with sufficient speed and deliberation?

- Why are the traditional tools of enforcement not working to prevent safety incidents and promote a high-functioning safety culture?

- Are the improvements PG&E has made (i.e., organizational changes) as widespread and deep as are necessary for a long-lasting and sustainable safety culture?

- What additional actions can the Commission order or promote to realize a high-functioning safety culture at PG&E?

NorthStar's review focused on the activities of Gas Operations, Electric T&D, Power Generation and Corporate Safety. Nuclear was not specifically a focus of this review; however, this review did consider best practices in the nuclear organization that could be transferred or adopted throughout the organization. Similarly, NorthStar's review did not focus on issues of environmental compliance and remediation or industrial hygiene. As

---

[7] NTSB report

[8] IRP report



stated by the Commission, NorthStar's investigation is not a duplicative review of enforcement actions concerning specific incidents already investigated or that are pending investigation at the Commission. This investigation instead conducts a deeper review of PG&E's and PG&E Corp.'s organizational culture, governance, and operations, and the systemic issues identified by the NTSB. According to the OII, the investigation should begin with what the Commission, customers, and the public should expect from PG&E when the State awarded PG&E its franchise and approved PG&E's rates. To answer this question, the investigation should examine PG&E's budgets, operational requirements, staffing, and approved revenue requirements and recorded spending in past years.

As NorthStar was not at PG&E prior to or immediately following San Bruno, it does not have first-hand knowledge of the safety culture and attitudes of the employees, management and the Board of Directors (Board or BOD) at that time. To assess changes in PG&E's safety culture, NorthStar relied on contemporaneous documentation (such as the IRP report, other consultant reviews and reports by external parties); policies, practices and procedures; trend information and other data regarding safety performance or priorities; meeting minutes and executive actions; interviews with personnel who have been in place since or prior to San Bruno; the impressions of individuals who were newer to the organization; and NorthStar's professional experience. NorthStar's assessment is largely based on PG&E's current safety culture.

PG&E has taken a number of steps following San Bruno to improve the safety of its infrastructure, the public and its employees. **Attachment 1** details some of the changes since San Bruno. PG&E made additional improvements during the course of NorthStar's investigation; however, more improvements are warranted. PG&E recognizes that there is additional work to be done, and that its focus on safety must never end. Culture change takes time and commitment. NorthStar's conclusions and recommendations are made with this intent — to assist PG&E and the CPUC in continuing to improve PG&E's safety culture.

At PG&E, the primary responsibility for safety rests with the various LOBs, in particular Gas Operation, Electric T&D, and Power Generation. Ultimately, responsibility rests with each employee to be accountable for his/her own safety and the safety of co-workers and the public. To achieve a unified culture at any large organization is challenging. Culture is driven by management commitment; the behavior and personality of an employee's immediate supervisors and co-workers; and, to a lesser extent by "corporate speak." The specific challenges and risks faced by gas operations, electric operations, other field operations and the various generating stations differ from each other and from those faced by corporate office workers. Maintenance and construction activities and associated risks differ between the LOBs. Hydro generation differs in many respects from fossil generation and from the risks associated with nuclear power. PG&E operates in a diverse, expansive service territory. Some of the facilities are remote, with minimal connection to the activities in downtown San Francisco. One should not expect precisely the same culture in each office, district or division. However, basic cultural tenets should be consistent throughout the organization.

PG&E made two significant changes in the early years following San Bruno to drive improvements in the safety culture:  1) the modification to its discipline policies and, 2) the emphasis on speaking up for safety.

In May 2012, PG&E developed a behavior-based approach to discipline, replacing its previous matrix-driven approach to determining the level of discipline for various safety infractions.  Previously an employee may have been fired for a violation of safety rules or a safety incident.  With the change in policy, discipline following safety incidents or accidents was to be used only as a last resort.  In order to remove any perception of punitive action, PG&E began referring to the discussion between an employee involved in a safety incident and his/her supervisor, as a "Safety Discussion."

Consistent with the change in the discipline policy, PG&E began encouraging management and employees to report safety issues and to have open dialogue regarding potential safety concerns.  Ultimately this led to a number of initiatives.  In February 2014, PG&E and the IBEW signed a Letter of Agreement related to the sharing and reporting of near hits (incidents where no property was damaged and no personal injury sustained, but where, given a slight shift in time or position, damage and/or injury easily could have occurred).  According to the employee announcement: "This agreement reinforces PG&E's commitment to foster a culture of trust an open dialogue in which near hits can be openly shared without the use of disciplinary action.  This is a significant change from past practices and one we wholeheartedly believe is the right approach in order for us to build a safety-first culture."[9]  PG&E also launched a training program to foster a more open environment in which employees would feel comfortable speaking up and placing safety first.

## E.   KEY CONCLUSIONS

Conclusions with broader organizational implications are highlighted in this chapter.  Conclusions in all scope areas are detailed in the subsequent chapters of this report.

### 1.   PG&E employees at all levels are committed to safety.

Throughout the course of the review, NorthStar was allowed unfettered access to PG&E personnel and executive management meetings and processes.  This included attendance at Board committee meetings, executive management meetings and internal self-assessments.  Employees were encouraged to be candid with NorthStar, and NorthStar believes for the most part that this occurred.  PG&E immediately notified NorthStar in the event of a serious incident or a compliance violation which required self-reporting to the CPUC.  Some of these may have ended up in fines.  NorthStar believes this speaks positively to the issue of PG&E's safety culture, its willingness to accept potentially negative findings and its desire to improve.   NorthStar believes PG&E executive management is committed to safety.  NorthStar observed a similar to commitment to safety among the field employees.  No one desires to be unsafe.

---

[9] DR 66 attachment 40



2. **The dual-president model in place for most of NorthStar's review, is not typical of the industry and does not promote the "One PG&E" focus. Regarding safety, PG&E continues to maintain a strong LOB, rather than enterprise-wide focus.**

On August 17, 2015, following Chris Johns retirement as President of the utility, PG&E separated the roles of electric and gas operations, appointing Ms. Geisha Williams as President, Electric Operations and Mr. Nick Stavropoulos as President, Gas Operations. While this may have been beneficial from a succession planning standpoint, it was not consistent with a unified company focus.

On November 14, 2016, PG&E announced that the PG&E Corp. BOD had elected Ms. Williams as the Chief Executive Officer (CEO) and President of PG&E Corporation and Mr. Stavropoulos as President and Chief Operations Officer (COO) of the Utility, effective March 1, 2017. NorthStar is hopeful that the March 1, 2017, re-consolidation of the roles of president of the gas and electric businesses into a single utility president role will help foster a more consistent and inclusive approach to safety.

3. **Corporate Safety's organizational placement prior to March 1, 2017, did not send a strong message about PG&E's commitment to safety. Additionally, the Lead Safety Officer in place until March 1, 2017, did not possess significant operational or safety credentials.**

During the course of its review, NorthStar expressed concern that Corporate Safety was buried within the organization and was not led by individuals with strong safety credentials. The Safety organization and the Lead Safety Officer should have reported much higher in the organization, if for no reason other than to send a strong message about Executive Management's commitment to safety. Until NorthStar's review, Corporate Safety was part of the Safety and Shared Services (S&SS) organization which reported to Gas Operations. NorthStar recommended that this organization should report to the Utility President and be staffed with experienced safety personnel. NorthStar also expressed concern that the inclusion of the Environmental function within Safety and Health served to detract from the focus on public and employee safety. NorthStar recommended that the Lead Safety Officer also have a reporting relationship to the Nuclear, Operations and Safety (NOS) Committee of the Board, similar the relationship of an entity's Internal Audit function to the Audit Committee of the Board.

For the most part this recommendation has been adopted. Following the return to a one-president structure in November 2016 (effective March 1, 2017), PG&E split Environmental from Safety and Health, and removed Safety and Health from the Shared Services organization, instead having it report to the President and COO of the utility with a reporting relationship to the NOS Committee. PG&E selected a new Vice President of Safety and Health with operational experience to serve as the Lead Safety Officer and hired an experienced Senior Director of Safety and Health.

**4. Current safety culture efforts are disjointed and not part of a comprehensive, company-wide health and safety plan.**

The need for a safety culture strategy was identified as early as 2010. PG&E changed its discipline policy, launched leadership training classes, and encouraged employees to "speak up," but it did not develop a comprehensive strategy. Each of the LOBs has its own safety plan. Gas Operations has a Gas Safety Excellence Plan; Electric T&D created an Electric Operations Improvement Plan; and, Power Generation developed its own safety culture strategy. Corporate Safety manages the utility's health and wellness programs and a number of cultural initiatives. Corporate Safety's "plan" consists of six elements which shift and evolve based on timing and feasibility. The earliest iteration of Corporate Safety's Safety Culture Roadmap is from mid-2014.

While each LOB implemented various programs and initiatives to improve safety, they were not part of a comprehensive corporate-wide plan, which encompasses all aspects of safety and which clearly defined the roles and responsibilities and inter-relationships between the LOBs and the Corporate Safety function. As a result, PG&E was slow in addressing some of the cultural issues. The lack of a comprehensive plan also creates the potential for differing messages and inconsistent communication. NorthStar believes PG&E felt considerable pressure to improve performance following San Bruno and launched a number of initiatives aimed at improving safety without sufficient consideration of the potential impact on the workforce or its ability to determine the effectiveness of individual campaigns.

**5. Historically, the respective roles and responsibilities of corporate safety and the LOBs have been ill-defined. NorthStar believes the significant turnover in the Corporate Safety organization has also contributed to delays in addressing safety culture and the development of a holistic approach to safety.**

**6. PG&E has made positive strides in embedding a safety consciousness throughout the workforce; however, a cultural divide still exists between corporate and the field.**

PG&E has made progress in improving its safety culture; however, the pace could be improved. The speed of change has been affected by internal blind spots, organizational issues and communication challenges. Management bandwidth issues may also play a role. Despite NorthStar's concerns regarding the potential pace of change, there is a need in some areas to pause, recognize that change does not happen overnight, evaluate the effectiveness of initiatives currently underway and develop a comprehensive and robust plan for continuing to improve the safety culture throughout the organization.

**7. PG&E has placed a heavy emphasis on training to improve safety performance and promote a positive safety culture. Many of these programs are good; however, the sequence and timing of training means crew foreman safety training may not be complete until 2019.**

Since San Bruno, PG&E has delivered two enterprise-wide safety culture leadership training programs. The first program, conducted primarily in 2012 and 2013, was a one-day



Safety Leadership Workshop delivered to over 4,500 PG&E leaders from crew foremen to the CEO. It provided a good foundation for the development of an improved safety culture. The second safety culture leadership training program, the Safety Leadership Development Program, consisted of a series of six workshops delivered between 2014 and 2016. This workshop training should have positive impact on safety culture, but it was not given to crew foremen. PG&E plans to implement a safety training program for crew leaders in 2017, but the training will not be complete until the end of 2019.

## 8. There is insufficient company-wide communication regarding PG&E's safety culture strategy.

There is limited company-wide communication regarding PG&E's overall safety culture strategy. PG&E's primary approach to first communicating its post–San Bruno approach to safety was through the Safety Leadership Workshops in 2012 to 2014, and the leaders' follow-up discussions with employees. Although not part of a specific or unified campaign, the overarching message PG&E has been striving to instill in its workforce is that nothing is more important than safety and employees should "speak-up" where safety is concerned. PG&E has made significant strides in this area; however, this belief is not yet firmly and fully entrenched within the organization. The need to improve the "speak up" culture was identified in 2012 and 2014 surveys, but the PG&E did not implement a "Speak Up" campaign until fall 2016.

There are also indications that corrective actions related to incident investigations may not be shared with other LOBs on a timely basis or may be "lost" amongst the many other communications. PG&E recently replaced Electric T&D's Rapid Incident Notification System (RINS) with other systems. RINS gave Electric Supervisors a daily summary of safety incidents and outages from the previous day. It is too soon to predict the impact this may have on the field.

## 9. The Integrated Planning Process (IPP) has had a positive impact on the safety culture of PG&E since its introduction in 2012, but is not a replacement for a comprehensive integrated Utility Safety Plan.

The IPP involves a large number of employees on an almost continual basis throughout the year. Senior executives are a highly visible part of the process, indicating its importance. Each of the four sessions of the process requires employees and managers to consider and evaluate projects and initiatives that affect safety. Unfortunately, safety is not separated or differentiated from reliability and integrity. While reliability and integrity can often be linked to safety, they are not always the same thing as safety. Both PG&E and the CPUC are working to improve the focus on safety separate from reliability and integrity.

## F. CRITICAL RECOMMENDATIONS

The following provides NorthStar's most critical recommendations for PG&E and the Commission.

- Development of an implementation plan for NorthStar's recommendations, to be submitted to the CPUC.  PG&E should also provide periodic updates on its implementation status.  This information shall be used by SED to ensure timely and effective implementation of NorthStar's recommendations.

- The need for clear definition of supervisory requirements, including an assessment of workload requirements, ongoing field monitoring efforts and time requirements, and associated staffing levels.

- Expedited completion of the safety leadership training for crew leads and foremen.

- Development of a comprehensive safety strategy, with associated timelines/ deliverables, resource requirements and budgets, personnel qualifications, clear delineation of roles and responsibilities; action plans, assignment of responsibility for initiatives, and associated metrics to assess effectiveness.  This should be followed with the identification of necessary corporate and LOB safety resource requirements and development of an appropriate organization structure.  Also shared with SED

- Greater coordination among the LOBs and with Corporate Safety to increase consistency, improve efficiencies, minimize operational gaps, and facilitate sharing of best practices.

- Meaningful, consistent routine reporting of safety performance and metrics to the CPUC (all major California Investor-Owned Utilities (IOUs)).

- A non-punitive system for reporting actual and potential safety incidents to the CPUC to encourage reporting and facilitate lessons learned sharing among all California utilities.  To the extent that the utilities are made aware of incidents or potential incidents in other states this information could also be shared.

- A Performance-Based Ratemaking (PBR) mechanism that includes a safety element to be considered in the rate design phase of the TY2017 PG&E General Rate Case (A. 15-09-011).  The PBR mechanism should include a traditional rate of return component and a variable safety-related component based on pre-defined criteria and the discretion of the CPUC.

## G. RECOMMENDATIONS FOR PG&E

**Exhibit I-1** provides a summary list of the recommendations contained throughout the report.  Additional detail on the recommendations is provided in the individual chapters. Exhibit I-1 provides NorthStar's assessment as to the priority of each recommendation (high, medium, low) and the potential cost/ease of implementation.  Implementation is ranked using



an A, B, C scale, with A representing those initiatives that are relatively easy to implement and lower cost, and C representing those initiatives that are more difficult to implement or higher cost.

**California Public Utilities Commission**
**Forum on Governance, Management, and Safety Culture**
**April 26, 2019**

## To Improve Utility Performance, Fix the Culture of Entitlement

### Scott Hempling[1]

*"Public services are never better performed than when their reward comes in consequence of their being performed, and is proportioned to the diligence employed in performing them."*

Adam Smith, *The Wealth of Nations*[2]

Public services, performance, and consequences.  To improve utility performance, we need the best performers.  To get those performers, we must identify the public services we want, define the level of performance we want, attract the best talent and assign the right consequences.  Carrying out these steps in California today requires us to address three questions:

1.  Monopoly franchise and "too-big-to-fail":  Have we created a culture of entitlement?

2.  Taking action:  What near-term actions will best signal, to PG&E and its potential successors, the Commission's insistence on performance?

3.  Ending the entitlement culture:  How might we explore alternatives to PG&E?

I commend the Commission for creating these panels to explore large ideas.  There may be pressure for immediate action, but there are no quick fixes.  Because our problems have deep roots, we must aim at the roots.

---

[1]  Scott Hempling (shempling@scotthemplinglaw.com) is a regulatory advisor and expert witness.  He teaches utility law at Georgetown University Law Center.  His legal book, *Regulating Public Utility Performance: The Law of Market Structure, Pricing and Jurisdiction*, was published by the American Bar Association in 2013.  He also has authored a book of essays, *Preside or Lead? The Attributes and Actions of Effective Regulators*.  He received a B.A. *cum laude* from Yale University in (1) Economics and Political Science and (2) Music; and a J.D. *magna cum laude* from Georgetown University Law Center.  More detail is available at www.scotthemplinglaw.com.  While built largely from prior writings, this paper and panel appearance are funded by a contract with the Public Advocates Office.

[2]  At Book V, Chapter 1, Part II, para. b20.

## I.  Monopoly franchises and "too big to fail":  Have we created a culture of entitlement?

Our efforts to fix our utilities' performance must start from two premises.

*First: No amount or type of "incentives" can fix a company infected by a culture of entitlement.*  We have granted our utilities monopoly franchises noncompetitively, for reasons no one remembers.  Decades go by, performance slips, and no one reassesses the franchise grant.  The natural result?  A culture of entitlement—the utility's entitlement to remain the monopoly franchise, indefinitely, no matter how many rules it breaks,[3] no matter how much anticompetitive conduct it carries out,[4] no matter how many felonies it commits.[5]

*Second:  In regulation as in life, one can act from a position of strength only if one has alternatives.*  When we treat our utility as "too big to fail," we act as if we have no alternatives.  But as I will explain, "too big to fail" is a falsity because no utility is irreplaceable.

Combine a culture of entitlement with a too-big-to-fail premise, and we get three predictable results:

*Dulled motivation:*  Competitive markets induce performance because the seller's choice is stark:  Please the customer or lose the customer.  A monopoly utility can't lose the customer, so to induce performance we need consequences.  But by never questioning the franchise, and by softening penalties to save the company, we dilute the consequences.  Diluting the consequences dulls the inducement and corrodes the culture.

*Subsidized inefficiency:*  Diluting the consequences also violates regulation's first principle:  Cost-causers must be the cost-bearers.  If the utility doesn't bear its costs, someone else does.  When a pipeline explodes, taxpayers fund the first responders, insurance premium-payers fund the hospitals.  Costs rise for all.

---

[3]  *See* CPUC Press Release of Sept. 18, 2008 (describing Commission-imposed fine on Southern California Edison in Docket No. I.06-06-014 for violating reporting rules on performance-based ratemaking).

[4]  *See SCE Corp., Southern Calif. Edison and San Diego Gas and Elect. Co.*, Decision 91-05-028, 122 P.U.R.4th 225, 258 (Calif. PUC May 8, 1991) (describing Southern California Edison's historical practice of "us[ing] its transmission dominance to undercut [municipalities'] efforts to lower costs to their retail customers"; and using its "strategic control over transmission to the competitive disadvantage of other utilities").

[5]  *See* "PG&E Guilty of 6 Felony Charges in San Bruno Pipeline Explosion," https://thomasjhenrylaw.com/blog/premises-liability/pge-guilty-6-felony-charges-san-bruno-pipeline-explosion/.

2

*Distorted competition:*   "[R]escues in times of crisis can give large financial players an unfair advantage:  They can borrow cheaply in normal times, because everyone knows that they are 'too big to fail' and will be bailed out if things go wrong."[6]  If we giving incumbent utilites cost-of-capital advantages, prospective competitors will go away, making too-big-to-fail a self-fulfilling prophecy.  Some say that more "supportive" regulation will lower the cost of capital.  They miss this point completely.  Giving artificial support to an inefficient incumbent raises costs, because it deprives us of efficiencies available from others.

## II.   What near-term actions will best signal, to PG&E and its potential successors, the Commission's insistence on performance?

### A.   Define the safety obligations of a prudent utility

"What gets measured, improves."[7]  What should we measure?   What we should measure is outcomes. But outcomes require inputs, and inputs drive costs, so we also need to address inputs.  If we isolate one goal from another we ignore the tradeoffs.  So we need to define inputs and outcomes comprehensively, to "[a]void a band-aid approach."[8]

At bottom, we need to define prudent performance:  by making best practices mandatory practices.  Compliance reasonable compensation; non-compliance gets penalties and disallowances.  That is true "performance-based regulation."  Those are the basics.  Here are some of the detailed questions to address:

If the Commission orders an action, is the utility relieved of responsibility for the results?  Not necessarily.  A mandatory action can be a minimum action—necessary for a finding of prudence but not sufficient.

By what criteria should the Commission decide when to order actions and when instead to require results, leaving actions to the utility's discretion?

---

[6]  Paul Krugman, "Obama's Other Success:  Dodd-Frank Financial Reform Is Working," *The New York Times* (Aug. 3, 2014).

[7]  Attributed to Peter Drucker, author of *The Effective Executive* among other books.

[8]  Governor Newsom's Strike Force, *Wildfires and Climate Change:  California's Energy Future* at 4.

3

What should be the consequence of a utility taking the mandatory actions:  protection from any imprudence finding; or only assurance of recovering the reasonable costs of taking the action?

## B.   Order internal fixes to PG&E's accountability problem

The Commission should explore requiring PG&E to take the following actions:

1. Identify all situations involving a conflict between profit and safety.  The new PG&E CEO's compensation is based on a combination of safety and profitability.  When self-administered, those two goals are in direct conflict, because a dollar cut from safety is a dollar added to profit.  More fundamentally:  No one should need a personal financial incentive to do the right thing.  What should depend on his safety record is not his compensation but his job.

2. Each PG&E Board member receives over $200,000 annually for part-time work.[9] PG&E should specify what each Board member is responsible for achieving in the next 12 months, and how the full Board will hold that member accountable for those achievements.

3. Consider whether the Board membership should include a union representative, who can assure that executives do not compromise worker safety for earnings.

## C.   Strengthen the state's safety oversight

The Commission should explore these options:

1. Ensure that the Commission's technical safety staff has expertise and compensation at least comparable to their utility counterparts.

2. Empower the Commission's technical staff to impose penalties, subject to review.

3. Order the utility to contract out the safety function, to an entity chosen by the Commission and paid for by the shareholders.

4. Require on-site safety monitoring by a Commission-appointed, independent entity, funded by the shareholders but accountable only to the Commission.

## D.   Cease "encouraging" companies with "incentives"

When we convert discretion into obligation, the need for "incentives" disappears.  Much of "performance-based ratemaking" misses this point.  And it fails—with the utility "drifting to failure" (Prof. David Hoffman, Apr. 15 Forum).  Why?  Four main reasons.

---

[9] PG&E Corp, *Notice of 2018 Annual Meetings, Proxy Statement* at 30 (Apr. 10, 2018).

4

*Compensation divorced from performance:* The typical performance-based rate proposal does not align the utility's total compensation with total performance because it does not define total performance. Instead it offers supra-normal returns for merely prudent performance. That's the definition of monopoly rent.

*Rewards for cost-cutting:* Performance-based rate plans often reward cost-cutting, because the revenue stays constant while the costs decline. But cost-cutting is no proxy for performance. The "incentive" is to favor short-term cost cuts over investments in long-term performance.

*Rewards for committing fraud:* Combine earnings incentive with self-reporting, and you get incentive to mis-report. Between 1997 and 2003, to gain PBR awards Southern California Edison's "employees and management manipulated and submitted false customer satisfaction data," and submitted "false and misleading health and safety data."[10]

*Worker-reward gap:* What enhances performance are people who work at jobs, not people who wait for dividends. But performance-based rate plans increase earnings for dividend-collectors rather than salaries for benefit-creators. To reward shareholders for employees' performance assumes that executives won't press for performance unless there's money in it for shareholders. Executives with that attitude don't belong at a public utility.

Some argue that "incentives" are necessary to overcome utility "resistance." That's not win-win; it's lose-lose. Efficiencies lose and customers lose. Trying to "incentivize" someone who can't perform, won't perform, feels entitled not to perform, or who has a long history of not performing—that's the definition of insanity: repeating the same mistakes and expecting different results. Those who say "we can't force the utility to take action" are wrong legally and logically. The purpose of regulation is performance. Commissions exist to cause performance. Issue orders, compensate only if there is compliance. Less incentivizing, more ordering.

### E.      Assign financial consequences fully, because no utility is "too big to fail"

*Behavioral psychologists have proven, repeatedly, that people are more inclined to avoid losses than to seek gains.* Because "[l]osses hurt about twice as much as gains make you feel good," loss aversion "has become the single most powerful tool in the behavioral economist's arsenal." [11] And it should become a powerful tool in the regulator's arsenal. If the utility misses an operational target it should miss an earnings target.

---

[10] *See* CPUC Press Release of Sept. 18, 2008 (describing fine of $146 million in Docket No. I.06-06-014).

[11] Richard Thaler, *Misbehaving: The Making of Behavioral Economics* 34 (2015).

Some want to weaken consequences because the utility is "too big to fail." They conflate our need for utility service with a need for this utility's service. They are wrong, twice.

*Wrong on legal grounds:* Regulators have no constitutional duty to guarantee a utility's financial success, or even its viability. Courts and commissions have said as much, multiple times, for over a century.[12] And to the extent California statutes require the Commission to soften penalties to save the company, they undermine regulation's core purpose:  to produce the performance that competitive markets would produce. The Commission should seek changes to statutes that place an incumbent utility's financial health ahead of its prudence responsibility.

*Wrong on practical grounds.* A utility is not a "systemic" bank whose failure could bring down the economy. A bank's value is its assets. Its assets are financial. When its money disappears, the assets are gone. A utility is different. Its finances may fail, but its assets—its generators, its transmission network, its distribution system, its wholesale contracts—all survive. And its employees and customers will survive. So the power can flow and the funds can flow. A successor can replace the incumbent, take over the assets, hire the employees, service the contracts, and supply the customers. PG&E is neither indispensable nor irreplaceable.

## III.   Ending the culture of entitlement:  By what steps can we explore replacing PG&E?

Regulating without alternatives is regulating from weakness. Our main source of weakness is our assumption that a utility's monopoly franchise is a permanent franchise. It is not. The franchise is a privilege granted by the government; it is not an asset owned by the utility.[13] Franchise permanence is a policy choice; it is not a necessity. And its roots lie in inertia rather than alertness. Other nations do things differently. (See Appendix on the European Union and the nation of Vanuatu.)  Instead of permanently entrenching the incumbents, we

---

[12]   *See, e.g., Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 596-97 (1896) ("If a corporation cannot maintain such a highway and earn dividends for stockholders, it is a misfortune for it and them which the Constitution does not require to be remedied by imposing unjust burdens on the public."); *Market St. Ry. Co. v. R.R. Comm'n of Cal.*, 324 U.S. 548, 567 (1945) ("The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or restore values that have been lost by the operation of economic forces.").

[13]   *See New Orleans Gas Co. v. Louisiana. Light Co.*, 115 U.S. 650, 669 (1885) (franchise "belong[s] to the government, to be granted, for the accomplishment of public objects, to whomsoever, and upon what terms it pleases"); *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 595 (1839) (franchises are "special privileges conferred by government upon individuals, and which do not belong to the citizens of the country generally of common right").

should open our doors to all ownership forms, including investor-owned, state government-owned, and municipal government-owned.[14]

To identify and attract alternatives to PG&E, we need to take these steps: (a) identify the services customers need, (b) determine which of those services are monopoly services and which are potentially competitive services, (c) describe the company characteristics that produce the best performance, then (d) start the process of attracting and selecting the best.

### A.    What services do customers need?  Which are monopoly services and which are potentially competitive?

No longer is electricity a mere commodity, electrons traveling over wires.  Electricity is a service taking multiple forms:  generation, transmission, distribution, demand aggregation, conservation services, microgrids, storage, electric vehicle charging stations.  These different services can be provided by different providers:  vertically integrated monopolies, organized wholesale markets, retail competition, rural cooperatives, municipal power systems, community choice aggregators, consumers themselves.  With so many possible services and service providers, electric policy needs to serve multiple purposes:  ensuring safety, reducing emissions, improving power quality, and maintaining reliability.  We cannot achieve all these goals simultaneously, because some constrain others.  So the industry's regulators must decide:  What mix of goals and services best serves the state's total needs?

Once we know what services we want, we need to decide what quality we want.  Some want "first quartile" performance, others are fine with third.  Some want 100% reliability, others will accept outages to lower their cost.  But to the extent physics makes electric service a common good, there can be only one standard.  So regulators need to choose that standard— necessarily a political judgment rooted in benefit-cost analysis.

The legendary economist and regulator Alfred Kahn wrote:  The "continuing responsibility of legislators and regulators is to find the best possible mix of inevitably imperfect competition and inevitably imperfect regulation."[15]  So we next need to ask:  Of the services we want, which services are natural monopoly services requiring a monopoly providers,[16] and which are potentially competitive services that can be provided by competitive companies?

---

[14] *See* Strike Force, *supra* at 4 (emphasizing that "no options can be taken off the table").

[15] A. Kahn, *The Economics of Regulation: Principles and Institutions*, Vol. I, Introduction at xxxvii; Volume II at 114 (1970; 1988 edition).

[16] A natural monopoly service has two characteristics:  (1) a subadditive cost function, *i.e.,* its per-unit cost declines as output increases; and (2) the decline continues for the entire quantity of the defined market.  "The term [natural monopoly] does not refer to the actual number of sellers in a market but to the relationship between demand and the technology of supply.  If the entire demand within a relevant market can be satisfied at lowest cost by one firm

7

**B.      What characteristics should providers have, and not have?**

Provider characteristics affect performance.  They also affect regulators' ability to produce performance.  Here are six characteristics that matter.

*Ownership structure:*  We have government-owned and privately-owned; non-profit, for-profit and semi-profit; publicly traded and privately traded; holding company-owned and retail shareholder-owned; hedge fund-owned and widows-and-orphans owned.  Different business forms bring different strengths.  It's best to be open to all forms, but there are at least four minimums:  (1) No conflict between earning profit and pursuing the public interest, (2) commitment to transparency, (3) commitment to the state's clean energy goals, and (4) respect for workers and their unions.

*Skills and experience:*  There are the old-line veterans, experienced companies in the old ways; the start-ups inventing new ways; and the in-the-middle companies that came up in the 1990s as competition came to gas and electricity.  Some are generalists, some are specialists.

*Business activities* and their location (past, current, future):  There's pure play and conglomerate; local and remote; domestic and foreign.

*Culture and governance:*  Who controls which decisions?  Who is accountable to whom, for what types of performance?  How does the company pay its people?  Do compensation methods create conflict between executives' interest and customers' interest?  Boardroom and workforce—do they reflect the communities the company serves?

*Attitude toward quality:*  Does the entity aspire to excellence or does it rest on its government-protected laurels?  Does it look for hazards to prevent—or does it wait for disasters to happen, then rush to claim credit for solving them?

*Attitude toward regulation and regulators:*  Companies differ on regulatory purpose, on performance standards, and on the consequences of falling short.  Each company assesses regulation's worth self-interestedly.  Everyone wants regulation when it protects; but not when it obstructs.

Why do these company characteristics matter?  A corporate family's business activities determine whether it has internal conflicts—between the utility's public service obligation and the holding company's private business priorities.  Companies that mix utility and non-utility businesses have an internal conflict over scarce capital.  Companies that compensate their

---

rather than by two or more, the market is a natural monopoly, whatever the actual number of firms in it."  Richard A. Posner, "Natural Monopoly and Its Regulation," 21 *Stan. L. Rev.* 548 (1999).

executives based on share price or earnings have an internal conflict between shareholder interest and ratepayer interest.  Companies with internal conflicts require more regulatory effort than companies without those conflicts.  And regulatory effort does not always succeed.[17]

### C.    How do we attract and choose the best performers?

When Pope Julius II wanted the Sistine Chapel's ceiling painted, he didn't hire the house painter; he got Michelangelo.  In the utility businesses, today's job requirements look nothing like they did thirty years ago.  Yet we still are served by the same companies.

How do businesses find employees and manufacturers find suppliers?  They search for the best, then choose the best.  Rather than relying on inertia, regulatory policy-makers should do the same:  Create competition for privilege of being a monopoly.  "[T]he public has an obvious interest in competition, 'even though that competition be an elimination bout.'"[18]

We have a real-time example in South Carolina, where the Legislature is considering selling the state-owned utility, Santee Cooper.[19]  With ICF as its consultant, the Legislature sought competitive expressions of interest and indicative offers.  It got 15 "strong and diverse" proposals:  seven full purchase proposals and eight others—long-term asset management agreements, long-term power supply arrangements, and partial acquisitions.[20]  *Owning a monopoly is desirable.*  We know this also from the mergers-and-acquisitions trend:  Nearly 100 acquisitions over 30 years proves that California create an opportunity arise to take over a utility's government-protected franchise, there will be takers.[21]

---

[17] *See, e.g.,* this Commission's Decision No. 91-05-028, *supra* at 277 (("[I]f Edison's past violations of the regulatory compacts set forth in our ... decision [authorizing SCE's holding company] are any indication of what will transpire in the future, it will be increasingly difficult to ensure that inappropriate costs are not passed on to ratepayers. . . . Edison has attempted to use [that decision] to shield its activities rather than open the Commission's access to expeditious and thorough review.  Such contentiousness produces increased burdens on the Commission. . . .").

[18] *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 991 (D.C. Cir. 1977).

[19] Primarily a wholesaler to rural cooperatives, the utility also serves about 170,000 retail customers.  Its 2017 it had a revenue requirement of about $1.7 billion, and assets of about $13 billion, including about 5100 mW of generation.

[20] *See* ICF's evaluation of February 2019, available at https://governor.sc.gov/sites/default/files/Documents/newsroom/ICF%20Evaluation%20of%20EOI%20Responses%20for%20Santee%20Cooper.pdf.

[21] For a long list of many of those acquisitions, and some reasons why they occur, *see* Hempling, "Inconsistent with the Public Interest:  FERC's Three Decades of Deference to Electricity Consolidation," *Energy Law Journal* (Fall 2018), available at https://www.eba-net.org/assets/1/6/15-233-312-Hempling_[FINAL]1.pdf.

*Why does this conversation never occur?* Not because replacing the incumbent is infeasible but because we don't make plans. Parents buy life insurance and schools run fire drills. Regulators too should have contingency plans. Consider a rough analog: the Dodd-Frank Act's requirement of a "living will." Banks whose failure could pose "systemic risk" must file "resolution plans" that provide for the "rapid and orderly" liquidation or restructuring of the company, "so as to "mitigate[] serious adverse effects on U.S. financial stability." The plans must "[f]ocus on identifying core business lines and critical operations and mapping to legal entities"; and must identify "funding, liquidity needs, interconnections and interdependencies, and management information systems."[22] If regulators did something similar—if they created plans by which they could replace their utilities, we'd be prepared to impose consequences commensurate with performance shortfalls. No longer would we hear "too big to fail."

Using competition to find the best performers, and having replacements ready to replace those performers, is the path to real performance. Granting someone a permanent monopoly, then trying to "incentivize" them to improve, is not. Juggling board membership for a company that faces no pressure to compete is not. But starting a Commission inquiry into how to solicit for expressions of interest—that will get our utilities' attention fast.

### D.   Don't wait for the bankruptcy court to say who will provide electric service

A bankruptcy trustee's job is to put creditors' interest first. So if PG&E is sold, it will be sold to the highest bidder, not the best performer—unless the Commission acts now. The necessary Commission action: *Make clear to the bankruptcy court that it will approve a new owner of PG&E, or a new successor to PG&E, or a rate path for PG&E or its successor, only if that entity, among all possible entities, best meets the Commission's criteria for performance.* By taking that action—and only by taking that action—can the Commission's priorities prevail.

The bankruptcy court's approval of an acquirer does not preempt a state commission's authority to reject that acquirer. We know this from Texas. The retail utility Oncor was owned 80 percent by Energy Future Holdings Corp ("EFHC"). EFHC went bankrupt. The federal bankruptcy court approved the Oncor's acquisition by NextEra (which owned Florida Power & Light). But the Texas Commission rejected NextEra because NextEra wanted control of Oncor's utility cash flow to pay off NextEra's high acquisition debt. The court then approved Sempra's bid—again subject to the Commission's approval. Both times, no one argued preemption.[23]

---

[22]   Federal Deposit Insurance Corp., "Living Wills Overview" (Jan. 25, 2012), available at https://www.fdic.gov/about/srac/2012/2012-01-25_living-wills.pdf.

[23]   On Oncor, *see Joint Report and Application of Oncor Electric Delivery Company LLC and NextEra Energy*, Docket No. 46238, Tex. Pub. Util. Comm'n, (Apr. 13, 2017). On Sempra, *see Joint Report and Application of Oncor Electric Delivery Company and Sempra Energy for Regulatory Approvals*, Docket No. 47675 (Mar. 8, 2018). While bankruptcy litigants

10

*This Commission should not follow Texas's approach of waiting for the bankruptcy court outcome.*  Doing so makes a Commission a spectator rather than a decision-maker.  The Commission should make clear, now, that it will approve only the best performer, not the highest bidder.

*   *   *

The Commission is the policy leader.   Rate-setting and auditing are essential activities, but they are essentially reactive—to utility decisions on what to spend and how to spend it.  Leadership means empowering customers to state their desires, channeling those desires toward a common good, setting the standards for performance that attract the best performers, then enforcing those standards without sympathy for those who fail to meet them.  With this type of leadership, we can replace "drifting to failure" with heading toward success.

---

behave as if the state commission is not preempted from rejecting a bankruptcy-approved acquirer, that specific question has not been litigated.  The Ninth Circuit has held that a court-approved bankruptcy reorganization plan is preemptive of state regulation "relating to financial condition."  *See Pacific Gas and Electric Co., et al. v. People of the State of California*, 350 F.3d 932, 937, 948 (9th Cir. 2003).  It is not clear whether regulation of corporate structure or ownership type is regulation "relating to financial condition."

11

# Appendix on Utility Franchises

## European Union
## Article 18 (Directive 2014/23 on Concessions):  Duration of the concession

"1. The duration of concessions shall be limited. The contracting authority or contracting entity shall estimate the duration on the basis of the works or services requested.

"2. For concessions lasting more than five years, the maximum duration of the concession shall not exceed the time that a concessionaire could reasonably be expected to take to recoup the investments made in operating the works or services together with a return on invested capital taking into account the investments required to achieve the specific contractual objectives.

"The investments taken into account for the purposes of the calculation shall include both initial investments and investments during the life of the concession."

### The nation of Vanuatu:  Utility concession for the capital city of Port Vila

Three ways to replace the incumbent:

1.      At end of the 30-year concession, paying for any unrecovered costs.

2.      At any time, paying for any unrecovered costs plus 7 years' profit.

3.      At any time for breach of the concession, paying for unrecovered cost.

Contrast typical U.S. treatment:  Indefinite term of years; revocation only with egregious failure—with opportunity to cure.

Contrast U.S. electric utility acquisitions:  Our unstated premise is that the monopoly franchise is the incumbent's to keep or sell for gain.  We see this in the 30 years of mergers and acquisitions, nearly 100 total.

.

**Relevancy of the** *Assessment of Pacific Gas and Electric Corporations and Pacific Gas and Electric Company's Safety Culture, prepared for the CPUC on May 8, 2017, by NorthStar Consulting Group* **to Worker's Compensation Claim No. 19W0302:**

*"While PG&E is committed to safety and efforts have been made to reduce incidents and increase the organizational focus on safety, these efforts have been somewhat reactionary — driven by immediate needs and an understandable sense of urgency, rather than a comprehensive enterprise-wide approach to addressing safety. PG&E moved quickly to address the issues with its gas system surfaced by San Bruno, but was slower in addressing its safety culture. As a result, the extent to which the desired culture is embedded in the organization varies among lines of business (LOB) and other organizations, and between the corporate offices and the field. Gas Operations and Power Generation have more robust implementation than Electric Transmission & Distribution (Electric T&D). PG&E has placed considerable emphasis on changing the culture of management personnel and this is evident in the corporate offices. Field personnel generally believe management is committed to safety, but in many respects it is business as usual in the field, or the field locations are working to address safety issues on their own." Page I-1 Section A. Summary*

This is a symptom of inexperience. At the level that energy workers operate, there is no room for error, failure is not an option. There is no need to re-invent the wheel. There are long standing traditions that are tried and true. Those proficient in the field understand that a "big picture" approach encourages optimum safety performance at a core level and not just temporary reactionary solutions that prove to be more costly in the long run.

Humboldt Division was doing an excellent job of this, before Ryan Harriman came to town. We all worked together to get the job done. We were like a family, much like the PG&E of old. I attribute Humboldt's success to their ability to work so well together as a team. Even across departments. That is a rare quality. Ryan Harriman not only misrepresented Eureka but insisted that they bend to his will. This is sign of incompetence, in my mind. A confident leader knows how to utilize talent appropriately and has little need to micromanage. I expressed this to Ryan, but he seemed diametrically opposed to listening to any of my input at all.

*"With the exception of the change in the discipline policy and its efforts to foster a "speak up" environment, PG&E has only recently begun to address safety culture on an enterprise wide basis. The absence of a comprehensive strategy has resulted in the lack of coordination between corporate safety and the field functions and the introduction of numerous initiatives aimed at improving safety without a coordinated approach. Initiatives driven by the field or lessons learned within an LOB are not adequately transmitted across the organization to maximize the benefit of internal best practices. Delays in the development or implementation of a plan have been exacerbated by the two-president model, line of business silos,* **the lack of management personnel with safety experience, re-organization and considerable turnover within corporate safety, and the lack of a comprehensive understanding of the issues and underlying causes."** *Page I-1 Section A. Summary*

My experience has been an unfortunate vetting of PG&E's "Speak Up" culture and, in my mind, has found it to be quite wanting. As someone who is intimately familiar with the PG&E safety culture before San Bruno, I can say that we have not improved as a company. In fact, the increase of non-traditional leaders has caused us to drift farther and farther from the mark.

How can an individual, who is not familiar with the mechanics of this very industrial work that we do, be expected to develop comprehensive, long term solutions to such systemic problems? Why is the company so adverse to listening to the "expert in the field" and implementing the very comprehensive suggestions that come from the Corrective Action Program?

I personally experienced on multiple occasions a "check the box" mentality in regard to CAP. Even when speaking on something as fundamental, to field operator safety, as dispatch answering their phone for first responders. No real solutions were offered or pursued. In fact, dispatch supervision spent more time defending their work group than trying to listen for understanding and develop comprehensive solutions. In the end, the exercise offered no resolution and merely put a target over my head and became yet another support system that would fail me when I needed it most.

I have repeatedly seen firsthand the dangers of having such an inexperienced middle management team. It is my expert opinion that any workforce that experiences daily hands on interaction of the company's two very dangerous commodities, especially in their most dangerous form (Abnormal Operating Conditions) should, at the very least, have front line leadership that has a traditional understanding of the commodity and the procedures that keep the work force and public safe from harm. I cannot count the number of times I heard the "old timers" express this at group level. This is the single most common complaint I have heard from the hardened workers that built the energy industry in California. It is unfortunate that upper management does not demonstrate an appreciation for this plain fact.

*"On September 9, 2010, at approximately 6:11 P.M., a portion of PG&E's 30-inch diameter underground natural gas transmission system (Line 132) suddenly ruptured. Operating at approximately 386 pounds per square inch gauge (psig), the pipeline was located under the asphalt paving at the intersection of Glenview Drive and Earl Avenue in a residential area of San Bruno, California. Installed in 1956, the 28-foot long section of Segment 180 Line 132 that failed consisted of five segments which were propelled into the air and landed about 100 feet away. An explosion ensued, fueled by blowing natural gas. The explosion and fire resulted in the loss of eight lives and the total destruction of 38 homes. Sixty-six people were injured. Seventy homes sustained damage and eighteen homes adjacent to the destroyed dwellings were left uninhabitable." Pg. I-2, Section B. Background*

As a San Carlos first responder and Area 1 Safety Chair, I was present for the exhaustive restoration of this horrific event. I was one of the many workers who saw this carnage firsthand and one of the first few to respond. I spoke with victims face to face and worked for over a

2

week from 7am in the morning to 11pm at night to attempt to restore this devastated community to some semblance of normalcy.

I will never forget the look on the self-proclaimed cousin of Joe Ruigomez, who's hands and upper body were severely burned as he tried desperately to save his beautiful young girlfriend, Jessica Morales, from the towering inferno that incinerated her and took her life right in front of him. I'll never forget the faraway look in that young man's eyes. I know trauma when I see it. This community was deeply traumatized. That night changed me forever. I have fought for safety and accountability ever since. I will not apologize for it, nor will I cease to hold the company that has meant so much to me and my family to the high standards it sets for itself and for its employees.

As a safety steward and first responder, this experience forever changed me. These are not just words on a page to me. This is the foundation of how we, as a company, ensure that nothing like this ever happens again. I will not downplay it or dilute that fact; come what may.

*"On June 24, 2011, the IRP issued its report, citing a* ***"dysfunctional culture"*** *at PG&E in which the goals of its* ***enterprise risk management process were disconnected from the reality,*** *decisions, and actions throughout the company. "…[PG&E] management made a faulty assumption. It did not make the connection among its high-level goals, its enterprise risk management process and the work that was actually going on in the company." The IRP Report determined,* ***"this failing is a product of the culture of the company – a culture whose rhetoric does not match its practices. This dysfunctional culture, the IRP Report concluded, appeared based on excessive levels of management, inconsistent presence of subject matter expertise in the management ranks, an appearance-led strategy setting, an insularity that impeded its ability to judge its effectiveness, and an overemphasis on financial performance."*** *Pg. I-2, Section B. Background*

How does the company expect to meet the lofty goals set out before them with such an inexperienced middle management body? Why is it not obvious to upper management, that in order to "connect" with the boots on the ground, managers must have a practical (not just theoretical) knowledge of what their workforce actually does every day and night?

My time in Customer Field Services and at the Premiere Gas Academy gave me a unique perspective as to how rampant this disconnect really is. As an instructor, I was tasked time and time again, to teach job functions I had no traditional knowledge of. And, when I tried to address the disconnect, I was painted as a complainer by my director, Linda Floyd. This characterization could not be farther from the truth. I could fill a courtroom with character witnesses, both personal and professional, that would gladly attest to my strong work ethic, agreeable demeanor and positive "can do" attitude.

This egregious "disconnect" is exactly what brought me to my knees on February 26, 2019. I was witnessing before my very eyes the erosion of the safety culture, myself and so many

3

others worked so hard to build in Field Services. My repeated pleas for accountability and desperately needed support fell on deaf ears, over and over again.

When I was ultimately targeted, I KNEW this was an attack meant to shut me up for good. Ryan Harriman and Daniel Campbell came in too hot and heavy for it to be a coincidence. I had DARED speak up against the system one too many times. Instead of listening to my ideas and solutions for change, my disability was exploited and I was put down. This disconnect of "rhetoric" and "action" shakes my very foundation of personal ethics, safety and financial security. The full-frontal attack on the livelihood, I had worked so diligently and for so many years to protect, proved too much to bear. When Daniel Campbell was rewarded with a lucrative position for his wife, it only drove the knife in deeper. I am struggling to survive during one of the nation's most precarious moments in history and he is living high on the hog with no accountability at all, thanks to this broken system that remains largely unchecked. THIS is PG&E's commitment to a strong "Speak Up" culture. THIS is what PG&E does to silence dissent and reward blind ignorant compliance.

These flagrant disconnects have real world consequences for PG&E field employees and for California as a whole.

*"A strong safety culture requires commitment and accountability throughout an organization. A company's leadership and executive management must display a positive commitment to safety that is recognized throughout the organization. **This commitment must be evident in the actions of management and the support they provide to the workforce. The organization must provide its people with the tools, resources, training and oversight necessary to ensure safe operations. Rules and requirements must be clear and consistent. Management must take a thoughtful approach to incidents and the implementation of new rules and standards. Employees should feel accountable for their own safety and the safety of their co-workers. They should feel comfortable stopping work during unsafe conditions or stepping in if they see another employee placing themselves, others or the public at risk. Employees should feel comfortable reporting potential hazards and incidents without fear of retribution as these can provide valuable lessons learned to improve safety practices. Disciplinary procedures should be consistently applied, recognizing the difference between human error, process defects, insufficient controls and a wanton disregard for safety rules."***
*Pg. I-3, Section C. Safety and Culture*

Simply put this paragraph describes exactly what Ryan Harriman and Daniel Campbell did NOT do when faced with the challenges in Eureka Service Center. Daniel Campbell claims to have been a Lean Coach but demonstrated none of the behaviors associated with the title. What they did demonstrate was classic "Command and Control" behavior. By silencing the most vocal person in the yard, they were able to assume control swiftly and efficiently. After all, the company had just announced bankruptcy. I think it's a safe bet to say that there wasn't a soul in the company at that time that was not concerned for their livelihood. In my dismantling, they provided an example to the work group of what will happen to anyone who dares question their misguided methods. To this day, no one has been held accountable for what was done to

4

me. In fact, the company's reaction has been quite the opposite. While I have been slandered, set up and stripped of all company assets; Daniel Campbell (much like Gene Burns) was rewarded with even MORE financial stability. I have fought tooth and nail to provide a stable environment for my two daughters. It has been exceedingly difficult to do with California housing costs being what they are. It has taken me 28 years to build the resources to fulfill the American Dream and finally become a homeowner In December of 2017. Now all that I have bled for stands in jeopardy. And what was my crime? Simple: I dared to be a competent female with an impeccable record and a resounding voice. If only I had been born a man. How different, I believe this story would have ended.

*"As defined in the OII, a positive safety culture includes, among other things:*

• *A clearly articulated set of principles and values with a clear expectation of full compliance.*

• *Effective communication and continuous education and testing. "Employees will do it right sometimes if they know how. They're more likely to do it right every time if they fully understand why."*

• *Uniform compliance by every individual in the organization, with effective safety metrics, recognition, and compensation, and consequences or accountability for deviating or performing at, above, or below the standard of compliance.*

• *Continuous reassessment of hazards and reevaluation of norms and practices."*
*Pg. I-3, Section C. Safety and Culture*

None of these principles were demonstrated when the change of guard occurred in Eureka. The entire group was affected by Ryan Harriman and Daniel Campbell's hubris and brutish quest for advancement. With two GSRs out with injuries. all that was left was a whisper of the skeleton crew that had held down Eureka Service Center for so long. At one point, Lead GSR Ernie Vasquez scolded me over the phone and implied it was my fault that there were only two (or so) GSRs in Eureka left to respond to gas emergencies. I reminded him that the work group had been stretched thin for years and our multiple pleas for proper staffing fell on deaf ears. It wasn't until Chris Nelson, the veteran supervisor, was already retired that management finally decided to give Eureka the manpower they needed. And this was not an immediate fix. It is well known, within the department, that it takes a GSR 3 to 5 years to gain competency in the job; due to the scope of responsibilities GSRs are tasked with. All the while our manager, Donnie Humphrey, was nowhere to be found. My experience gave me the foresight to brace for impact when the new supervisor reported to Eureka. Why didn't Mr. Humphrey's experience alert him to the obvious challenges inherent in this type of transition? If a manager expects a work group to trust him to resolve real world issues, he or she must put in the time. It is unrealistic to think that a visit once every six months will encourage the work group to "speak up" when something needs address, especially in the hostile work environment that Ryan Harriman created and Dan Campbell perpetuated. Where was our manager in all this? Why was there no guidance? OR where Ryan and Daniel doing exactly what they were instructed to do, silence the opposition?

This type of behavior is not "good faith personnel actions", it is gross incompetence and extremely dangerous in such a safety critical department as Customer Field Services and such a stressed and struggling industry as California energy.

*"Previous analyses of PG&E's safety record and management focused on specific areas. The NTSB focused on PG&E's design, operation and maintenance of its gas transmission and distribution activities and policies. The IRP's central focus was PG&E's pipeline integrity management, but **it expanded its scope to address such areas as emergency response and company culture."** Pg. I-5, Section D. Scope and Objectives*

A mountain of pressure is put on GSRs to perform to these enhanced metrics. My time with the company has provided a unique periscope to this fact. GSRs are the first person on site to ANY gas emergency, they are expected to hold incident command under such circumstances; acting as liaison to the public, emergency services and any media organizations that might be on site. They are evidence gatherers and mediators simultaneously. They leave their families in the dead of night and respond within a moment's notice. And they have done all of these things with little to no support from their leaders. I have seen this reality play out with my own eyes over and over again.

I am hard pressed to think of a department that has higher standards to adhere to. Everything GSRs do is tracked, monitored and recorded for federal and state record. GSRs are held to the highest standard of any department I have been exposed to. Oddly, I don't see that same sense of accountability demonstrated by the organizations put in place to lead and support them. In fact, the company has downplayed the role of GSR for at least as long as I have been one. The inherent risk of increasing the pressure without applying controls along the way to mitigate the effects is not theory, it is reality. And in the utility business, the consequences are dire and exponential. The fact that the controls, put in place to ease the pressure, failed me so miserably NEEDS to be addressed.

Thankfully, the company's dismissal of the department has never stopped Field Services from meeting and exceeding the company's expectations. In fact, Customer Field Services is one of the very few field organizations that has been able to boast progress when so many other departments are marred with controversy.

I have always been honored to be a part of this work group. It is with great sadness that I face the possibility that I may never be able to do the job safely again, due to my newly diminished state and the risks it would pose to those around me. Besides the fact that the leadership team under Donnie Humphrey has made it crystal clear that I am no longer welcome in the department I helped to build over the years. Certainly, the dismantling of one of the departments most esteemed members (albeit female) is not how you encourage open and honest communication.

6

I am well known throughout the department for my voice and prowess. I had long made my mark on the department when Mr. Harriman and Mr. Campbell were grappling to make theirs. I have seen the effect my dismantling has had on my immediate colleagues and it has not been positive. Not to mention the fact that I may never repair the damage done to the reputation I enjoyed before Ryan Harriman came to town. His slander and defamation was one of the main points of contention between us; although he could not recognize that fact or any other fact that shines a less than favorable light on his behavior.

*"At PG&E, the primary responsibility for safety rests with the various LOBs, in particular Gas Operation, Electric T&D, and Power Generation. **Ultimately, responsibility rests with each employee to be accountable for his/her own safety and the safety of co-workers and the public.** To achieve a unified culture at any large organization is challenging. **Culture is driven by management commitment; the behavior and personality of an employee's immediate supervisors and co-workers; and, to a lesser extent by "corporate speak."** The specific challenges and risks faced by gas operations, electric operations, other field operations and the various generating stations differ from each other and from those faced by corporate office workers. Maintenance and construction activities and associated risks differ between the LOBs. Hydro generation differs in many respects from fossil generation and from the risks associated with nuclear power. PG&E operates in a diverse, expansive service territory. Some of the facilities are remote, with minimal connection to the activities in downtown San Francisco. One should not expect precisely the same culture in each office, district or division. However, basic cultural tenets should be consistent throughout the organization." Pg. I-5, Section D. Scope and Objectives*

This is precisely the philosophy I have embodied during my many years as a PG&E field employee and long-standing safety leader. This is the core belief that keeps each individual safe and able to return to their families unharmed. Ironically, this is the exact principle I was trying to communicate to Ryan Harriman when he began his campaign of harassment against me. The PG&E I grew up in demonstrated this core belief on a daily basis. The boots on the ground still believe and adhere to it to this day. I would attribute the falling away from these core principles to the lack of subject matter expertise in management and their high level of turn over.

How can our first line supervisors lead effectively if they have no traditional understanding of the job function they supervise? How can a leader demand respect and "buy in" from a work group if they have not put in the time? How can you effectively lead such a robust and safety critical job function, if you have no appreciation or respect for the work they do, day in and day out? How do you optimize a work group with a "do as I say and not as I do" mentality?

I tried to explain the uniqueness of Eureka Service Center to Ryan Harriman. I thought the differences were quite obvious, but they seemed to be completely missed on him. He expected Eureka Gas Service to function the same way that Santa Rosa Gas Service did. I tried to tell him that was not a realistic expectation. Eureka does not have the manpower, nor do they have the surrounding support from other service centers. Eureka and Santa Rosa were not the same. The more I tried to break this down for Ryan, the more agitated he became. I was just trying to

speak up for my fellows. I had seen Eureka Service Center overcome impossible odds over and over again because we worked so well together as a team. Mr. Harriman's gross misrepresentations were as incessant as they were false. He had everyone in the yard doubting themselves and living in fear of being pulled in for discipline. As a long-standing company leader, I felt an obligation to try to speak sense into Ryan. But, my words only seemed to anger and antagonize him more.

*"PG&E made two significant changes in the early years following San Bruno to drive improvements in the safety culture: 1) the modification to its discipline policies and, 2) the emphasis on speaking up for safety. In May 2012, PG&E developed a behavior-based approach to discipline, replacing its previous matrix-driven approach to determining the level of discipline for various safety infractions. Previously an employee may have been fired for a violation of safety rules or a safety incident. With the change in policy, discipline following safety incidents or accidents was to be used only as a last resort. In order to remove any perception of punitive action, PG&E began referring to the discussion between an employee involved in a safety incident and his/her supervisor, as a "Safety Discussion." Consistent with the change in the discipline policy, PG&E began encouraging management and employees to report safety issues and to have open dialogue regarding potential safety concerns. Ultimately this led to a number of initiatives."* Pg. I-5, Section D. Scope and Objectives

Again, this is NOT AT ALL what Ryan Harriman and Dan Campbell demonstrated during the short time I worked with them. What happened to me is a painful example of the clear intoxication and subsequent abuse of power both men suffered from. Simply put, they did not like the sway I had with the group or the fact that I had no issue calling a spade a spade. I was simply not going to let the group be abused. Given the chance, I would intervene on their behalf again. The way Eureka was treated, by these two, was abhorrent. They both behaved like it was their own personal playground. and with such an absentee up-line, it wasn't difficult for them at all. In fact, it sounds to me like not much has changed. Their approach has proven to be quite effective. After all, they successfully silenced the one person with the experience and swagger to stand up against their tyranny. Lucky for Dan Campbell, he has had free unchecked reign ever since.

A prime example of this is when Dan Campbell (in one of his first tailboards as supervisor) was urging the group, to "just use a redwood plug" in the event of a blowing pipeline rupture. He even said, "he would go to bat for us" if we got caught. I laughed loudly at the suggestion. As if he held that kind of power! Maybe in his head he did, but in reality if he even tried to "go to bat for us" (which I didn't believe for a second) for doing something so stupid, he'd most certainly be shown the door as a response.

Thankfully, ALL of the veteran GSRs in the room immediately balked. But there were two BRAND NEW GSRs sitting in the room and the damage was done. It was the very next tailboard that one of the rookies asked the group, "I know what the procedure says. But tell me how we really do it." I couldn't believe my ears. I would've responded but the group beat me to it. I couldn't have been prouder when the veterans all said in unison. "No really! You follow the

8

procedure!". This was what I loved about Eureka. We all, for the most part, saw things eye to eye. I was glad when Brad and Dale stepped up and set Dan straight later on. It's unfortunate the lasting impression he made on the rookies that day. Once an idea like that sets in, it's difficult to uproot. That has been my experience.

THIS is the behavior that PG&E is elevating and rewarding right now, a supervisor that tells his group to defy long standing company safety procedure in one of the most dangerous ways possible, because the idea of "blowing gas" makes HIM nervous. A competent GSR holds a healthy respect for blowing gas, but it does not create anxiety in us; it drives focus. The same way adhering to procedure builds security and confidence. If Daniel had ever held the job he supervises, he might have known that. Had he ever read the procedure he was encouraging the work group to ignore; he may have held a different perspective. Had Daniel Campbell ever responded to a safety incident that created catastrophic loss of life and property, he may have known better than to make such a preposterous suggestion at group level with two new GSRs in the room.

### "1. PG&E employees at all levels are committed to safety." Pg. I-6, Section E. Key Conclusions

I would argue that Linda Floyd, Glenn Pritchard, Daniel Campbell, Ryan Harriman and Donnie Humphrey do not fit this category. A commitment to safety is exercised day in and day out. It is evident in one's safety record and in the work produced. My contribution to the company in this regard is something that, no matter how hard they try, they cannot take away from me. I argued with Ryan Harriman that Safety is not only expedient it is cost effective. The behaviors that I witnessed, from the above named, reflected a hyper focus on the bottom line (which translates into a bigger STIP check for them) rather than an appreciation for the positive lasting effect a strong safety culture would have on the bottom line. Christopher Nelson, though nontraditional, had no problem balancing these two concepts.

They were all, when given the opportunity, more interested in their own image, enrichment and advancement, than they were working together as a team to produce the best possible result for the company, the shareholders and the community at large. That was my repeated experience of all of them.

*"PG&E has made positive strides in embedding a safety consciousness throughout the workforce; however, a cultural divide still exists between corporate and the field."*

*PG&E has placed a heavy emphasis on training to improve safety performance and promote a positive safety culture. Many of these programs are good; however, the sequence and timing of training means crew foreman safety training may not be complete until 2019." Pg. I-8, Section E. Key Conclusions*

This "timing of training" statement lightly touches on an important training issue that was material to my collapse. The day I had a severe panic attack that left me unable to finish my

9

workday. I had been pulled in for "mandatory training" five hours before the actual start of my shift.

The group had been working a great deal of overtime to accommodate an inflated compliance schedule. Eureka had 5,000 gas meters that needed to be remediated for atmospheric corrosion by the end of the year. It was mid-October. Gas meter work can be very physically demanding. It is hard on the knees, back, arms and shoulders. Any gas meter that is approached must be brought to certain standards. That can be a lot of work, depending on the condition in which it is found and the reason for the visit.

We were all tired. I work the night shift because I am not a morning person. I do my best work at night and my advanced training level made me a perfect match for the unique emergency response needs in Eureka. I had a deal with the previous supervisor that I would work overtime to help share the load, but that I would come in at 10am instead of 8am, like the others. This helped me ease into the day and kept me fresh for the two hours a night I was expected to cover the territory alone., I have always been very conscientious about managing my mental and physical health in relation to the very demanding job I do. It has proven time and time to be a winning approach. I have always spoken frankly to front line supervision and provided them with open and honest communication around my needs and methods of operation. At this point, the symptoms, I was experiencing in early 2017, had grown almost completely dormant thanks to the positive changes I made in my life in the years before (The EMDR therapy I paid out of pocket for, getting away from the academy, moving to a slower paced and friendlier environment and finally entering into a very positive and loving relationship). All of these things had a very positive effect on the symptoms that moved me to initiate my search for care in January of 2017.

I was agitated that morning because I was familiar with the training that we were being "mandated" to attend. I knew from my experience at the academy that Plastic Refresher Training was NOT a Gas Service course. I thought it was tone deaf to pull us in at the end of a long and arduous year to attend a course that held five minutes of relevancy for Gas Service. I could not understand why they didn't just utilize me to do the five minutes of training the group required. After all I was still certified as a trainer AND OQ evaluator. Christopher Nelson often used me to fill this role. He seemed to be grateful to have my experience and expertise on the team. It would have been ridiculously easy to just have me go over the required training material, rather than pull us all in on OT, to sit for six hours in a training session that was not relative to our department at all. But, I was willing to give the instructor the benefit of the doubt. I waited until he reviewed the "Target Audience" slide and when I confirmed that Gas Service was not on the list. I protested. The instructor was savvy and came up with a great solution. He would rearrange the training to review the five-minute section relative to Gas Service and then let those who wanted to go out and work do just that. I thought it was a perfect solution and was impressed with the instructor's ability to pivot so adeptly. It's exactly what the Instructor Excellence Program trains instructors to do in such circumstances. Apparently management didn't share my enthusiasm. They were pretty pushed out of shape that I dare defy their orders and we were all brought in AGAIN, a few weeks later, to review the

10

SAME information we went over that day. Later on that week, I was having a conversation with my former colleague, Jose Leal, and he said, "Did you hear someone walked out of training?!" I said, "Yeah! It was me! You guys need to get your S**T together. GSRs do NOT belong in Plastic Refresher Training" At this point I was completely done with the academy's indolence and had lost all political correctness. I'm certain it didn't take more than a moment after he got off the phone for him to run to Glenn and then for Glenn to run to Linda Floyd (or whoever) and BAM. There I was right back on the academy's radar. Two weeks later Ryan Harriman began his campaign of harassment against me and four months later I was being slandered all over the yard and pulled in on trumped up charges. The fact that Mr. Harriman insisted he was getting pressure from above only cemented my suspicions that Linda Floyd had made a phone call and put a flag over my head. It would be perfectly in line with the warning I received regarding BOTH Linda Floyd and Glenn Pritchard. I was told to "watch my back" from individuals that had worked with them in the past. Later that day is when the panic incident occurred and Ryan Harriman became aware of my disability.

*"There is limited company-wide communication regarding PG&E's overall safety culture strategy. PG&E's primary approach to first communicating its post–San Bruno approach to safety was through the Safety Leadership Workshops in 2012 to 2014, and the leaders' follow-up discussions with employees. Although not part of a specific or unified campaign, **the overarching message PG&E has been striving to instill in its workforce is that nothing is more important than safety and employees should "speak-up" where safety is concerned.** PG&E has made significant strides in this area; however, this belief is not yet firmly and fully entrenched within the organization. **The need to improve the "speak up" culture was identified in 2012 and 2014 surveys, but the PG&E did not implement a "Speak Up" campaign until fall 2016.** Pg. I-9, Section E. Key Conclusions*

My dismantling is a clear indication of the company's <u>true</u> commitment to a "Speak Up" culture.

*There are also indications that corrective actions related to incident investigations may not be shared with other LOBs on a timely basis or may be "lost" amongst the many other communications. PG&E recently replaced Electric T&D's Rapid Incident Notification System (RINS) with other systems. RINS gave Electric Supervisors a daily summary of safety incidents and outages from the previous day. It is too soon to predict the impact this may have on the field." Pg. I-9, Section E. Key Conclusions*

I can prove that this is true. I submitted many CAP items, all of which claim to be resolved, none of which actually were. The Corrective Action Program is a running joke in the field. It has proven itself to be feckless and those administrating the CAP Program have repeatedly demonstrated a "check the box" mentality when it comes to completion and resolution of CAP concerns. It's unfortunate as CAP is one of the better ideas the company has produced in a long time.

*"The need for clear definition of supervisory requirements, including an assessment of workload requirements, ongoing field monitoring efforts and time requirements, and*

11

***associated staffing levels."*** *Pg. I-10. Section F. Critical Recommendations*

There seems to be no accountability for leadership. I have discovered during my time with the academy that the indolent cover for each other and the diligent do all the work the indolent don't do. Management is well known for this. I have heard many talented employees express to me that this is precisely why they refuse to get involved in management. It, in fact, is the biggest reason why I left management. I found my ethics just weren't flexible enough for them and I was exhausted from holding up the heavy end of the log without appropriate compensation or recognition.

***"Reevaluate the travel requirements placed on employees to reduce the overall mileage driven. Accelerate the use of mobile technology and electronic information exchange. PG&E employees drive a significant number of miles per year and are frequently called upon to support workload at great distances from their normal assigned locations."***

*Pg. I-13, Exhibit I-1 Summary of Recommendations, Recommendation V-6/Field Operations*

This would have been helpful during my time with the academy. In 2014 I traveled a total of 5,888 miles, teaching remotely and learning the hard way how to teach on the fly. In 2015, I traveled a total of 5,766 miles. In 2016, I traveled 4,255 miles. All while my male counterparts enjoyed their comfort zone at the academy campus, with its cafeteria, its Smart Screen, its onsite support, it's multiple break rooms with all the goodies you could eat. Incidentally, I was chosen to be the instructor that would spearhead the Virtual Learning experience, one of the tools used to mitigate the issue of excessive travelling for employees as it relates to training.

I moved to Eureka in September 2016. Needless to say, I was physically, mentally and emotionally exhausted by the time I returned to Gas Service on October 3, 2016. Of course, I had to hit the ground running. That's the PG&E way. It didn't help that 2017 and 2018 were such problematic years for PG&E. Customer Field Services was one of the work groups directly impacted. The fact that Eureka was already shorthanded when I got there, didn't help matters much at all. I tried desperately to communicate to my peers and to my supervisor that that I had to "basically relearn" Gas Service because my time teaching was largely spent elsewhere. No matter how many people I tried to tell this to, my words just washed right over them.

As always, I rose to the occasion and, against unbelievable odds, had regained my "field legs" within the year. By the time I experienced my collapse I had never felt more confident or more secure in my profession. My time at the academy, working in so many different fields of Gas Operations gave me a unique advantage as a first responder at night by myself. I had never felt more at ease or more competent in my job. I was mixing well with my peers and I had finally been able to purchase a home. I had entered into a healthy and enriching relationship with a man that was emotionally mature and focused on building a better life together. Life had never been better. Unfortunately, that was all about to change in one of the most humiliating, demoralizing and dehumanizing ways possible. The damage front line supervision would do to

12

the life I had worked so hard to build would prove over and over again to be exponentially destructive and damaging to my psyche and to my physical wellbeing.

*Develop and implement a strategic communications plan that does not*
*overwhelm employees with too much information, but effectively*
*addresses the issues identified in the January 2015 Monitor 360 Study,*
*the 2016 Premier Survey (and PG&E's narrative analysis.)*

*Pg. I-15, Exhibit I-1 Summary of Recommendations, Recommendation IX-1/Communications*

Management is horrible at this when it comes to Gas Service. They just keep piling on the responsibilities, raising the bar and ignoring the concerns; all while their workload goes largely unchecked. They pay no mind to the inherent pressures they are tasking their work force with. Maybe that is precisely why they prefer inexperienced leaders. It's much easier to press hard on someone when you have no frame of reference for the weight you are imposing. In fact, Donnie Humphrey had a choice between a twenty plus year PG&E Gas Service veteran and a greenhorn from out of state. His choice was a surprise to NONE of us in the field.

*"Assess the effectiveness of the 2016 Speak Up Culture campaign,*
*particularly among field resources."*

*Pg. I-15, Exhibit I-1 Summary of Recommendations, Recommendation IX-4/Communications*

What a lucky coincidence that upper management has my dismantling to use as an example to pull from. Too bad I still to this day can't get ANYONE to listen to me or take me seriously. Instead, I have only suffered more insult and compounded injury. The "witness testimony" provided on June 18, 2020 is a prime example of this. It's almost like they don't mean ANYTHING they say in this regard. How many opportunities must they squander before I am allowed to make that assessment, I wonder?

*"Evaluate the adequacy of the information captured by various incident*
*tracking systems (SEMS, CAP) to ensure it is sufficient to understand*
*the causes of incidents, perform trending analyses and other analytics,*
*and provide timely information. Improve CAP, near hit and incident*
*tracking and reporting systems to increase the clarity of the information,*
*ensure the appropriate level of causal evaluation has been assigned and*
*that all required actions have been taken before an item is closed."*

*Pg. I-15, Exhibit I-1 Summary of Recommendations, Recommendation X-1/Corrective Action*

CAP is a joke. It's a black hole. The only resolution I have experienced from submitting issues to the CAP, is to have a target put over my head. I have several examples to pull from, if anyone is interested.

*"Develop a protocol involving concise, targeted, timely communications
to notify other crews, work locations and LOBs of incidents or corrective
actions that are applicable to that group."*

*Pg. I-16, Exhibit I-1 Summary of Recommendations, Recommendation X-7/ Corrective Action*

I believe that the Lean Program was meant to address this challenge. When Karras Moore came up to give the presentation, I was excited. The Lean Program seemed very promising. It seemed to be comprehensive and easy to execute. Unfortunately, Eureka would never get the chance to implement it (at least while I was there). Neither Ryan Harriman nor Daniel Campbell hosted ANY problem-solving sessions. I wouldn't be surprised if Mr. Campbell still hasn't. And he boasts of his experience as a Lean Coach before he came to Field Services. It's too bad, because I saw the potential right away. But I also saw that it would require work on the supervisor's part. The follow up and investigation process alone would require time and energy.

*"Consider the implementation of a performance-based ratemaking mechanism with a fixed
component based on traditional ratemaking principles and a variable adder based on
safety performance. Both components should have defined ranges. Safety performance
can be defined in a variety of ways. As with any incentive mechanism, the potential for
gaming is real. NorthStar's recommendations to PG&E, includes items that should
provide a greater tie between safety performance and executive compensation.*

- ***NorthStar has recommended that PG&E reevaluate the appropriateness of the
Earnings from Operations component of the STIP due to its lack of transparency and
the ongoing adjustments for Items Impacting Comparability.***
- ***NorthStar recommends that PG&E increase the weighting of safety in the LTIP to
more closely align safety performance and executive compensation." Pg. I-17, Section H.
Recommendations for the Commission***

I have a sneaking suspicion this was the core motive for Linda Floyd's management style. That, and the incompetency and abuse executed by Linda Floyd's leadership team is why most of the talent left the building and why the academy struggles to meet their compliance requirements to this day.

I was tipped off to this fact when Crystal Fugere achieved a 7% raise in her first year as a RIM Coordinator. I was told that number was practically unachievable when I worked as an academy instructor. I was told I really had to "move the needle" to get more than 3%. I was of the opinion that the innovation, dedication and agility I brought to the table was something management would want to reward and encourage. HA! How naive I was. That said, I'm a quick study. I figured if I was going to be stuck at 3%, I might as well go back to the field and rake it in with overtime. In my first year back to Gas Service I made nearly as much as I did when I was an instructor. This is one of the biggest reasons why some talent refuses to participate in management most of the time. There is no money in it unless you're part of the "Good Ole Boys" club, then the possibilities are endless. I thought the academy would be different. I was

14

lured in by the thought of actually making a positive impact on the company and California as a whole. Again, I couldn't have been more wrong.

Perhaps that is why Ryan Harriman and Daniel Campbell took the approach they did. For some, it's all about money and status. For me it's all about safety, supporting my peers and the providing excellent service to the customer.

*"Work planning and preparation has a significant impact on job safety." Pg. I-17, Section H. Recommendations for the Commission*

This was exactly what Ryan Harriman was neglecting while he was busy trying to be "one of the guys". He seemed to pick and choose what supervisor duties he focused on. He seemed to enjoy the command and control part of the job and was much less interested in the support part of the job. He didn't have time to worry about such arbitrary things as work planning and preparation. Unfortunately, I was at the butt end of his neglect, more times than I can count. As the last person on shift, it all flowed down to me. This was the biggest reason for my agitation with Dispatch. I was hard pressed between the indolence of dispatch and the negligence of Mr. Harriman. There were MANY times their absenteeism had a directly negative effect on my workload for the night and ultimately what I was face with when everyone went home. Dwayne, the North Coast PM dispatcher was famous for leaving his desk. I actually had another dispatcher tell me that he was making dinner for "the girls" every night in the break room. He was particularly vacant when it came to change of shift. Brad worked diligently to make sure the work was cleared before he went home at night. When Brad wasn't there to harangue Dwayne into doing his job, I felt how absent Dwayne really was. Dwayne would just let the work pile up on my screen and make no effort to spread it around or keep a couple guys over to clear the work. The reality of Eureka was that after everyone went home at 4:30pm, that was when it started to jump. After all, when do folks call in leaks? When they are home, of course. Brad and I were the only ones on after 4:30pm. He was kind enough to make sure everyone completed their work before they went home. He had that kind of rapport with the guys. He also made sure my screen was clear before he went home. He was a valued ally to me in Eureka. We worked incredibly well together. It is rare to have the luxury of such comradery. This is the biggest reason why I adamantly stood up when the bullying commenced. These guys were my brothers. I took care of them and they took care of me. Construction had the same rapport with Brad and that called for a seamless transition when Gas Service needed to turn jobs over to Construction and vice versa. I had never seen anything like it. It is much more common for Gas Service and Construction to be at odds. But not in Eureka. We were a well-oiled team and referred to each other as family. When Ryan Harriman started spreading rumors that Eureka needed "fixing", I sternly disagreed. I took it personal, because it was. I had seen us excel together as a team, time and time again. Ryan's portrayal of Eureka to the rest of the department was uncalled for and just plain mean. He seems to be the kind of person who is not happy unless he is being exalted and others are being repressed. He clearly has a superiority complex and enjoys bullying others into submission. It's disgusting and I wasn't going to stand for it; not on my watch.

15

*"Retrained its leaders to promote an open exchange of ideas rather than a command and control environment."* Pg. I-18, Attachment 1: Significant PG&E Safety-Related Accomplishments since San Bruno

Command and control is exactly how I would describe Ryan Harriman and Daniel Campbell's leadership style. I find this approach to be the default for the inexperienced and the unimaginative. I got the distinct impression that both men were getting pressure from above to lead in this manner. In fact, Ryan Harriman said as much multiple times.

*"Added a risk propensity component to its hiring process for higher safety-risk positions."* Pg. I-18, Attachment 1: Significant PG&E Safety-Related Accomplishments since San Bruno

Too bad this approach isn't used in Customer Field Services front line supervision. When Daniel Campbell was hired, the company had a choice between a 25-year veteran Gas Service Rep and a greenhorn from Locate and Mark. (one of the departments who's record keeping and business practices have recently come under scrutiny). And Donnie Humphrey chose the latter.

I cannot think of a more "safety-risk" position than the folks who leave their homes in the middle of the night to respond to gas emergencies. But, for some reason, the company doesn't think that work group deserves experienced leadership. The reason is quite obvious, it's much easier to get an individual to press hard on a work group if they 1. Have never worked with the folks they are pressing on and 2. Have no frame of reference regarding the inherent pressures and challenges of the work they actually do in the field.

When I was an academy instructor, I queried many a "nontraditional" supervisor and found most of them to be pompous and unwilling to recognize their handicap. The ones that are willing to recognize their blind spots actually turn out to be pretty good supervisors. Chris Nelson is someone I would put in this category. He had never done the job, but he was mechanical and had decades of experience with the company, He spoke the language and if his knees allowed would have made a great GSR.

Furthermore, he wasn't shy about giving us what we needed to be successful. We didn't always see eye to eye, but he was able to respect my level of professional expertise. In fact, I rarely heard from him at all. I got the distinct impression that he recognized that I was not a concern for him. He knew I was competent and he gave me the appropriate space to get my work done. I respected that. I knew losing Nelson was going to be a BIG shift for the group. We all had a lot of anxiety around it. That said, I had NO idea how bad it would get. My anxious anticipation paled in comparison to what ACTUALLY happened to me when Chris Nelson left the company. I never in a million years thought I would be in the position I am today. No amount of experience or training could have prepared me for what was about to happen to me or how painfully exhaustive my quest for restoration would prove to be.

16

*"On September 9, 2010, at approximately 6:11 P.M., a portion of PG&E's 30-inch diameter underground natural gas transmission system (Line 132) suddenly ruptured. Operating at approximately 386 pounds per square inch gauge (psig), the pipeline was located under the asphalt paving at the intersection of Glenview Drive and Earl Avenue in a residential area of San Bruno, California. Installed in 1956, the 28-foot long section of Segment 180 Line 132 that failed consisted of five segments which were propelled into the air and landed about 100 feet away. An explosion ensued, fueled by blowing natural gas. The explosion and fire resulted in the loss of eight lives and the total destruction of 38 homes. Seventy homes sustained damage and eighteen homes adjacent to the destroyed dwellings were left uninhabitable."* Pg. II-8, Section B. Events Leading to the Investigation

This event forever changed my approach to the job. I'll never forget driving home that night on Northbound 101 in San Carlos and seeing that huge fireball on the hill in San Bruno. I had just taken a day shift, from the 4 p.m. to 12 a.m. shift I had been doing for almost a year. My replacement was one of the first on the scene. I remember the look in his eye the next morning when he described seeing a burnt cadaver in the wreckage. He tried to appear untouched, but I could see that he wasn't. It was difficult for me to hear about, I can't imagine having actually been there to see it with my own eyes. I was glad when I was chosen to be one of the group that were tasked to canvass the adjacent neighborhood the very next night and offer free "safety checks" to those who wanted it. That was when I met Joe Ruigomez' cousin. I'll never forget the look in his eyes either, as he described how his cousin, Joe, was maimed. He described how Joe's girlfriend; Jessica was incinerated right in front of Joe as he desperately tried to save her. Joe's hands, arms and upper body were badly burnt as a result. I was the Area 1 Safety Chair at the time. I was tasked to bring some semblance of reason to the work group after this horrific tragedy. I decided to cut right to chase and speak on "Personal Accountability". I fashioned my entire presentation around the concept at our very next annual Safety Kick Off in early 2011. I did not see any value in candy coating it or spewing the same canned safety message we had heard over and over again. I respected the work group more than that and wanted to honor the victims. I believe I did that. I know that I had an entirely captured audience. It was one of the few times I presented without any flak from the work. They all listened attentively and offered great commentary afterward. I could see that the entire group had felt the impact. I was glad to see that my hard-hitting approach landed well. I'll never forget the lives that were lost that day. This is one of the biggest reasons why I jumped at the chance to work with the Gas Academy. I shared my experience at group level many times. and every time I received that same deafening silence and undivided attention. See, the boots on the ground have a profound desire to do what's right and to honor the safety of our customers in relation to these two very dangerous commodities. I've experienced that time and time again, as I traveled far and wide throughout the territory and taught in a number of different capacities. It discourages me greatly to see what the inexperience in middle management, that really began to take hold around 2008, has done to this company. I can only say that it has NOT been positive, not at all. The experience gained in the field is invaluable. It is the exact heat that treats and hardens the unique steel of PG&E utility workers. The incessant hammering of field work pounds us into the precision tools we need to be to keep our communities safe. There are a few shining exceptions, like Christopher Nelson, but most of the

inexperienced leaders are pompous and puffed up and feel like they have nothing to learn from their direct reports. This is a liability just waiting to happen and everyone sees it except those in a position to do something about it, like Donnie Humphrey.

*"This dysfunctional culture, the IRP Report concluded, appeared based on excessive levels of management, inconsistent presence of subject matter expertise in the management ranks, an appearance-led strategy setting, an insularity that impeded its ability to judge its effectiveness, and an overemphasis on financial performance. The IRP also cited a lack of "process excellence," which was explained as a failure of communication resulting from siloed, or segregated, business enterprises that should have, but failed to, communicate with each other. Importantly, the IRP indicates that PG&E's company culture failed to explain and acculturate the live link that must be maintained between the executive, management, and field operations ranks; between individuals and their actions; between divisions and subdivisions; and between processes, functions, and overarching safety goals."* Pg. II-8, Section B. Events Leading to the Investigation

I could not agree with this statement more.

*"Organizational accidents have multiple contributing causes, involve people at numerous levels within a company, and are characterized by a pervasive lack of proactive measures to ensure adoption and compliance with a safety culture. Moreover, organizational accidents are catastrophic events with substantial loss of life, property, and environment; they also require complex organizational changes in order to avoid them in the future."* Pg. II-8, Section B. Events Leading to the Investigation

This has been a struggle my entire career. My hypervigilance makes me an incredible value add to Customer Field Services. I have keen instincts and have no trouble seeing the writing on the wall. I am proactive and focus on how to AVOID the hazard, not how to REACT to it. I credit this approach as the main contributing factor to my pristine safety record with the company. In fact, this was the <u>exact</u> concept I was trying to convey to Mr. Harriman when he began his campaign of harassment against me.

*"NorthStar believes that a strong safety culture requires commitment and accountability throughout an organization. A Company's leadership and executive management must display a positive commitment to safety that is recognized by all. This commitment must be evident in the actions of management and the support they provide to the workforce. The organization must provide its people with the tools, resources, training and oversight necessary to ensure safe operations. Rules and requirements must be clear and consistent. Management must take a thoughtful approach to incidents and the implementation of new rules and standards. Employees should feel accountable for their own safety and the safety of their co-workers. They should feel comfortable stopping work during unsafe conditions or stepping in if they see another employee placing themselves, others, or the public at risk. Employees should feel comfortable reporting potential hazards and incidents without fear of*

*retribution as these can provide valuable lessons learned to improve safety practices. Disciplinary procedures should be consistently applied, recognizing the difference between human error, process defects, insufficient controls and a wanton disregard for safety rules."*
Pg. II-11, Section C. Safety and Culture

I could not agree more. These are the exact fundamental principles I was trying to express to Mr. Harriman on October 29, 2019. He expressed to me that he was "just trying to save the company five dollars". He seemed genuinely unable to make the connection of how costly loss of life, destruction of property and employee injuries and lost workdays are for the company. He also didn't seem to mind squandering more dollars than that when he was passing out overtime like it was candy to the group to win their sympathy.

*"The Audit Committees also were actively involved in and responsible for assisting the Boards in overseeing the implementation and effectiveness of the Companies' legal compliance and ethics program, through those Committees' review of program design and effectiveness in PG&E as a whole as well as in specific lines of business."* Pg. III-2, Section A. Background

Compliance and Ethics has proven itself to be ineffective at best and complicit at worst. Several of my colleagues and myself tried to use this avenue when we were abused and were instead left exposed to retaliation and our issues unresolved. There is a very long list of overtly talented employees that left the academy due to mismanagement and outright abuse.

What hope does the workforce have when their only avenue to report unethical behavior is, itself, unethical and corrupt? Compliance and Ethics is nothing more than another facade the company uses to impress their shareholders and regulators; all bark, no bite. That has been my experience.

*"Grass Roots Safety Teams (in existence prior to San Bruno)"* Pg. III-15, Exhibit III-5, PG&E Safety Initiatives

I was part of the original charter for the Grass Roots Safety Committee. Safety has always been a passion for me. Nothing is more important to me that coming home safe to my family. As a single mother, this ONE responsibility towered above all the rest. I recognized very early on that a sharply honed safety mindset is the foundation for everything we do in the field and everywhere else. These are very dangerous commodities we provide. I am grateful for the wisdom I have been blessed with in this regard. My immaculate safety record (before Ryan Harriman) attests to my commitment along these lines.

My passion for safety was what many had come to know about me. I genuinely cared very deeply about the safety of those around me. After all, I spent more time with these people than I did my actual family. My history of dedication, creativity and innovation in regard to safety is something that Daniel Campbell, Ryan Harriman, Donnie Humphrey, Glenn Pritchard and Linda Floyd can never take from me. They may have slandered me, defamed me and stripped me of

my dignity but the high level of performance I emulated around this important aspect is forever etched in stone.

**"Communication tends to be one-way from leaders down, and collaboration with front-line workers is perceived by workers to be non-existent.."**

My experience is a clear demonstration that this concept is not simply perception it is fact.

*"The different state of each LOB's journey along the safety curve was evident in interviews and meetings.*
*- DCPP culturally differs from the rest of the organization given the level of regulation and oversight, and is generally viewed as distinct and different by other utility functions.*
*- Substation and Power Generation are viewed by some as having better safety performance and a better safety culture than other organizations.*
*- The culture at 77 Beale and 245 Market, differs from that in San Ramon.*
*- To some extent, the culture reflects the outlook of each Officer or Director." Pg. III-20, Section C. Findings and Conclusions*

This is very true. I was surprised to see such a "check the box" approach to the safety program under Linda Floyd. I had much more enriching experiences in the field in regard to conversations around safety. The folks with daily firsthand interaction with the commodities have a clear understanding of the connection between a well-honed, proactive approach to safety and their safe return home. They don't take it for granted. They know how dangerous their jobs are and they behave appropriately in this regard.

The folks in the office buildings, from my experience, obviously live a much more insulated life and it is reflective in their safety programs (At least the few I have experienced firsthand). It is also reflective in how they interact with the field personnel they are meant to support. Take, for example, dispatch. It was surprising for me to see how difficult it was for my dispatcher and his supervisor to connect how important it was for him to answer the phone for the first responders he supported. Dispatch has the Police Department, Fire Department, Emergency Services, Supervision and Gas Control all at their fingertips. Why wouldn't they be compelled to answer the phone for GSRs given this fact? Aren't they our first line of defense when out in the field alone (in most cases)? Especially during a time when PG&E's public image is so strained. Service trucks are being shot at in the field?! How "at risk" does this work group need to be before management takes their position seriously? Why are GSRs held to such a high standard, where they are threatened with discipline if they do not answer their phones, but dispatch is allowed to squander their responsibilities in this regard over and over again? Why is it that when management is faced with a challenging issue they are allowed to simply ignore it? Are they not expected to lead by example? I am truly baffled by the different set of standards set forth for field workers and office workers. Why wouldn't the most vulnerable work group be treated with the highest regard? I don't see how the company expects to improve their performance around safety with these double standards in place. It does not seem realistic to

me at all. Simply put, I have been off of work for over a year and not one leader in the company has tried to address the egregious behaviors that put me in this position. That is deeply concerning to me and should be for any resident and ratepayer of California. I am genuinely concerned for the future of the company as it relates to this safety culture assessment. From my experience the exercise of this assessment has been nothing more than a façade to satisfy the CPUC and their shareholders and make it appear that something is being done, when it clearly is not. I believe this is the largest contributing factor to my injury. When faced with these two opposing realities it was simply too much for my psyche to take. How many times must a disabled worker reach out for support only to be ignored, abused, harassed, slandered, defamed and wrongfully disciplined before the company is willing to take accountability for its malfeasance? The question is rhetorical but the consequences, for me, are not. The very physical symptoms of trauma I now live with on a daily basis are very real. The grief, loss and emotional pain I feel around this experience is as well. I absolutely LOVED my job and I was damn good at it. The fact that the company has so wantonly ignored their responsibilities around my disability not only adds insult to injury, it jeopardizes their ability to fulfill their commitment to California. My reputation and perfect safety record has been squandered and destroyed. I have done nothing to deserve ANY of this barbaric treatment. I performed my due diligence at every turn. Every system put in place to support me, failed me; and I am the only one experiencing any consequences at all.

**DECLARATION**

I, the undersigned, declare under penalty of perjury that the statements made in the above declaration are true and correct to the best of my knowledge, information and belief.

Signed / Christina Goerss/Employee ID: 00113690                    Date